**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| DARLENE GIBBS, STEPHANIE EDWARDS, LULA WILLIAMS, PATRICK INSCHO, and LAWRENCE MWETHUKU, *on behalf of themselves and all individuals similarly situated*, :<br><br>Plaintiffs, :<br><br>v. :<br><br>HAYNES INVESTMENTS, LLC, L. STEPHEN HAYNES, SOVEREIGN BUSINESS SOLUTIONS, : LLC, VICTORY PARK CAPITAL ADVISORS, LLC, VICTORY PARK MANAGEMENT, LLC, SCOTT ZEMNICK, JEFFREY SCHNEIDER, AND THOMAS WELCH, :<br><br>Defendants. : | Civil Action No. _3:18cv048_____ |

## CLASS ACTION COMPLAINT

Plaintiffs, Darlene Gibbs, Stephanie Edwards, Lula Williams, Patrick Inscho, and

Lawrence Mwethuku ("Plaintiffs"), on behalf of themselves and all individuals similarly situated,

by counsel, and for their Class Action Complaint against Defendants Haynes Investments, LLC,

L. Stephen Haynes, Sovereign Business Solutions, LLC, Victory Park Capital Advisors, LLC,

Victory Park Management, LLC, Scott Zemnick, Jeffrey Schneider and Thomas Welch

(collectively "Defendants"), they allege as follows:

### INTRODUCTION

1.      Most states have usury and licensing laws that limit the amount of interest that a

lender can charge on a loan. To evade usury and licensing laws, payday lenders originated their

loan products in the name of national banks, who were exempt from state interest-rate caps under

the National Bank Act. *See* 12 U.S.C. § 85. Under these arrangements, the bank served as a conduit

1

for the loans in exchange for a fee, but the payday lender funded, serviced, and collected the loans—a tactic known as "rent-a-bank." When federal regulators began cracking down on these arrangements, the payday lenders developed a solution—they used Native American tribes as the conduit to ostensibly cloak the loans in tribal sovereign immunity. *See, e.g.*, Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012) (providing background on payday loans and describing the "rent-a-tribe" model as "the most recent incarnation of payday lending companies regulation-avoidance").

2.      This case involves a rent-a-tribe enterprise funded and partially operated by Haynes Investments and Victory Park. Through an association with Think Finance, Inc.,[1] and several other companies, Defendants provided the capital used to make high-interest loans to consumers in the name of Plain Green, LLC ("Plain Green"), and Great Plains Lending, LLC ("Great Plains")—two entities formed by Native American tribes. Although tribal entities were held out as the actual lender of these internet loans, Haynes Investments and Victory Park provided the capital used to fund the illegal loans and, in return, generated large profits from their investment in the schemes. Haynes Investments and Victory Park used the profits to continue to expand the portfolios of Plain Green and Great Plains—resulting in the unlawful collection of more than $69.4 million dollars from Virginia consumers in the last four years alone.

3.      L. Stephen Haynes is the owner and managing partner of Haynes Investments. Scott Zemnick, Jeffrey Schneider, and Thomas Welch are partners at Victory Park. Each of these individuals participated in their respective firms' decision to invest and reinvest in the enterprise.

---

[1]  Plaintiffs filed a related case against Think Finance, its chief executive officer (Kenneth Rees), and some of the other companies involved on May 19, 2017. *See Gibbs v. Rees*, 3:17-00386 (MHL) (E.D. Va.). On July 11, 2017, Plaintiffs filed a related case against Plain Green and Great Plains. *Gibbs v. Plain Green, LLC*,  3:17-cv-495(MHL) (E.D. Va.).

They also actively participated in the enterprise's affairs and helped design the financial and operational structure of the rent-a-tribe scheme. As a result of their participation in the enterprise and direct involvement of the underlying illegal conduct, the individuals are jointly and severally liable for the Plaintiffs and the class members' claims.

4.      Based on Defendants' conduct, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. Defendants received millions of dollars derived from the collection of unlawful debt, and Defendants used and reinvested this income to grow the rent-a-tribe enterprise. Further, Defendants acquired and maintained interests in the rent-a-tribe enterprise, actively participated in the scheme, and conspired with Think Finance and others to repeatedly violate state lending statutes resulting in the collection of an unlawful debt from Plaintiffs and the class members. Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962(a)-(d).

5.      Plaintiffs also assert a class claim for violations of Virginia's usury laws. Because the loans exceed 12% annual percentage rate ("APR"), they are null and void and neither the lender nor any third party may collect, obtain, or receive any principal, interest, or charges on the loans. 15 U.S.C. § 1541(A). Accordingly, Plaintiffs and the class members seek to disgorge all amounts paid by Virginia consumers in excess of 12%, plus twice the amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorneys' fees and costs. Va. Code § 6.2-305(A).

## **JURISDICTION**

6.      This Court has jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover,  the Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiffs Darlene Gibbs and Lula Williams are residents of this District and Division and a substantial part of Plaintiffs' claims occurred in Virginia.

## PARTIES

8.      Plaintiff Darlene Gibbs ("Gibbs") is a natural person and resident of the Richmond Division.

9.      Plaintiff Stephanie Edwards ("Edwards") is a natural person and resident of the Commonwealth of Virginia.

10.     Plaintiff Lula Williams ("Williams") is a natural person and resident of the Richmond Division.

11.     Plaintiff Patrick Inscho ("Inscho") is a natural person and resident of the Commonwealth of Virginia.

12.     Plaintiff Lawrence Mwethuku ("Mwethuku") is a natural person and resident of the Commonwealth of Virginia.

13.     Defendant Haynes Investments, LLC ("Haynes Investments") is a limited liability company with a principal place of business in Dallas, Texas. Haynes Investment is a private equity company focused on investments related to Native American tribes. Haynes Investments claims that its "Native American investments have successfully monetized the tribal advantages of sovereignty to enhance yield while substantially reducing risk."[2] As explained below, Haynes Investment provided the initial capital to fund Plain Green's operations. (Ex. 1, March 11, 2011 Term Sheet ("Haynes will arrange to provide funding to the Tribe to enable it to make each of the Loans."); *see also* Ex. 2 March 18, 2011 Credit Agreement between Haynes Investments and Think

---

[2] Haynes Investment, *American Indian*, http://www.haynesinvestments.net/native-american/ (last visited on Dec. 15, 2017).

