**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

———————————————————————
DARLENE GIBBS, *et al*.,         )
                                      )
                 Plaintiffs,    )
      v.                       )     Civil Action No. 3:18-cv-48 (MHL)
                                        )
HAYNES INVESTMENTS, LLC, *et al*.,  )
                                      )
              Defendants.    )
———————————————————————)

**PLAINTIFFS' OPPOSITION TO DEFENDANTS HAYNES INVESTMENTS, LLC,
L. STEVEN HAYNES, AND SOVEREIGN BUSINESS SOLUTION, LLC'S
<u>MOTION TO COMPEL ARBITRATION</u>**

Plaintiffs, by counsel, respectfully submit this opposition to Defendants Haynes Investments, LLC, L. Steven Haynes, and Sovereign Business Solution, LLC's Motion to Compel Arbitration. (Defs.' Mot. Compel Arb., ECF 34.)

<u>**INTRODUCTION**</u>

In an attempt to evade state usury and licensing laws, Defendants helped to establish what is commonly referred to as a "rent-a-tribe" lending scheme. Under the "rent-a-tribe" model, Defendants sought to cloak themselves in tribal immunity through associations with the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation and the Otoe-Missouria Tribe (collectively, the "Tribes"). As part of the scheme, loans were made in the name of Plain Green, LLC and Great Plains Lending, LLC (the "Tribal Lenders")—two entities created under the laws of the Tribes to serve as fronts designed to disguise Defendants' roles and to shield the scheme through a dubious claim of tribal sovereign immunity. On paper, the Tribes received no more than 4.5% of the revenue[1] from the loans in return for the use of their names, but otherwise the Tribes had no actual

———————————————
[1] Although the Tribes received 4.5% of the revenue on paper, these funds were diverted to tribal leaders such as Neal Paul Rosette and Billi Anne Morsette, the former "chief executive officers"

role in or control over the income, expenses, or day-to-day operations of the businesses. Although the doctrine of tribal sovereign immunity protects the tribe itself, it does not automatically extend to economic subdivisions of a tribe, such as Plain Green and Great Plains Lending. Thus, Defendants attempted to add a second layer of protection to their scheme—they included arbitration and choice-of-law clauses in their Loan Agreements that attempted to disclaim all federal and state laws in favor of "tribal law."

The Court's decision with respect to Defendants' Motion to Compel Arbitration is an easy one as Fourth Circuit precedent clearly establishes the unenforceability of the agreements Defendants seek to enforce. While the Federal Arbitration Act ("FAA") allows "parties the freedom to structure arbitration in the way they choose," it does not give parties the freedom to use arbitration as a means to substantively waive federally protected rights. *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 673 (4th Cir. 2016). In fact, the Fourth Circuit has held that one of the contracts at issue in this case, the Great Plains Loan Agreement, contained "unenforceable choice of law provisions, which are not severable from the broader arbitration agreement and render the entire arbitration agreement unenforceable." *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 337 (4th Cir. 2017). *Dillon* did not break new ground and simply reiterated the Fourth Circuit's earlier decision in *Hayes*, which involved a similar tribal lending enterprise who attempted to draft their way out of legal accountability. In addition, this Court recently ruled that similar provisions in

---

of Plain Green who were sent to prison for accepting bribes in exchange for facilitating the award of tribal contracts and for helping another tribal member siphon over $55,000 in tribal monies, which were laundered through the predecessor company of Plain Green. The United States Attorney's Office, District of Montana, *Plain Green Officials Sent to Prison* (March 8, 2016), https://www.justice.gov/usao-mt/pr/plain-green-officials-sent-prison. As part of this investigation, the Montana Attorney General's office uncovered that Rosette, Morsette, and James Eastlick, Jr., each received $400,000 from a consulting company, Ideal Consulting, LLC, involved in the Plain Green operation. *Id.* In other words, the Chippewa Cree Tribe actually received far less than the 4.5% allocated to it under the agreement.

another rent-a-tribe contract constituted a prospective waiver of federal rights and were thus unenforceable. *Williams v. Big Picture Loans, LLC*, 3:17-cv-461 (E.D. Va.) (ECF No. 125) (Payne, J.).

Faced with these decisions, Defendants seek to salvage the enforceability of the arbitration provisions by ignoring the agreements' plain language and selectively quoting various sentences out of context. In doing so, Defendants contend that the "Arbitration Agreements at issue do not reject or preclude the application of federal law, but rather expressly invoke the application of federal law." (ECF 35 at 20.) Defendants' argument ignores the plain language of the Agreements. Just as the contract in *Dillon*, Defendants' contract provides that "this Agreement shall remain ***exclusively*** subject to Tribal Law and courts of the Otoe-Missouria Tribe." (ECF 35-1, Smith Decl., Exhibit 2 at 5 ("Williams Agr.")) (emphasis added).) In another section, the contract states that the inclusion of the Truth in Lending Act disclosures "does not mean that we or any subsequent holder of this Agreement consent to the application of state or federal law to us, to the Loan, or this Agreement." (Williams Agr. at 2.) Consistent with these disclaimers, the contract further specifies that arbitration may be performed on tribal land or within thirty miles of the consumer's residence provided that "this accommodation for you shall not be construed in any way" to "allow for the application of any other law other than Tribal law." (Williams Agr. at 9.) And the contract forbids the arbitrator from applying any law other than "Tribal Law." (Williams Agr. at 9.) Standing alone, any one of these defects renders the clause unenforceable. Taken together, they comprise a "sham system unworthy even of the name arbitration." *Hooters of Am. v. Phillips*, 173 F.3d 933, 940 (4th Cir. 1999).

## **BACKGROUND**

The lending agreements were designed to insulate Defendants from any claims by consumers for their blatant violations of state and federal laws. This is particularly apparent when considering three key features of the agreements. First, the arbitration agreements include a provision that designates Tribal law as the only applicable law—to the exclusion of all state and federal law. Second, the mechanics of the arbitration system designated by the agreement further work to ensure that Plaintiffs' will be unable to pursue claims for Defendants' federal and state statutory violations by only allowing for the application of tribal law, waiving all of a consumer's state and federal remedies, and creating an onerous and unfair process for the challenging and enforcement of arbitration awards. Third, each of the lending agreements includes a "Governing Law" provision further demonstrating the agreements' purpose of avoiding the application of all state and federal law.