Finance (creating a revolving line of credit of $2 million dollars)). Haynes Investments continued to invest substantial funds in the rent-a-tribe enterprise, and it also conducted and participated in the enterprise's affairs.

14. Defendant L. Stephen Haynes ("Mr. Haynes") is Haynes Investments' managing partner and owner. Mr. Haynes's biography indicates that he "is one of the leading business executives in Native American project finance."[3] Mr. Haynes personally participated in the rent-a-tribe enterprise and signed each of the agreements used to fund the illegal loans.

15. Defendant Sovereign Business Solutions, LLC ("SBS") is a limited liability company with a principal place of business in Dallas, Texas. Mr. Haynes formed SBS because Plain Green wanted its "lender entity to be named something more generic" than Mr. Haynes's last name. (Ex. 3, Oct. 31, 2012 E-mail Chain). Like Haynes Investments, SBS received income from the unlawful collection of debt through its investment in the enterprise, it used the proceeds of that income to reinvest into the enterprise, and it maintained an interest in the enterprise through a series of agreements between it and the other entities referenced herein.

16. Defendant Victory Park Capital Advisors, LLC ("Victory Park") is a private equity firm headquartered in Chicago. As explained below, Victory Park invested no less than $250-$300 million in Plain Green and Great Plains.

17. Defendant Victory Park Management, LLC ("VP Management") is a wholly-owned subsidiary of Victory Park.

18. Defendant Scott Zemnick is a partner at Victory Park and the firm's general counsel. Zemnick joined Victory Park in 2008 and "oversees the firm's legal operations and the

---

[3] Haynes Investment, *About Us*, http://www.haynesinvestments.net/native-american/ (last visited on Dec. 15, 2017).

structuring, negotiation, execution and protection of the firm's investment portfolio."[4] As the general counsel, Zemnick personally participated in the enterprise and had direct personal involvement in the unlawful conduct alleged herein.

19.     Defendant Jeffrey Schneider ("Schneider") is a partner at Victory Park and the firm's chief financial officer. Schneider joined Victory Park in 2010 and "oversees the accounting, tax, finance, treasury and fund operations of the firm and assists in the structuring of VPC's investments."[5] As the chief financial officer, Schneider personally participated in the enterprise and had direct personal involvement in the unlawful conduct alleged herein.

20.     Defendant Thomas Welch ("Welch") is a partner and investment professional at Victory Park. According to his biography, Welch is "primarily responsible for sourcing, analyzing, executing, and management of direct private debt and equity investments in middle market companies within the specialty finance and financial technology sectors."[6] As explained below, Welch personally participated in the enterprise and had direct personal involvement in the unlawful conduct alleged herein.

## FACTUAL BACKGROUND

**I.     Overview of tribal lending.**

21.     In a "payday" loan, a consumer who can't afford to wait until payday receives a cash advance and, in exchange, the lender subtracts a larger amount from the consumer's

---

[4] Victory Park Capital, *Team – Legal, Investor Relations and Operations, Scott Zemnick*, https://www.victoryparkcapital.com/legaloperations.html (last visited on Dec. 19, 2017).

[5] Victory Park Capital, *Team – Legal, Investor Relations and Operations, Jeffrey Schneider*, https://www.victoryparkcapital.com/legaloperations.html (last visited on Dec. 19, 2017).

[6] Victory Park Capital, *Team – Legal, Investor Relations and Operations, Thomas Welch*, https://www.victoryparkcapital.com/legaloperations.html (last visited on Dec. 19, 2017).

paycheck. Consumers renew the loans when they are unable to pay them off, creating a cycle of mounting debt.

22.     Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra,* 69 Wash. & Lee L. Rev. at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611-12 (2010)).

23.     It is no secret that "internet payday lenders have a weak history of complying with state laws." *Id.* at 764. Prior to the rent-a-tribe business model, some payday lenders, including Think Finance, entered into partnerships with national banks to avoid compliance with state laws.[7]

24.     Beginning in 2005, federal regulators began cracking down on rent-a-bank arrangements, and they were nearly eliminated by 2010—largely by the assessment of penalties and fines against participating banks. *See, e.g.*, Creola Johnson, *America's First Consumer Financial Watchdog Is on A Leash: Can the CFPB Use Its Authority to Declare Payday-Loan Practices Unfair, Abusive, and Deceptive?*, 61 Cath. U. L. Rev. 381, 399 n. 16 (2012).

25.     In response to the crackdown on rent-a-bank arrangements, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. *Id.*; *see also* Martin & Schwartz, *supra* at 1.

26.     "In these partnerships, online payday lenders register businesses on Native American lands and claim to be exempt from lawsuits and state usury caps under tribal sovereign

---

[7] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17-22 (2001), available at http://www.consumerfed.org/pdfs/paydayreport.pdf.

immunity. Using this doctrine, lenders argue that because their businesses are located on or headquartered within the borders of a Native American reservation, they are bound by the laws of that reservation only, not the laws of the state in which the reservation is located or the state in which the borrower resides." *Id.*

## II.     The initial structure of the rent-a-tribe enterprise involving the Chippewa Cree Tribe.

27.     Prior to the formation of Plain Green, a nearly identical venture existed where loans were originated through First Bank of Delaware, but it served as nothing more than a nominal lender for Think Finance. (Ex. 4, May 1, 2009 Universal Fund Investor Overview).[8]

28.     Under this arrangement, loans were originated in the name of First Bank of Delaware, but it served as nothing more than a nominal lender. (*Id.* at TF-PA-504641) (identifying Think Cash as a "key player" and "[l]eading online consumer lender")).