**(1)     The loan agreements implicitly disclaim the application of all federal laws.**

Although two of the five Plaintiffs' agreements are worded slightly differently, the unambiguous purpose and effect of the language of each agreement's arbitration provision is that only tribal law will apply, to the exclusion of all state and federal law. Accordingly, each agreement limits the arbitrator's authority to apply only tribal law and the terms of the agreement. Williams, Edwards, and Inscho's agreements each provides:

> **APPLICABLE LAW AND JUDICIAL REVIEW OF ARBITRATOR'S AWARD. THIS AGREEMENT TO ARBITRATE SHALL BE GOVERNED BY TRIBAL LAW.** The arbitrator shall apply Tribal Law and the terms of the Agreement, including this Agreement to Arbitrate and the waivers included herein.

(Williams Agr. 10; ECF 35-1, Smith Decl., Exhibit 3 at 9 ("Edwards Agr."); ECF 35-1, Smith Decl., Exhibit 4 at 10 ("Inscho Agr.").) Gibbs's agreement states:

> **APPLICABLE LAW AND JUDICIAL REVIEW OF ARBITRATOR'S AWARD: THIS AGREEMENT TO ARBITRATE IS MADE PURSUANT TO**

**A TRANSACTION INVOLVING INTERSTATE COMMERCE AND SHALL BE GOVERNED BY TRIBAL LAW. THE PARTIES ADDITIONALLY AGREE TO LOOK TO THE FEDERAL ARBITRATION ACT AND JUDICIAL INTERPRETATIONS THEREOF FOR GUIDANCE IN ANY ARBITRATION THAT MAY BE CONDUCTED HEREUNDER.** The arbitrator shall apply Tribal Law and the terms of this Agreement, including the Agreement to Arbitrate and the waivers included herein.

(ECF 35-1, Smith Decl., Exhibit 1 at 9 ("Gibbs Agr.").) And, Mwethuku's agreement provides:

**Applicable law and Judicial Review.** THIS AGREEMENT TO ARBITRATE IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE CHIPPEWA CREE TRIBE. The arbitrator will apply the laws of the Chippewa Cree Tribe and the terms of the Agreement, including the Agreement to Arbitrate.

(ECF 35-1, Smith Decl., Exhibit 5 at 7 ("Mwethuku Agr.").)

Each of Plaintiffs' agreements also expressly specifies that it is not subject to the laws of any state of the United States. (Williams Agr. 11; Edwards Agr. 10; Inscho Agr. 11; Gibbs Agr. 9; Mwethuku Agr. 8.)

(2)     **Defendants' arbitration system is designed to only allow for the application of tribal law, to waive all of a consumer's state and federal remedies, and to create an onerous and unfair process for the challenging and enforcement of arbitration awards.** There are several features of Defendants' arbitration system that demonstrate the consumer's prospective waiver of all federal rights. For example, the lending agreements allow for the arbitration to occur either on tribal land or within thirty miles of the consumer's residence. However, each of Plaintiffs' agreements provides that the allowance of arbitration to occur off of tribal lands "shall not be construed in any way . . . to allow for the application of any law other than [Tribal law] . . . ." (Williams Agr. 10; Edwards Agr. 9; Inscho Agr. 10; Gibbs Agr. 8; Mwethuku Agr. 7.) And, with respect to remedies, the arbitrator only has the "ability to award all remedies available under

[Tribal law]." (Williams Agr. 10; Edwards Agr. 9; Inscho Agr. 10-11; Gibbs Agr. 9; Mwethuku Agr. 7.)

Further, although a consumer may elect that the arbitration be conducted in his or her home-state, a consumer may only confirm or challenge an award in tribal court. (Williams Agr. 10; Edwards Agr. 9; Inscho Agr. 10; Gibbs Agr. 9; Mwethuku Agr. 7.) Thus, in order to confirm or challenge an arbitration award, Williams, Edwards, and Inscho would have to proceed in the Otoe-Missouria Tribal Court in Oklahoma, (Williams Agr. 2; Edwards Agr. 2; Inscho Agr. 2), and Gibbs and Mwetheku would only be able to confirm or challenge an arbitration award in the Chippewa Cree Tribal Court in Montana. (Gibbs Agr. 2; Mwethuku Agr. 2.) All but one of the arbitration agreements states, "As an integral component of accepting this Agreement, you irrevocably consent to the exclusive jurisdiction of the Tribal courts for purposes of this Agreement." (Williams Agr. 10; Edwards Agr. 9; Inscho Agr. 10; Gibbs Agr. 9.)

Additionally, the lending agreements also provide a consumer the ability to opt out of the arbitration provision. However, in doing so the consumer must still agree that only tribal law will apply and that the tribal court has exclusive jurisdiction over any disputes. Thus, each agreement states, "IN THE EVENT YOU OPT OUT OF THE AGREEMENT TO ARBITRATE, ANY DISPUTES SHALL NONETHELESS BE GOVERNED UNDER TRIBAL LAW AND MUST BE BROUGHT WITHIN THE COURT SYSTEM OF THE [TRIBE]." (Williams Agr. 8-9; Edwards Agr. 8; Inscho Agr. 9; Gibbs Agr. 8; Mwethuku Agr. 6.)

**(3) The lending agreements include a "Governing Law" provision, further demonstrating Defendants' attempt to escape the application of any law other than tribal law.** Each of Plaintiffs' lending agreements includes a choice-of-law provision specifying that only tribal law applies. In a few of the agreements, it indicates that the lender may choose to voluntarily

use certain federal laws as guidance only. It appears that Defendants wanted to ensure the application of the Indian Commerce Clause, while excluding the application of any other federal law. For example, each of Williams, Edwards, and Inscho's lending agreement includes the following,

> **GOVERNING LAW; NON-APPLICABILITY OF STATE LAW; INTERSTATE COMMERCE:** This Agreement and the Agreement to Arbitrate are **governed by Tribal law** and such federal law **as is applicable under the Indian Commerce Clause of the Constitution of the United States of America**. We do not have a presence in Oklahoma or any other state of the United States of America. Neither this Agreement nor the Lender is subject to the laws of any state of the United States. The lender may choose to **voluntarily** use certain federal laws as **guidelines** for the provision of services. **Such voluntary use does not represent acquiescence of the Otoe-Missouria Tribe to any federal law unless expressly applicable to the operations of the Otoe-Missouria Tribe**. You and we agree that the transaction represented by this Agreement involves interstate commerce for all purposes.