29.     In return for the use of its name, First Bank of Delaware received 10% of the revenue from the loans.  (*Id.* at TF-PA-504640 ("Payments to FBD (net partcip. fees and revenue share) = 10%")).

30.     After the Federal Deposit Insurance Corporation shut down Think Finance's arrangement with First Bank of Delaware—ordering it to terminate its relationship with "all third-party lending programs"[9]— Think Finance adopted the rent-a-tribe model as the new mechanism to continue the scheme.

_____

[8] The identical venture involved Think Cash, Inc., Think Finance's predecessor.

[9] *See, e.g., In the Matter of First National Bank*, Case No. FDIC-07-256b, Order to Cease and Desist, Order for Restitution, and Order to Pay (Oct. 9, 2008), available at https://www.fdic.gov/bank/individual/enforcement/2008-10-03.pdf

31.     Initially, Think Finance was transparent about its motive and its chief executive officer, Kenneth Rees, informed the media that Think Finance abandoned doing direct lending itself because "byzantine state laws" cut into the profits.[10]

32.     According to Rees, Native American tribes did not "have to look to each state's lending laws,"[11] and, thus, Rees contacted the Chippewa Cree Tribe proposing that they participate in the lending venture  where loans would be originated in the name of a tribe, but the tribe would serve as nothing more than a nominal lender.

33.     Shortly thereafter, the key companies involved in the enterprise—the Chippewa Cree Tribe, Think Finance, Haynes Investments, and Victory Park (through GPLS)—entered into a term sheet dated March 11, 2011. (*See, e.g.*, Ex. 1).

34.     Pursuant to the term sheet, Think Finance agreed to provide the infrastructure to run the lending operations, including the software, "risk management, application processing, underwriting assistance, payment processing, and ongoing service support" for consumer loans in the name of the Chippewa Cree Tribe. (*Id*. at 1).

35.     On the other hand, Haynes Investments agreed to "provide funding to the Tribe to enable it to make each of the Loans," and to fund Plain Green's bank account with "sufficient monies to fund one business day of Loans based upon the average Loan volumes for the preceding month." (*Id*. at 1-2.)

---

[10] Carter Dougherty, *Payday Lenders and Indians Evading Laws Draws Scrutiny* (June 4, 2012), http://stoppredatorygambling.org/wp-content/uploads/2012/12/2012-Payday-Lenders-and-Indian-Tribes-Evading-Laws-Draw-Scrutiny.pdf

[11] This prediction was  subsequently rejected by courts across the country, including when Great Plains unsuccessfully challenged a cease and desist issued by the New York of Financial Services. *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F.Supp.2d 353, 356 (S.D.N.Y. 2013) ("There is simply no basis… that the Tribes are treated differently from any other individuals or entities that enter New York to lend to a New York resident."), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

36.     Consistent with the term sheet, Haynes Investments entered into a Credit Agreement with Think Finance where it agreed to "provide a revolving line of credit" to Think Finance "in a principal amount up to $2,000,000," which could only be used to fund loans originated in the name of Plain Green. (Ex. 2).

37.     After the loans were originated in Plain Green's name, 99% of the loans were "purchased" within two days by GPLS—an employee-less company who created by Victory Park "to allow investors to purchase interests in the consumer loans originated by Native American Tribal lending businesses." *See Think Finance, LLC, v. Victory Park Capital Advisors, LLC*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. at ¶ 24) (explaining Victory Park's creation of GPLS).

38.     As part of this process, GPLS refunded 99% of the funds provided by Haynes Investments, who also received: (1) 5% interest on the money loaned to the Tribe, and (2) 1% of the revenue collected on the loans as a "referral" fee.

39.     By contrast, GPLS paid "the Tribe 4.5% of cash revenue received" on the loans received by GPLS, as well as reimbursement for costs and expenses. (Ex. 1 at 2).

40.     After accounting for all expenses, GPLS paid a 20% fixed rate of return to Victory Park and the remaining revenue was distributed to TC Administrative Service, a wholly-owned subsidiary of Think Finance.

**III.     The initial structure of the rent-a-tribe venture involving the Otoe-Missouria Tribe.**

41.     Great Plains had a similar structure to Plain Green—although Haynes Investments does not appear to have provided the initial capital to fund the loans.

42.     Instead, Victory Park, through GPLS, deposited the initial $1 million used to fund the illegal loans made in the name of Great Plains. (Ex. 5, Flow of Funds Overview).

43.     After the loans were originated in Great Plains's name—a process that had no tribal involvement— Great Plains "sold the loans at book value to GPLS," who "processed customer payments on loans via ACH each day" and deposited those payments "in a GPLS bank account." (*Id*. at ¶¶ 3-4).

44.     At the end of each month, GPLS performed a "reconciliation of all cash revenue" and the revenue was "remitted according to the contracts whereby 6% (initially) of the cash revenue collected" by GPLS was remitted to Great Plains. (*Id*. at ¶¶ 4-5).

45.     However, the revenue allocated to Great Plains was further reduced by "$100 for each funded loan" for marketing services and "$50 for each funded loan during the month" for licensing services. (*Id*. at ¶ 6).

46.     These amounts were paid to Tailwind Marketing, LLC, and TC Decision Sciences, LLC—two wholly-owned subsidiaries of Think Finance. (*Id*. at ¶ 6).

47.     Although the marketing and licensing invoices were sent to Great Plains, GPLS was responsible to pay the invoices "within 10 days of receipt" out of the bank account in the name of Great Plains. (*Id*. at ¶ 6).