(Williams Agr. 8; Edwards Agr. 7-8; Inscho Agr. 8 (emphases added).) Gibbs's choice-of-law provision, which additionally "comprehends" the application of the FAA, states,

> **GOVERNING LAW; NON-APPLICABILITY OF STATE LAW; INTERSTATE COMMERCE:** This Agreement and the Agreement to Arbitrate **are governed by Tribal Law**. The Agreement to Arbitrate also comprehends the application of the Federal Arbitration Act, as provided below. Plain Green does not have a presence in Montana or any other state of the United States of America. Neither this Agreement nor the Plain Green is subject to the laws of any state of the United States. Plain Green **may** choose to **voluntarily** use certain federal laws as **guidelines** for the provision of services. **Such voluntary use does not represent acquiescence of the Chippewa Cree Tribe to any federal law unless found expressly applicable to the operations of the Chippewa Cree Tribe.**

(Gibbs Agr. 7 (emphasis added).) Mwethuku's choice-of-law provision simply provides,

> **GOVERNING LAW:** This Agreement and the Agreement to Arbitrate are governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Chippewa Cree Tribe. We do not have a presence in Montana or any other state of the United States of America. **Neither this Agreement nor the Lender is subject to the laws of any state of the United States.**

(Mwethuku Agr. 7 (emphasis added).) Consistent with the governing law provisions, each of the agreements states that the inclusion of the Truth in Lending Act disclosures "does not mean that we or any subsequent holder of this Agreement consent to the application of state or federal law to us, to the Loan, or this Agreement." (Williams Agr. 3; Edwards Agr. 3; Inscho Agr. 3; Mwethuku Agr. 2; *see* Gibbs Agr. 3 (using nearly identical language).) By extension, all but the oldest of the agreements provides that the lenders are subject exclusively to the Tribal regulatory authority. (Williams Agr. 2; Edwards Agr. 2; Inscho Agr. 2; Gibbs Agr. 2.)

## LEGAL STANDARD

The legal standard that applies to the Court's determination of whether arbitration may be judicially compelled is similar to that applied at summary judgment. *Meridian Imaging Sols., Inc. v. OMNI Bus. Sols. LLC*, 1:17-CV-186, 2017 WL 1491134, at *6 (E.D. Va. Apr. 25, 2017). Accordingly, "the pleadings and 'all relevant, admissible evidence submitted by the parties' are considered and all 'reasonable inferences' are drawn in favor of the non-moving party." *Id.* (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)).

## ARGUMENT

I. **The arbitration agreements are unenforceable pursuant to controlling precedent of the Fourth Circuit because they require consumers to prospectively waive their federal statutory rights.**

A. **The arbitration between Plaintiffs and the lenders required Plaintiffs to prospectively waive all federal statutory rights and remedies.**

It is well established that an arbitration agreement is unenforceable if it "prospective[ly] waived" a "party's right to pursue statutory remedies." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985); *see also Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013). In this case, Defendants' lending agreements included a wholesale waiver of all state and federal laws, including all of Plaintiffs' substantive rights under federal law.

(Williams Agr. 10; Edwards Agr. 9; Inscho Agr. 10; Gibb's Agr. 9; Mwethuku Agr. 7.) Accordingly, the agreements are unenforceable, and Defendants' motion to compel arbitration must be denied. *See, e.g.*, *Hayes.*, 811 F.3d at 673 ("[W]hile the Court has affirmed that the FAA gives parties the freedom to structure arbitration in the way they choose, it has repeatedly cautioned that this freedom does not extend to a 'substantive waiver of federally protected civil rights' in an arbitration agreement." (quoting *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273 (2009))).

The Fourth Circuit recently applied the prospective-waiver doctrine in two cases, holding that similar payday lending agreements—which also waived all federal law in favor of only tribal law—were void as a matter of law. *Dillon*, 856 F.3d at 337; *Hayes*, 811 F.3d at 673. The loan agreement considered by the Fourth Circuit in *Hayes* expressly stated that no federal law or regulation would apply to the agreement. *Hayes*, 811 F.3d at 669. Relying on the United States Supreme Court's established law concerning the prospective-waiver doctrine, the *Hayes* court held that the loan agreement was unenforceable, reasoning that "a party may not underhandedly convert a choice of law clause into a choice of no law clause—it may not flatly and categorically renounce the authority of federal statutes to which it is and must remain subject." *Id.* at 675. A little over a year later, the Fourth Circuit expanded on this principal in *Dillon*, holding that a loan agreement that "implicitly accomplishes" what the agreement in *Hayes* expressly stated was also unenforceable. *Dillon*, 856 F.3d at 336.

The Fourth Circuit's more recent decision in *Dillon* completely forecloses any attempt by Defendants to enforce the arbitration provisions. Indeed, the *Dillon* decision considered the enforceability of an agreement that was entered into by one of the same lenders involved in this case—Great Plains—and that included terms that are substantively indistinct from the terms of Plaintiffs' payday loan agreements. *See infra* Part I.B (explaining in detail the nearly identical

terms of the *Dillon* agreement and each of Plaintiffs' agreements in this case). In *Dillon*, the Fourth Circuit observed that "Great Plains purposefully drafted the choice of law provisions in the arbitration agreement to avoid the application of state and federal consumer protection laws." *Id.* at 336.

In addition, this Court recently held that a contract's choice-of-law provision used by a similar rent-a-tribe model was unenforceable because it contained a prospective waiver of fenderally-created rights. *Williams v. Big Picture Loans, LLC*, 3:17-cv-461 (E.D. Va.) (ECF No. 125). In that case, the contract provided that:

> This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal law"), including but not limited to the Code as well as ***applicable*** federal law.
> …
> You acknowledge and agree that this Agreement is subject ***solely*** and ***exclusively*** to the Tribal law and jurisdiction of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

*Id.* at ECF No. 1-1 at 4, 6 (emphasis removed and added). This Court agreed with the *Williams* plaintiffs that these provisions constituted a waiver of federal law and were thus unenforceable.