48.     In other words, neither the Otoe-Missouria Tribe nor Great Plains had control over the bank account in Great Plains' name.

IV.    **Haynes Investments, Mr. Haynes, and SBS's role in the enterprise.**

       A.    **Haynes Investments provides millions of dollars to the enterprise.**

49.     As explained above, Haynes Investments provided the initial capital used to fund the Plain Green loans.

50.     Consistent with the term sheet, Haynes Investments entered into a Credit Agreement with Think Finance where it agreed to "provide a revolving line of credit to [Think Finance] in a principal amount up to $2,000,000." (Ex. 2).

51.     Due to the success of the operation and the returns it earned, Haynes Investments increased its investment on several occasions.

52.     First, Plain Green and Haynes Investments entered into a "First Amendment to Credit Agreement" on April 5, 2011, which increased the line of revolving credit from $2,000,000.00 to $5,000,000.00. (Ex. 6, April 5, 2011 First Amendment to Credit Agreement).

53.     As a result of the increase, Haynes Investments received a monthly profit between $131,555 and $166,714 from December 2011 through June 2012. (Ex. 7, ILP Profit Share Breakout Trend at TF-VA0602566).

54.     On July 12, 2012, Plain Green and Haynes Investments entered into a "Second Amendment to Credit Agreement," which increased the line of revolving credit from $5,000,000.00 to $20,000,000.00.

55.     In August 2012, Haynes presented Think Finance with another loan proposal to allow Think Finance to continue to grow the rent-a-tribe enterprise.

56.     In an e-mail to Chris Lutes, the chief financial officer of Think Finance, Haynes wrote "[p]lease find attached our loan proposal, short and sweet. Our due diligence would be focused on the Think Financials and legal documents tying the parties together." (Ex. 8, Aug. 16, 2012 e-mail from L. Stephen Haynes to Chris Lutes at TF-VA0556886).

57.     Mr. Haynes's e-mail attached a "Financing Proposal," where "Tribal Business Solutions, LLC," would make available $11.1 million dollars "in the next 30 to 60 days for the purpose of loan originations and cash reserves." (*Id*. at TF-VA0556887).

12

58.     Mr. Haynes proposed the financing in the name of "Tribal Business Solutions, LLC," because the Chippewa Cree Tribe wanted its "lender entity to be named something more generic" than Mr. Haynes's last name. (Ex. 3).

59.     Ultimately, Mr. Haynes selected the name "Sovereign Business Solutions, LLC," as opposed to Tribal Business Solutions, LLC.

60.     On February 21, 2013, Plain Green and SBS finalized the terms for the new financing arrangement whereby SBS provided Plain Green with "a revolving line of credit" in the amount of $15,000,000.00. (Ex. 9, Feb. 21, 2013 Credit and Security Agreement).

61.     In return, SBS received 15% interest on the outstanding advances on the line of credit, as well as a security interest in the loans in the event of default. (*Id*. at §§ 3.3, 3.7).

62.     The February 21, 2013 Credit and Security Agreement was signed by Mr. Haynes on behalf of SBS, and any notices necessary were to be sent to the attention of Mr. Haynes at 4215 San Carlos Street, Dallas, Texas 75205—Mr. Haynes's residence. (*Id*. at § 8.1).

63.     Over the next several years, Mr. Haynes and his companies continued to receive proceeds from the enterprise and invest funds in the illegal business, including a $6-8 million dollar investment in February 2015. (*See,* Ex. 10, Feb. 2015 e-mail thread at TF-VA332610) (indicating that Haynes was confirmed for a $6-8 million dollar investment in a new share).

**B.      Haynes Investments and Mr. Haynes participated in the affairs of the enterprise.**

64.     Mr. Haynes did not merely invest in the rent-a-tribe enterprise. Rather, Mr. Haynes used his connections to assist the enterprise's efforts to collect unlawful debt.

65.     Among other things, Mr. Haynes played an integral role in helping the enterprise obtain a bank willing to process payments through the Automated Clearing House Network (the

"ACH Network"), an electronic payment processing system regulated by the National Automated Clearing House Association ("NACHA").

66.     Unlike other financial networks, the ACH Network allows financial institutions to send or take money directly out of a bank account without the requirement of a direct relationship between the financial institution and the borrower.

67.     Without access to the ACH Network, a payday lender would not be able to electronically process payments in batches or without participation of the consumer—necessary functions of companies who specialize in providing small dollar loans over the Internet. Elizabeth G. Balassone & Lauren L. Wroblewski, 17 No. 2 Fintech L. Rep. 1 (Mar. 2014) (explaining that "online lenders predominantly rely on electronic withdrawals and deposits to the consumer's bank account," which are carried out through bank connected to the ACH Network).

68.     Because of the vital role played by the ACH Network, "[s]tate and federal regulators, as well as the Department of Justice, have seized on the ACH Network as a way to stop online lending by out-of-state lenders." *Id.*

69.     For example, in August 2013, the New York Department of Financial Services issued a cease and desist to 117 banks placing "'the onus on the banks originating the debits'" to "ensure the legality of the underlying transactions submitted" through the ACH Network. *Id.* (quoting Letter from Benjamin M. Lawsky, New York Department of Financial Services "Re: Illegal Online Payday Loans Offered and Sold to New York Customers", available at http://www.dfs.ny.gov/about/press2013/pr130806-link1.pdf).

70.     Similarly, the Department of Justice launched "Operation Choke Point," an initiative aimed at financial institutions working with online lenders.

71.     In doing so, the Executive Director of the Financial Fraud Task Force explained that the government had "prioritized the role of financial institutions in mass marketing fraud schemes—including deceptive payday loans[.]" Michael J. Bresnick, Executive Director, Financial Fraud Enforcement Task Force, Address at the Exchequer Club of Washington, D.C. (Mar. 20, 2013), http://www.justice.gov/iso/opa/doj/speeches/2013/opa-speech-130320.html.