Here, each of Plaintiffs' lending agreements includes the same or a similar provisions, specifying that the arbitrator shall apply tribal law and the terms of the agreement to the exclusion of all state and federal law. Indeed, Mwethuku's agreement includes identical language to the term in *Dillon*, while each of the remaining Plaintiffs' lending agreements are not materially different, each specifying the agreement to arbitrate is governed by tribal law and that the arbitrator "shall apply Tribal law and the terms of the Agreement." (Williams Agr. 10; Edwards Agr. 9; Inscho Agr. 10.) Thus, the choice-of-law provision does not merely select the law of a certain jurisdiction to govern the agreement as such provisions are meant to do, but instead, "this arbitration agreement

uses its 'choice of law' provision to waive all of a potential claimant's federal rights." *Hayes*, 811 F.3d at 675.

A cursory review of the loan agreements "confirms the disavowal of state and federal law." *Hayes*, 811 F.3d at 669. Indeed, the governing law provisions in Plaintiffs' lending agreements are identical in relevant part to the one in *Dillon*, providing "'[t]his Agreement and the Agreement to Arbitrate are governed by [tribal law]' and 'neither this Agreement nor the Lender is subject to the laws of any state of the United States.'" *Dillon*, 856 F.3d at 335 (comparing to *Hayes*, 811 F.3d at 669); (Williams Agr. 8; Edwards Agr. 7-8; Inscho Agr. 8; Gibbs Agr. 7; Mwethuku Agr. 7 (each stating "[t]his Agreement and the Agreement to Arbitrate are governed by [tribal law]" and "neither this Agreement nor the Lender is subject to the laws of any state of the United States"). As the Fourth Circuit noted, this provision also appeared in the lending agreement in *Hayes*. *Dillon*, 856 F.3d at 335.

What is worse, the more recent lending agreements specify that "certain" federal laws may be "voluntarily" consulted by the lender as mere "guidelines." Specifically, the governing-law provision in the four more recently executed lending agreements states that the lender "***may choose*** to ***voluntarily*** use ***certain*** federal laws as ***guidelines*** for the provision of services." (Williams Agr. 8; Edwards Agr. 7-8; Inscho Agr. 8; Gibbs Agr. 7.) Further, each of these agreements specifies that "[s]uch ***voluntary*** use does not represent acquiescence . . . to any federal law unless expressly applicable to the operations of the [Tribe]." (Williams Agr. 8; Edwards Agr. 7-8; Inscho Agr. 8; Gibbs Agr. 7.)   Likewise, each of the agreements states that the inclusion of the TILA disclosures—a federal statute—"does not mean that we or any subsequent holder of this Agreement consent to the application of state or federal law to us, to the Loan, or this Agreement."

(Williams Agr. 3; Edwards Agr. 3; Inscho Agr. 3; Mwethuku Agr. 2; *see* Gibbs Agr. 3 (using nearly identical language).)

Additionally, other terms throughout the agreements "evince an explicit attempt to disavow the application of federal or state law to any part of the contract or its parties." *Dillon*, 856 F.3d at 336. For example, the more recent agreements provide that the lenders are subject exclusively to a tribal regulatory authority to the exclusion of any federal or state regulatory authority. (Williams Agr. 2; Edwards Agr. 2; Inscho Agr. 2; Gibbs Agr. 2.) The agreements repeatedly specify that the agreements are not subject to the laws of any state of the United States. (Williams Agr. 11; Edwards Agr. 10; Inscho Agr. 11; Gibbs Agr. 9; Mwethuku Agr. 8.) This point is also reiterated in the arbitration provision's opt-out option, which specifies that in the event the consumer opts out the arbitration provision "any disputes shall nonetheless be governed under tribal law." (Williams Agr. 8-9; Edwards Agr. 8; Inscho Agr. 9; Gibbs Agr. 8; Mwethuku Agr. 6.) As the Fourth Circuit observed, these terms "further illustrate that the choice of law provision in the arbitration agreement 'disavows[s] the application of all state and federal law' and 'unambiguously forbids an arbitrator from even applying applicable law." *Dillon*, 856 F.3d at 336 (quoting *Hayes*, 811 F.3d at 668, 670).

"Because the effect of the arbitration agreement is unambiguous in the context of the whole contract, . . . the arbitration agreement functions as a prospective waiver of federal statutory rights and, therefore, is unenforceable as a matter of law." *Id.* at 336. "With one hand, the arbitration agreement offers an alternative dispute resolution procedure in which aggrieved persons may bring their claims, and with the other, it proceeds to take those very claims away." *Id.* at 673-74. Such a provision is rendered unenforceable as its enforcement would undermine the FAA's purpose of promoting legitimate and fair alternatives for dispute resolution. *See id.* at 674 ("The just and

efficient system of arbitration intended by Congress when it passed the FAA may not play host to this sort of farce."). Accordingly, the arbitration agreements Defendants seek to enforce are unenforceable as a matter of law.

> **B.** **The arbitration agreements are not meaningfully distinguishable from the agreements in *Dillon* and *Hayes*.**

Defendants attempt to distinguish this case from *Dillon* and *Hayes*; however, the agreements in this case are not meaningfully distinguishable from the lending agreement in *Dillon*, which the Fourth Circuit likened to the agreement in *Hayes*. First, the Great Plains agreement in *Dillon* appears to be nearly identical to Plaintiff Mwethuku's Plain Green lending agreement. *Compare* Exhibit A, *Dillon v. BMO Harris Bank, N.A.*, No. 1:13-CV-897, ECF 36-1 (M.D.N.C. 2014), *with* (Mewthuku Agr.). Additionally, as discussed above, the remaining Plaintiffs' agreements are substantially similar to the agreement in *Dillon* and include the same essential terms the *Dillon* court relied on in its analysis. *See supra* Part 1.A. Nonetheless, Plaintiffs address each of Defendants' arguments on this subject.

Defendants argue that the agreements' reference to the applicability of the "Indian Commerce Clause of the Constitution of the United States of America" proves that they invoke federal law. (ECF 35 at 21.) However, this same reference to the Indian Commerce Clause was included in the lending agreements considered by the Fourth Circuit in both *Hayes* and *Dillon*. *See Dillon*, 856 F.3d at 335; *Hayes*, 811 F.3d at 675. And, more importantly, the Indian Commerce Clause is an entirely "irrelevant constitutional provision" to the issue at hand. *See Jackson v. Payday Fin., LLC*, 764 F.3d 765, 778 (7th Cir. 2014). This reference to the irrelevant constitutional clause "does not except anything from the binding arbitration clause and . . . contains a misunderstanding of the Indian Commerce Clause." *See F.T.C. v. Payday Fin., LLC*, 935 F. Supp. 2d 926, 932 n.4 (D.S.D. 2013).