72.     Plain Green and Great Plains were targeted by state and federal regulators and, as a result, banks ceased processing the debits and credits on their loans.

73.     Mr. Haynes played a critical role in finding a new bank to partner with Plain Green and Great Plains.

74.     As early as August 2013, Mr. Haynes had meetings with several banks to encourage them to engage in business with Plain Green and Great Plains.

75.     In November 2013, Mr. Haynes had identified several possible partners, including Bank of America, Oklahoma State Bank, and Northern Nevada Bank. (Ex. 11, Nov. 25, 2013 e-mail between Haynes and Lutes).

76.     In another e-mail to Lutes, Haynes explained that he would have "details shortly" regarding a "new processing platform with" Bank of America, who would charge $1.50 per transaction.

77.     According to the e-mail, Haynes and Bank of America were "testing the [platform] with a small portion of a large portfolio."

78.     Haynes's email further indicated he was meeting with Oklahoma State Bank on December 11, 2013, and it was ready to start processing "[t]ribal transactions."

79.     Over the next year, Mr. Haynes continued to play a critical role in Plain Green and Great Plains's efforts to find banks willing to process their transactions.

V.     **Victory Park's role in the enterprise.**

A.  **Victory Park's creation and control of GPLS.**

80.     Victory Park, through its ownership interest in and control over GPLS, provided substantial capital to fund the loans to consumers and worked together with the other entities described herein to systemically perpetrate fraud and to scam consumers.

81.     GPLS was a company created by Think Finance and Victory Park "to allow investors to purchase interests in the consumer loans originated by Native American Tribal lending businesses." *See Think Finance, LLC, v. Victory Park Capital Advisors, LLC*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. at ¶ 24) (explaining Victory Park's creation of GPLS); (Ex. 12, Think Finance Liquidity and Funding PowerPoint) (explaining the "GPLS Debt Fund," is "Owned and managed by Victory Park Capital (PE firm in Chicago, IL)[.]").

82.     As explained above, GPLS purchased 99% of the interests in the loans originated by Plain Green and Great Plains within two days of the loan origination.

83.     According to Think Finance's verified complaint against Victory Park, "Victory Park was the primary investor in a loan participation venture, GPLS," but "Victory Park required that Think Finance purchase a portion of the equity in GPLS, which it did through Think SPV." *Think Finance*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. at ¶ 26).

84.     Victory Park also raised money from third-party investors to further grow the scheme. As part of this effort, Victory Park issued classes "shares to investors," in GPLS including funds named "Series I-A and I-B, Series II and Series III." *Think Finance*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. at ¶ 27).

85. Victory Park and Think Finance collected the revenue generated from the consumer loans and after payment of all operating expenses, the loan program would distribute the fixed-rate return to investors in GPLS and distribute the remaining revenue to Think Finance.

86. Victory Park managed the distribution of interest payments to those investors and Victory Park received a 1% management fee off the top of those interest distributions.

87. The shares, however, did not come with any management rights or entitle shareholders to exercise any voting rights relating to the management of GPLS. *Think Finance*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. at ¶ 28).

88. Instead, Victory Park also created "Management Shares," which were 100% owned and controlled by Victory Park, albeit through VP Management.

89. Victory Park also substantially invested and reinvested its own funds into GPLS, including a $100 million dollar investment on or around July 2010.[12]

90. As a result, Victory Park received between $67,000-$130,850 per month from July 2011 through July 2012. (Ex. 13, Balance Sheet Trend at TF-VA614064) (showing liabilities paid to GPLS from July 2011 through July 2012).

91. Victory Park continued to invest and reinvest amounts in GPLS, including a 50 million-dollar investment in late 2012, and additional nine-figure investments between 2013-2016.

92. As a result Victory Park continue to receive large payouts on its investment, including: (1) $75 million on March 31, 2017, (ii) $14 million on May 1, 2017, (iii) $42 million on May 10, 2017, and (iv) $6.2 million on May 31, 2017.

**B. Victory Park participates and conducts the affairs of the enterprise.**

---

[12] This investment was used to purchase loans originated by the rent-a-bank arrangement between Think Finance/FBD, which were transferred to GPLS after the creation of the rent-a-tribe scheme.

93.     Victory Park not only invested hundreds of millions of dollars in Plain Green and Great Plains, but Victory Park also participated in the affairs of the rent-a-tribe enterprise.

94.     On March 18, 2011, GPLS entered into a Participation Agreement with Plain Green, which was signed by Scott Zemnick as General Counsel for Victory Park. (Ex. 14, Mar. 18, 2011 Participation Agreement).

95.     Consistent with the Term Sheet, the Participation Agreement provided GPLS with the "right, but not the obligation," to purchase 99% of the participation interests in the loans originated in the name of Plain Green.

96.     In addition to the Participation Agreement, Victory Park also entered into an Administrative Agency Agreement with TC Administrative in which Victory Park appointed TC Administrative as its agent for the purpose of managing the enterprise's cash accounts. (Ex. 15, Mar. 18, 2011 Administrative Agency Agreement).

97.     Under the Administrative Agency Agreement, Victory Park agreed to pay TC Administrative all residual revenues after payment of the tribe's "service fee" and Victory Park's 20% return, which was further guaranteed by "Guaranty and Security Agreement" between Victory Park and Think Finance. (Ex. 16, Mar. 18, 2011 Guaranty and Security Agreement).

98.     Because of the structure of the Participation Agreement, Victory Park controlled whether and to what extent loans originated in the name of Plain Green.

99.     When Victory Park stopped purchasing the participation interests, Plain Green and Great Plains stopped originating loans.