Defendants also assert that the agreements' provision stating that "The Lender **may choose** to **voluntarily** use certain federal laws as **guidelines** for the provision of services" support their assertion that the agreements do not disclaim the application of federal law. (ECF 35 at 21.) This argument is puzzling, given that this passage clearly states that the Lender's use of federal law is completely optional, and that the Lender "may" or may not "choose" to "voluntarily" comply with federal law. If the agreement did not attempt to disclaim federal law, there would be no need to make this distinction. Additionally, when read in context, it is unmistakable that this passage is evidence of the lending agreements' disavowal of all federal law, the provision continues, "Such **voluntary** use **does not represent acquiescence** of the Otoe-Missouria Tribe **to any federal law** unless **expressly** applicable to the operations of the Otoe-Missouria Tribe." (Williams Agr. 8; Edwards Agr. 7-8; Inscho Agr. 8 (emphasis added).) This becomes even more apparent when considering the earlier provision that the lender does not "consent to the application of state or federal law" by providing the disclosure required by the Truth in Lending Act, a federal statute. (Williams Agr. 3; Edwards Agr. 3; Inscho Agr. 3; Mwethuku Agr. 2; see Gibbs Agr. 3 (using nearly identical language).)

Similarly, just as in *Hayes* and in *Dillon*, the lending agreements here make reference to the American Arbitration Association ("AAA") or JAMS, The Resolution Experts ("JAMS"). *See Hayes*, 811 F.3d at 671; Exhibit A at 6, *Dillon*, No. 1:13-CV-897. But selecting a neutral location or entity to administer the arbitration does nothing to change what law they may apply (no state or federal law). Just as this was not a factor that saved the arbitration clause in *Hayes* and *Dillon*, it is not here. Indeed, the agreements in this case specifically provide that the AAA or JAMs rules only apply to the extent they "do not contradict this Agreement to Arbitrate or Tribal Law," and as discussed in Part I.A., the agreements unambiguously disavow the application of all state and

14

federal laws. (*See* Williams Agr. 9; Edwards Agr. 9; Inscho Agr. 10; Gibbs Agr. 8; *see also* Mwethuku Agr. 7 ("do not contradict the law of the Chippewa Cree Tribe or the express terms of this Agreement")).

Defendants also attempt to argue that the instant case is distinguishable from *Hayes* and *Dillon* because the *Hayes* defendant attempted to bar the application of federal law, while Defendants argue they do not assert that Plaintiffs are barred from pursuing federal claims. (ECF 35 at 22.) This exact argument, however, was already flatly rejected by the Fourth Circuit in *Dillon* with respect to the *Dillon* defendants' request that the court sever the choice-of-law provision: "Because these choice of law provisions were essential to the purpose of the arbitration agreement, [Defendants'] consent to application of federal law would defeat the purpose of the arbitration agreement in its entirety." *Dillon*, 856 F.3d at 336.

Defendants also appear to distinguish the Fourth Circuit's decision in *Hayes* from this one on a factual basis. However, in doing so, Defendants do not discuss the facts essential to the Fourth Circuit in *Hayes*, but instead, discuss two entirely different cases from the Eleventh and Seventh Circuits. (*See* ECF 35 at 22-23.) The Eleventh and Seventh Circuit decisions considered whether the arbitral mechanisms were illusory based on the unavailability of the forum. *See Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1354 (11th Cir. 2014); *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 776 (7th Cir. 2014). Although the *Hayes* plaintiffs argued that the arbitral mechanism was illusory, the Fourth Circuit expressly stated that it did not need to consider whether the agreement was invalid on that entirely "separate basis" because the arbitration agreement failed under the prospective-waiver doctrine. *Hayes*, 811 F.3d at 673. The unreasonableness of the forum was thus not considered by the court in *Hayes* as a part of its analysis. *Id.* at 673-76. Accordingly,

15

Defendants' attempt to distinguish *Hayes* based on the decisions of the Eleventh and Seventh Circuits (based on a completely separate legal theory) is unavailing.

In direct contravention to the agreements' express terms, Defendants assert that the arbitration should proceed because "any arbitration decision is ultimately subject to review by an appropriate district court." (ECF 35 at 23-24.) However, in no uncertain terms, the agreements provide that a consumer may only confirm or challenge an award in tribal court. (Williams Agr. 10; Edwards Agr. 9; Inscho Agr. 10; Gibbs Agr. 9; Mwethuku Agr. 7.) Additionally, all but one of the arbitration agreements states, "As an integral component of accepting this Agreement, you irrevocably consent to the exclusive jurisdiction of the Tribal courts for purposes of this Agreement." (Williams Agr. 10; Edwards Agr. 9; Inscho Agr. 10; Gibbs Agr. 9.) Thus, Defendants' argument that a federal court will ultimately review any arbitral award is contrary to agreements' express terms.

Finally, Defendants' citation to tribal law as "adopt[ing] federal and state law" is also unavailing. With respect to the Chippewa Cree Tribal Code, Plaintiffs were unable to locate any copy of the code online, other than the excerpt of the code available on Plain Green's website. *See* Chippewa Cree Tribal Lending And Reglatory Code, https://www.plaingreenloans.com/css/title10.pdf. This section establishes the Chippewa's Tribal Consumer Protection Bureau (the Tribal Bureau). The Chippewa Code widely defines the term "Federal Consumer Protection Laws" in the definitions section of the code, but it only mentions the term once, authorizing the Tribal Bureau to

> To make or cause to be made reasonable investigations of any Licensee or Person as it deems necessary to ensure compliance with this Title or any lawful order of the TCPB, to determine whether any Licensee or Person has engaged, is engaging or is about to engage in any act, practice or transaction that constitutes an unsafe or unsound practice or violation of this Title, any ***applicable*** Federal Consumer Protection Laws or any order of the TCPB.