100.    For example, after the New York Department of Financial Services issued the cease and desist to Great Plains, Victory Park cut off funding to both Plain Green and Great Plains, which caused them to stop making new loans. (Ex. 17, Oct. 4, 2013 e-mail)

101. Victory Park not only invested in the rent-a-tribe ventures and controlled the amount of money available to the enterprise, but it also identified and solicited potential investors in the scheme.

102. For example, Victory Park was successful in recruiting a number of large investors in the scheme, including at least one foreign institutional investor who decided to make the investment after Victory Park and Think Finance's executives traveled overseas to pitch the rent-a-tribe venture.

**C. Zemnick, Schneider, and Welch's personal involvement in the affairs of the enterprise.**

103. During all relevant times, Zemnick, Schneider, and Welch were partners at Victory Park and participated in the affairs of the rent-a-tribe enterprise.

104. At all times relevant hereto, Zemnick, Schneider, and Welch directly and actively managed Victory Park's activities with Plain Green, Great Plains, and Think Finance.

105. Zemnick, Schneider, and Welch handled the day-to-day operation of Victory Park with respect to its relationship with Plain Green, Great Plains, and Think Finance.

106. For example, Zemnick oversaw and personally directed Victory Park's legal operations and participated in the structuring, negotiation, and execution of critical documents needed to establish and operate the enterprise.

107. Among other things, Zemnick personally participated in the structuring, negotiation, and execution of the Term Sheet, the Participation Agreement, the Administrative Agency Agreement, the Guaranty and Security Agreement, and all subsequent amendments of those agreements.

108. Each one of these documents were signed by Zemnick on behalf of Victory Park, as well as multiple amendments to each of the documents.

109.    Moreover, all notices required to be given under the agreements were to be delivered to Zemnick.

110.    By contrast, Schneider and Welch actively managed Victory Park's investment in GPLS, including receipt and review of weekly reports from Think Finance regarding the performance of Plain Green and Great Plains.

111.    Each of these weekly reports informed Schneider and Welch of the number of applications and loans made to new customers, the number of loans to former customers, the sources of the new customers (i.e., direct mail, affiliate referral, paid search), the credit scores of the new customers, the loan amounts for the new customers, approval rates, rollovers of prior loans, default rates, outstanding principal amounts, and outstanding loans by state.

112.    Schneider and Welch used these reports to determine whether GPLS would continue to purchase the participation interests and to solicit others to invest in the enterprise.

113.    Schneider and Welch also directed the major business decisions of Victory Park and GPLS with respect to the rent-a-tribe venture, including decisions on when to cease funding for the loans.

114.    Similarly, when Think was low on cash in March 2014, Think Finance's chief executive officer e-mailed Welch to determine whether Think Finance could redeem $10 million due to Think Finance in April 2014. (Ex. 18, Mar. 3, 2014 e-mail correspondence at TF-VA010830).

115.    That same day, Welch provided the approval for the early redemption of the $10 million.

116.    Zemnick, Schneider, and Welch knew the subject loans were a scam and illegal under state laws, but they nonetheless pursued the rent-a-tribe venture anyway, and continued to

fund the loans even after Great Plains's loss in *Otoe-Missouria Tribe*, 974 F. Supp. 2d at 356 ("There is simply no basis . . . that the Tribes are treated differently from any other individuals or entities that enter New York to lend to a New York resident.").

117.     As a result, Zemnick, Schneider, and Welch are jointly and severally liable for the claims herein.

## VI.     Defendants' loans charged interest in violation of Virginia's usury laws and RICO.

118.     Defendants, together with Think Finance, Plain Green, Great Plains, marketed, initiated, and collected usurious loans in Virginia.

119.     Under the standard terms of the enterprise's loan agreements, the interest rates charged were significantly greater than 12% APR—often between 118% and 448%, if not higher.

120.     Plaintiffs obtained loans in amounts ranging from $300.00-$3,000.00 from Plain Green and Great Plains.

121.     For example, Gibbs's interest rate was 277.92%, Williams's interest rate was 247.88%, and Inscho had loans with interest rates of 448%.

122.     Absent several exceptions, Va. Code § 6.2-1541 prohibits any person from making loans to Virginians in excess of 12% APR unless that company has obtained a consumer finance license from the Commission. *See* Va. Code § 6.2-1501.

123.     Neither Defendants nor Plain Green or Great Plains had a consumer finance license when they made the loans to Plaintiffs; nor did they ever attempt to obtain such a license.

124.     Under Va. Code § 6.2-1541(A), if a lender was not exempt from the provisions of those statutes and had not obtained a consumer finance license, yet nonetheless contracted to make a consumer loan and charged, contracted for, or received interest, or other compensation in excess of 12% per year, then the loan is null and void, and the lender is not able to collect, obtain, or receive any principal, interest, or charges on the loan.

125.    Ms. Gibbs paid no less than $711.02 as a result of her illegal loan—most of which was credited as payment for interest or other fees.

126.    Ms. Edwards paid no less than $15,369.15 as a result of her illegal loan—most of which was credited as payment for interest or other fees.

127.    Ms. Williams paid no less than $1,858.67 as a result of her illegal loan—most of which was credited as payment for interest or other fees.

128.    Mr. Mwethuku paid no less than $6,042.19 as a result of his illegal loan—most of which was credited as payment for interest or other fees.

129.    Mr. Inscho paid no less than $16,210.84 as a result of his illegal loan—most of which was credited as payment for interest or other fees.

130.    If Defendants did not invest and participate in the enterprise, Plaintiffs never would have received the illegal loans.

131.    Through their ownership interest and participation in the enterprise, Defendants received amounts collected as a result of Plaintiffs and the class members' loans.

132.    Because Plaintiffs' loans were null and void, and it was unlawful any person to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs. Va. Code § 6.2-1541(A).