Chippewa Code § 10-4-108(c). This provision, which concerns the authority of the Tribal Bureau, can hardly constitute an incorporation of all federal and state laws into Chippewa law. Similarly, a consumers' ability to file a complaint with the Bureau for all "*applicable* Federal law relating to their loan" is unlikely to undue the exclusion of all federal and state law to the application of the agreement. Defendants need only argue that federal law does not apply to Plaintiffs' loans. Similarly, the Court of Indian Offenses regulation cited by Defendants also refers to "*applicable* Federal law." 25 CFR § 11.500. The regulation, which is from the Code of Federal Regulations, can hardly be considered the law of the Otoe-Missouria Tribe. Instead, it appears to be regulations associated with the Court of Indian Offenses—a court that would not even have jurisdiction to consider Plaintiffs' claims against Defendants. *See* 25 CFR § 11.116.

As discussed in Part I.A., controlling precedent from the Fourth Circuit completely forecloses the enforceability of the arbitration clauses at issue in this case. Nonetheless, Defendants attempt to enforce an arbitration agreement that the Fourth Circuit has already determined to be unenforceable in its decision in *Dillon*. The Court should apply the controlling decisions from the Fourth Circuit, which render Defendants' arbitration provisions unenforceable.

## II. The delegation provision is unenforceable and, regardless, the prospective waiver issue is ripe for determination by the Court.

Hoping to delay resolution of this case, Defendants also argue that the loan agreements contain an enforceable delegation provision, which requires the validity and the scope of the arbitration provision to be decided by an arbitrator and not the Court. (ECF 35 at 11-14.) As an initial matter, Defendants contend that Plaintiffs were required to specifically challenge the delegation provision in their complaint. However, Defendants offer no legal support for this contention and, in fact, their cited case, *Rent-A-Center*, confirms that a challenge to a delegation clause only need to be raised in response to a motion to compel arbitration:

17

> The District Court correctly concluded that Jackson challenged only the validity
> of the contract as a whole. Nowhere in his opposition to Rent–A–Center's motion
> to compel arbitration did he even mention the delegation provision. See App. 39–
> 47. Rent–A–Center noted this fact in its reply: "[Jackson's response] fails to rebut
> or otherwise address in any way [Rent–A–Center's] argument that the Arbitrator
> must decide [Jackson's] challenge to the enforceability of the Agreement. *Thus,*
> *[Rent–A–Center's] argument is uncontested.*" *Id.,* at 50 (emphasis in original).

*Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 72–73 (2010). That is exactly what Plaintiffs are

doing here, and the Court should disregard Defendants' assertion that Plaintiffs were required to

raise a challenge earlier. Here, Defendants' reliance on the delegation provision fails for three

reasons—each of which independently render the delegation provision unenforceable.

First, as noted by other courts, the "delegation clause is unenforceable for virtually the

same reason as the underlying arbitration agreement—the Loan Agreement's wholesale waiver of

the application of federal and state law makes [the delegation] clause invalid." *MacDonald v.*

*CashCall, Inc*., No. CV 16-2781, 2017 WL 1536427, at *13 (D.N.J. Apr. 28, 2017). The reason

for this is simple: "enforcing the delegation provision would place an arbitrator in the impossible

position of deciding the enforceability of the agreement without authority to apply any applicable

federal or state law." *Smith v. W. Sky Fin., LLC*, 168 F. Supp. 3d 778, 786 (E.D. Pa. 2016); *Ryan*

*v. Delbert Servs. Corp.*, No. 5:15-CV-05044, 2016 WL 4702352, at *5 (E.D. Pa. Sept. 8, 2016)

("The wholesale waiver of federal and state law thus dooms both the delegation provision and the

arbitration clause, but for different reasons.").

Second, the delegation clause is unenforceable under Virginia law. If a company makes a

loan without a consumer finance license, Virginia law provides that the "loan contract ***shall be***

***void***" if it contains an interest rate above 12%. Va. Code. § 6.2-1541(A) (emphasis added). As

recently explained by the Fourth Circuit, when a contract is void it is "unenforceable from its

inception." *Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance*

*Co., Inc.*, No. 16-1511, 2017 WL 3442728 at *5 (4th Cir. Aug. 11, 2017) (citing *Liverpool & London & Globe Ins. Co. v. Bolling*, 176 Va. 182, 10 S.E.2d 518, 522 (1940)); *see also* Joseph M. Perrillo, Calamari and Perrillo on Contracts § 1.8(b) (6th ed. 2009) ("A contract is void, a contradiction in terms, when it produces no legal obligation . . . . It would be more exact to say that no contract was created."). Applying these principles, the Fourth Circuit held that a delegation provision in an insurance contract was void because "Virginia's decision to treat delegation provisions in insurance contracts" makes the delegation provision "void from its inception." *Minnieland Private Day Sch.*, 2017 WL 3442728 at *5.

Third, regardless of the delegation provision, the prospective waiver issue is ripe for current determination by the Court just as it was in *Hayes* and *Dillon*. In cases involving the prospective and categorical waiver of all federal and state law, there is no ambiguity concerning the effect of the waiver, and a federal court will refuse to enforce the arbitration agreement. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985); *Dillon*, 856 F.3d at 335 (reasoning that the prospective-waiver doctrine is ripe for review when there is no uncertainty regarding the effect of the choice-of-law provision).

A federal court would only defer determination of the waiver doctrine where there is uncertainty as to whether the foreign choice-of-law provision would preclude otherwise applicable federal substantive statutory remedies. *Dillon*, 856 F.3d at 334. "In such a case, the prospective waiver issue would not become ripe for final determination until the federal court is asked to enforce the arbitrator's decision." *Id*. For example, the mere possibility that an arbitrator may apply a foreign law, which may or may not reduce a party's legal obligations under federal law, was not sufficient for the court to determine the prospective-waiver issue. *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 541 (1995). In other words, if the waiver is "mere

speculation," then the issue is not ripe for judicial determination until the arbitrator's interpretation that waives federal law is effectuated. *See Dillon*, 856 F.3d at 334. On the other hand, where there is no uncertainty regarding the prospective waiver of federal statutory rights, the court should refuse to apply the unenforceable arbitration provision. *See Dillon*, 856 F.3d at 334.

This is particularly compelling in cases, such as this one, where a federal court will not have an opportunity to review the arbitration award. *See Sky Reefer*, 515 U.S. at 540 ("Were there no subsequent opportunity for review and were we persuaded that 'the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies . . . , we would have little hesitation in condemning the agreement as against public policy.'" (quoting *Mitsubishi Motors*, 473 U.S. at 637 n.19)). Here, the agreements specify that the tribal court has exclusive jurisdiction over the agreement, and any arbitration award may only be challenged or confirmed by the tribal court. Accordingly, even if there were some ambiguity regarding the effect of the foreign choice-of-law provision, a federal court will not have an opportunity to review the arbitrator's decision, which makes it even more critical that the Court address this issue now.