133.    Defendants' conduct also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c).

134.    RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

135.    Defendants charged an interest rate far in excess of the enforceable rate established by Va. Code § 6.2-1541(A), and, thus, Defendants violated RICO's prohibition against the collection of unlawful debt.

136.    Over the past four years, the enterprise collected more than $69.4 million dollars from Virginia consumers pursuant to these illegal loans.  (Ex. 19, Think Finance's Interrogatory Responses at Int. Nos. 9 & 10 (indicating that $50,942,975.88 was collected from Virginia consumers on loans in the name of Plain Green; $18,498,414.81 was collected from Virginia consumers on loans in the name of Great Plains)).

137.    A substantial amount of the funds collected from Virginia consumers were remitted to Haynes Investments and Victory Park as a result of their investment and participation in the enterprise—and those amounts were ultimately passed on to Haynes, Zemnick, Schneider and Welch for their roles and participation.

138.    As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### COUNT ONE:
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

139.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

140.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All consumers residing in Virginia when they entered into a loan agreement with Plain Green or Great Plains.

141.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a subclass initially defined as:

> All consumers residing in Virginia when they entered into a loan agreement with Plain Green or Great Plains where the loan was originated and/or any payment was made on or after January 19, 2014.[13]

142.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from Virginia consumers, numerosity is easily satisfied. (*See* Ex. 19) Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants and/or Think Finance, and the class members may be notified of the pendency of this action by published and/or mailed notice.

143.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether Think Finance, Plain Green, Great Plains, the Chippewa Cree Tribe, the Otoe-Missouria Tribe, Haynes Investments, and Victory Park constitute an "enterprise" under RICO; (2) whether Defendants received income derived from the unlawful collection of debt; (3) whether Defendants used or invested the part of that income to acquire an interest in, to establish, or to operate the enterprise; and (4) what the proper recovery is for Plaintiffs and the class members against each of the Defendants.

---

[13] Plaintiffs allege a subclass because they anticipate Defendants will argue that RICO's four-year statute of limitations applies to any loans originated or payments made prior to December 22, 2013. However, "the Supreme Court has established that the discovery-of-injury accrual rule applies to civil RICO actions." *Dickerson v. TLC The Laser Eye Ctr. Inst., Inc.*, 493 F. App'x 390, 393 (4th Cir. 2012) (citing *Rotella v. Wood*, 528 U.S. 549, 556 (2000). Because consumers could not have known or reasonably discovered their injuries caused by *Defendants' conduct*, the proper class should include all consumers who entered into a loan agreement with Plain Green or Great Plains.

144. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

145. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

146. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

147. **<u>Injunctive Relief Appropriate for the Class</u>. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the enterprise, including the receipt of any proceeds arising from the unlawful collection of debt; prohibiting Defendants from continuing to engage in the enterprise or selling the outstanding balances on the loans to any third parties.

148. All of the loans made to Virginia residents included an interest rate far in excess of twice the enforceable rate in Virginia and, thus, the loans constitute "unlawful debt" under RICO. 18 U.S.C. § 1961(6).

149. As alleged above, Defendants violated § 1962(a) of RICO through the receipt of income derived, directly and indirectly, through collection of unlawful debt; and through the use and reinvestment of parts of such income to acquire interests in and to further establish and assist the operations of the enterprise.

150. Defendants participated in the collection of the unlawful debt as a principal by aiding, abetting, procuring proceeds from the enterprise, and willfully investing money for the purpose of the unlawful scheme.

151. Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(a) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

152. Accordingly, the Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT TWO:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(b)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

153.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth
at length herein.

154.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this
action for themselves and on behalf of a class, initially defined as:

> All Virginia residents who executed a loan with Plain Green or Great Plains where
> the loan was originated and/or any payment was made.

155.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this
claim for themselves and on behalf of a subclass initially defined as:

> All consumers residing in Virginia when they entered into a loan agreement with
> Plain Green or Great Plains where the loan was originated and/or any payment was
> made on or after January 19, 2014.

156.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from Virginia
consumers, numerosity is easily satisfied. (*See* Ex. 19) Additionally, the names and addresses of
the class members are identifiable through the internal business records maintained by Defendants
and/or Think Finance, and the class members may be notified of the pendency of this action by
published and/or mailed notice.

157.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**
Common questions of law and fact exist as to all members of the putative class, and there are no
factual or legal issues that differ between the putative class members. These common questions
predominate over the questions affecting only individual class members. The common questions
include: (1) whether Think Finance, Plain Green, Great Plains, the Chippewa Cree Tribe, the Otoe-
Missouria Tribe, Haynes Investments, and Victory Park constitute an "enterprise" under RICO;

(2) whether Defendants acquired and maintained an interest in the enterprise; and (3) what the proper recovery is for Plaintiffs and the class members against each of the Defendants.

158.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

159.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

160.   **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the enterprise, including the receipt of any proceeds arising from the unlawful collection of debt; prohibiting Defendants from continuing to engage in the enterprise or selling the outstanding balances on the loans to any third parties.

161.   As alleged above, Defendants violated § 1962(b) of RICO by acquiring and maintaining interests in and control of the enterprise involved in the unlawful collection of debt.

162.    Defendants participated in the collection of the unlawful debt as a principal by aiding, abetting, procuring proceeds from the enterprise, and by willfully acquiring and maintaining interests in and control of the enterprise.

163.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

164.    As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT THREE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

165.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

166.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

> All Virginia residents who executed a loan with Plain Green or Great Plains where the loan was originated and/or any payment was made.

167.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a subclass initially defined as:

> All consumers residing in Virginia when they entered into a loan agreement with Plain Green or Great Plains where the loan was originated and/or any payment was made on or after January 19, 2014.