## III.    The arbitration agreements are unconscionable.

In the Fourth Circuit, unconscionability "generally includes an absence of meaningful choice on the part of one of the parties"—what is frequently called procedural unconscionability— "together with contract terms which are unreasonably favorable to the other party"—what is often called substantive unconscionability. *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 292–93 (4th Cir. 1989) (approving of test set forth in *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 455, 449 (D.C. Cir. 1965)); *see also Sanders v. Certified Car Ctr., Inc.*, 93 Va. Cir. 404 (2016) ("A contract is said to be unconscionable 'if no person in his senses would make it on the one hand and no fair and honest person would accept it on the other.' In practice, this means a court will not

enforce a contract or contract provision if it is both procedurally and substantively unconscionable." (quoting *Philyaw v. Platinum Enterprises, Inc.*, 54 Va. Cir. 364 (2001))). The arbitration agreements here are both procedurally and substantively unconscionable and thus unenforceable by Defendants.

### A. The arbitration agreements are procedurally unconscionable.

The arbitration agreements are "boilerplate" contracts of adhesion—borrowers must sign the contract to receive a loan, and they have no ability to modify its terms. However, the procedural unconscionability of the agreements goes far beyond this. Indeed, by providing that only the "Tribal court" may review any decision of an arbitrator, the arbitration agreement insulates the arbitration process from any meaningful judicial review and makes it impossible for a consumer to enforce an award as it appears that no tribal court is available to review any potential arbitration award. *See, e.g.*, *Williams v. Big Picture Loans, LLC*, 3:17-cv-461 (E.D. Va.) (ECF No. 125).

For example, Plaintiff Inscho's loan agreement provides that any award by the arbitrator can only be confirmed or challenged by a tribal court within the court system of the Otoe-Missouria Tribe. (Inscho Agr. 10-11.) However, as set forth in the Constitution of the Otoe-Missouria Tribe of Oklahoma, the Otoe-Missouria does not have its own tribal court system and instead relies on the Court of Indian Offenses to exercise its judicial authority. *See* Otoe-Missouria Const. art. XII, http://www.omtribe.org/who-we-are-government-constitution (last visited Aug. 3, 2018). The purpose of the Court of Indian Offenses is "to provide adequate machinery for the administration of justice for Indian tribes in those areas of Indian country where tribes retain jurisdiction over Indians that is exclusive of State jurisdiction but where tribal courts have not been established to exercise that jurisdiction." 25 C.F.R. § 11.102. "[E]ach Court of Indian Offenses has jurisdiction over any civil action arising within the territorial jurisdiction of the court in which: (1) The

21

defendant is an Indian; or (2) Other claims, provided at least one party is an Indian." 25 C.F.R. §
11.116. Thus, given that Plaintiffs' claims arose in Virginia and are against non-Native-American
Defendants, the Court of Indian Offenses would not have jurisdiction over Plaintiffs' claims or to
review an arbitration award concerning Plaintiffs' claims.

Plaintiffs have been unable to ascertain any information regarding the Chippewa Cree's
tribal courts or the manner in which claims may be filed with that court as the Chippewa Cree
Tribe apparently removed all information regarding its court system, constitution, and laws from
its official website. *See* Chippewa-Cree Indians of the Rocky Boy's Reservation, Montana- Tribal
Constitution, Nat'l Indian Law Library (Dec. 2013) (providing a table of contents of the Chippewa
Cree Constitution, noting that the table of contents was created using materials from the Chippewa
Cree's website, and providing a link to the Chippewa Cree's website for the full constitution),
http://www.narf.org/nill/constitutions/chippewa_cree/index.html; *see also* Page Not Found,
Chippewa Cree Law and Orders, http://www.chippewacree.org/Constitution.html (last visited
Aug. 3, 2018); Chippewa Cree Tribe, Montana.gov, https://tribalnations.mt.gov/chippewacree
(last visited Aug. 3, 2018). The Chippewa Cree Tribe's official website provides no information
regarding its tribal court system, not even mentioning the existence of a Tribal court or providing
a phone number or address for the court or the Tribe. *See* Chip Pew Acree,
http://www.chippewacree.org/ (last visited Aug. 3, 2018). Although the State of Montana's
website provides contact information for the Tribe, it does not mention any tribal court associated
with the Tribe. *See* Chippewa Cree Tribe, Montana.gov, https://tribalnations.mt.gov/chippewacree
(last visited Aug. 3, 2018). Accordingly, it appears that there is no meaningful judicial review
available for Plaintiffs Gibbs and Mwethuku in any Chippewa Cree tribal court that may, or may
not, exist.

Finally, the contract repeatedly (and falsely) purports to be subject solely to tribal law to the exclusion of all federal and state law. *See supra* Part I.A. Further, as pointed out by Defendants in their brief, a few of the agreements reference the applicability of the "Indian Commerce Clause of the Constitution of the United States of America." (ECF 35 at 21.) However, this is an entirely "irrelevant constitutional provision" that grants Congress the power to regulate commerce with Indian tribes. *See Jackson v. Payday Fin., LLC*, 764 F.3d 765, 778 (7th Cir. 2014). These claims "may have induced the Plaintiffs to believe, mistakenly, that they had no choice but to accede to" tribal dispute resolution. *Id.* (internal quotation marks omitted).

Further, the arbitration agreements' inclusion of a so-called "opt-out" provision does not make the arbitration provision any less procedurally unconscionable. Selection of the "opt-out" provision would leave the consumer with no forum for bringing their claims as in choosing the "opt-out" provision the consumer would have to agree that any disputes could only be brought in the court system of the tribe. (*See, e.g.*, Mwethuku Agr. 6.)

Given the procedural unconscionability of the arbitration agreements, Plaintiffs did not make a meaningful choice to assent to the terms of the tribal agreement.