168.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from Virginia consumers, numerosity is easily satisfied. (*See* Ex. 19) Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants

and/or Think Finance, and the class members may be notified of the pendency of this action by published and/or mailed notice.

169.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether Think Finance, Plain Green, Great Plains, the Chippewa Cree Tribe, the Otoe-Missouria Tribe, Haynes Investments, and Victory Park constitute an "enterprise" under RICO; (2) whether Defendants conducted the affairs or participated in the enterprise's affairs; (3) whether the loans violated Va. Code § 6.2-1501 because the interest rates were too high; and (4) what the proper recovery is for Plaintiffs and the class members against each Defendant.

170.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

171.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

172. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

173. **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

174. All of the loans made to Virginia residents included an interest rate far in excess of twice the enforceable rate in Virginia.

175. As alleged above, Defendants associated with the enterprise and participated in the affairs of the enterprise, which existed for the purpose of collection of unlawful debt.

31

176.     Defendants' participation in the enterprise violated § 1962(c) of RICO and caused Plaintiffs to repay amounts on unlawful loans.

177.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

<div align="center">

**COUNT FOUR:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

</div>

178.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

179.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

> All Virginia residents who executed a loan with Plain Green or Great Plains where the loan was originated and/or any payment was made.

180.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a subclass initially defined as:

> All consumers residing in Virginia when they entered into a loan agreement with Plain Green or Great Plains where the loan was originated and/or any payment was made on or after January 19, 2014.

181.     **Numerosity. Fed. R. Civ. P 23(a)(1).**  Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

182.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**  Common questions of law and fact exist as to all members of the putative class, and there are no

factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

183.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

184.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

185.   **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in the enterprise; and ordering the dissolution of each Defendant that has engaged in the enterprise.

186.   As alleged above, Haynes Investments, Mr. Haynes, and SBS violated § 1962(d) of RICO by entering into a series of agreements to violate §§ 1962(a)-(c), including but not limited to: (1) the Term Sheet between the Chippewa Cree Tribe, Think Finance, and Victory Park (through GPLS), (2) a similar term sheet between Otoe-Missouria Tribe, Think Finance, and

Victory Park (through GPLS), and (3) the credit agreements dated March 18, 2011, April 5, 2011, July 12, 2012, February 21, 2013.

187.    Similarly, Victory Park and VP Management violated § 1962(d) of RICO by entering into a series of agreements to violate §§ 1962(a)-(c), including but not limited to: (1) the Term Sheet between the Chippewa Cree Tribe, Think Finance, and Victory Park (through GPLS), (2) a similar term sheet between Otoe-Missouria Tribe, Think Finance, and Victory Park (through GPLS), and (3) the Participation, Administrative Agency, and Guaranty and Security Agreements.

188.    As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

<div align="center">

**COUNT FIVE:**
**VIOLATIONS OF VIRGINIA USURY LAWS**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

</div>

189.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

190.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

> **Virginia Usury Class**: All Virginia residents who made a payment on any loan with Plain Green or Great Plains.

> **Virginia Usury Subclass**: All Virginia residents who made a payment on any loan with Plain Green or Great Plains on or after January 19, 2014.

Plaintiffs are members of the Virginia Usury Class and Subclass.

191.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from Virginia consumers, numerosity is easily satisfied. (*See* Ex. 19) Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants

and/or Think Finance, and the class members may be notified of the pendency of this action by published and/or mailed notice.

192.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to Virginia consumers violated Virginia Code Section § 6.2-1501 because their interest levels were too high; (2) whether Plaintiffs may recover from Defendants the amounts paid on the loans; and (3) what the proper recovery is for Plaintiffs and the class members against each Defendant.

193.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

194.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

195.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action

is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

196.    All of the loans made to Virginia consumers in the name of Plain Green and Great Plains used an interest rate greater than 12%.

197.    As explained above, Defendants received revenues generated on the loans.

198.    Accordingly, Plaintiffs and the class members are entitled to recover all amounts repaid on the void loans, plus twice the amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorney's fees and costs. Va. Code § 6.2-1541; Va. Code § 6.2-305(A).

### COUNT SIX:
### UNJUST ENRICHMENT
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

199.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

200.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Virginia Unjust Enrichment Class"—initially defined as follows:

**Virginia Unjust Enrichment Class**: All Virginia residents who executed a loan with Plain Green or Great Plains where any amount of principal, interest, fees, or other charges were repaid.

Plaintiffs are members of the unjust enrichment class.

201.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from Virginia consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

202.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on Defendants; (2) whether Defendants knew or should have known of the benefit; (3) whether Defendants retained an unjust benefit because the loan was void; and (4) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

203.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

204.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic

to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

205.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

206.    All of the loans to Virginia consumers in the name of Plain Green and Great Plains were void and unenforceable.

207.    Plaintiffs conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

208.    Accordingly, on behalf of themselves and all other Virginia consumers similarly situated, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with Plain Green and Great Plains.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that the Court enter judgment on behalf of themselves and the class they seek to represent against Defendants for:

A.    Certification for this matter to proceed as a class action;

B.    Declaratory and injunctive relief and damages relief as pled herein;

C.    Attorney's fees, litigation expenses, and costs of suit; and

D.    Such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

<div style="margin-left:40%">

Respectfully submitted,
**PLAINTIFFS**

By:____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com
Email: casey@kellyandcrandall.com

Leonard A. Bennett, Esq., VSB #37523
Craig C. Marchiando, Esq., VSB #89736
Elizabeth W. Hanes, Esq., VSB #75574
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com

</div>

Email: craig@clalegal.com
Email: elizabeth@clalegal.com

James W. Speer, VSB#23046
VIRGINIA POVERTY LAW CENTER
919 E. Main Street, Suite 610
Richmond, VA 23219
(804) 782-9430
(804) 649-0974
Email: jay@vplc.org

*Counsel for Plaintiffs*