**B.      The arbitration agreements are substantively unconscionable.**

Because of the unavailability of judicial review and enforcement of any arbitration award, the arbitration agreements are nothing more than "a sham and an illusion," and thus the agreements are also substantively unconscionable. *See Jackson*, 764 F.3d at 778–79. The arbitration agreements assure consumers that disputes will be resolved "under the watchful eye of a legitimate governing tribal body," and yet "a proceeding subject to such oversight simply is not a possibility." *Id.* at 779. "There simply [is] no prospect of a meaningful and fairly conducted" dispute resolution process where the arbitrator is not subject to any judicial review. *See id.* Further, even if the Tribal courts were available, the arbitration provisions would still be substantively unconscionable given

that the contracts explicitly prohibits the arbitrator and the Tribal court from applying state or federal law. *See id.*

To say the arbitration contract "unreasonably favor[s]" the Tribal Lenders and Defendants would be an understatement. *See Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 292 (4th Cir. 1989). Here, the apparent purpose of the arbitration provision was to insulate Defendants from any liability thereby depriving Plaintiffs of any meaningful opportunities to bring claims against Defendants for their blatant statutory violations of state and federal law.

**IV.      The arbitration clause is a result of overreaching.**

As this Court recently explained, the "Supreme Court has consistently accorded choice of forum and choice of law provisions presumptive validity," but this presumption "is not absolute, and, therefore, may be overcome by a clear showing that they are 'unreasonable under the circumstances.'" *Hunter v. NHcash.com, LLC*, No. 3:17CV348-HEH, 2017 WL 4052386, at *3 (E.D. Va. Sept. 12, 2017) (quoting *The Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 9 (1972)). Those circumstances include if their formation was induced by fraud or overreaching. *Hunter*, 2017 WL 4052386, at *3 (quoting *Allen v. Lloyd's of London*, 94 F.3d 923, 928, 1996 WL 495553 (4th Cir. 1996)).

Here, the arbitration provisions in the Plaintiffs' loan agreements are unenforceable because they are the product of overreaching. *See* Black's Law Dictionary (10th ed. 2014) (defining "overreaching" as the "act or an instance of taking unfair commercial advantage of another, esp. by fraudulent means."); *Overreach*, para. 3, *Merriam-Webster* (Nov. 25, 2017) ("to get the better of especially in dealing and bargaining and typically by unscrupulous or crafty methods"), https://www.merriam-webster.com/dictionary/overreaching. Under Virginia law, a party may prove overreaching "by showing that the circumstances surrounding the bargaining

process were inequitable" and the presence of "bad faith in the form of 'concealments, misrepresentations, undue advantage, [or] oppression on the part of the one who obtains the benefit' under the agreement." *See, e.g.*, *Kesser v. Kesser*, 92 Va. Cir. 209, 2015 WL 13048012, at *3 (2015) (quoting *Sims v. Sims*, 55 Va. App. 340, 349, 685 S.E.2d 869, 873 (2009)). Notably, the Court recently held that another rent-a-tribe's choice-of-law provisions were unenforceable because they were the product of overreaching. *Williams v. Big Picture Loans, LLC*, 3:17-cv-461 (E.D. Va.) (ECF No. 125).

As the Complaint sets out in vast detail, the Defendants in this case associated with the Tribe for the purpose of evading state usury and licensing laws.  (*See generally* Dkt. 1). Rather than complying with these laws, the Defendants adopted the rent-a-tribe model, which involved predatory lending practices done in the name of the Tribe even though the Tribe was not involved in the day-to-day operations of the scheme and received little benefit. Unquestionably, the Defendants used the Tribe as a front, attempting to exploit their purported position as a sovereign nation. Consumers thought they were contracting with an instrumentality of a sovereign nation, but in reality, they were contracting with Defendants. For example, the agreements represent that the lender is "an arm of the Tribe, it is a commercial entity formed pursuant to tribal law, it is owned and operated by the Tribe and it functions as a non-profit commercial entity of the Tribe, formed for the express purpose of economic development" (Williams Agr. at 1; Edwards Agr. at 1; Inscho Agr. at 1), even though the Tribe was merely a front for the Defendants who funded, partially operated, and profited from the illegal loans. (*See* Compl. ¶¶ 29-30; Dkt. 1 at 2).

The "Waiver of Jury Trial and Arbitration Agreement" provision is one of the most critical parts of the effort to take unfair commercial advantage of consumers as its purpose was to allow the Defendants to ostensibly avoid state usury and licensing laws, such as Va. Code § 6.2-1541.

Indeed, the only purpose of the provision was to insulate the nontribal participants. The Tribe itself and any *true* economic subdivision of the Tribe would enjoy sovereign immunity from any lawsuit, and thus the arbitration provision merely attempts to protect nontribal participants such as Martorello. *See, e.g.*, *Somerlott v. Cherokee Nation Distributors, Inc.*, 686 F.3d 1144, 1157 (10th Cir. 2012) (Gorsuch, J., concurring) ("The Nation could have chosen to operate the chiropractic clinic itself and enjoy immunity for its operations." (citing *Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 753 (1998)); *see also* Martin & Schwartz, *supra*, 69 Wash. & Lee L. Rev. at 785 ("more tribes could choose to simply form, fund, and run operations of their own, solely for the benefit of their members, thus meeting *Kiowa* directly.").

Enforcing the arbitration provision would reward Defendants' overreaching and create a race to the bottom that could potentially impact a wide variety of state laws. Moreover, it would reward blatant misrepresentations in the Loan Agreements claiming that the lender was "owned and operated by the Tribe" and that consumers would be able to enforce their arbitration through the Tribal Court. (*See, e.g.*, Williams Agr. at 1, 8.) The Court should not bless this "odious practice" of exploiting sovereign immunity "to prey on financially distressed consumers, while shielding itself" from the law. *Moses v. CashCall, Inc.*, 781 F.3d 63, 94 (4th Cir. 2015) (Davis, J., concurring in part and dissenting in part).

## CONCLUSION

For the foregoing reasons, the Court should deny the Defendants' Motion to Compel Arbitration.

Respectfully submitted,
**PLAINTIFFS**

By:____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170

KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com
Email: casey@kellyandcrandall.com

Leonard A. Bennett, Esq., VSB #37523
Craig C. Marchiando, Esq., VSB #89736
Elizabeth W. Hanes, Esq., VSB #75574
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com
Email: craig@clalegal.com
Email: elizabeth@clalegal.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of August, 2018, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system which will send a notification of such filing (NEF) to all counsel of record.

_____/s/_____
Kristi Cahoon Kelly (VSB# 72791)
KELLY & CRANDALL, PLC
3925 Chain Bridge Rd, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyandcrandall.com
*Counsel for Plaintiffs*
