# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**DARLENE GIBBS,** *et al.*,
*on behalf of themselves and all*
*individuals similarly situated*,

      **Plaintiffs,**

**v.**                                        **Civil Action No. 3:18cv48**

**HAYNES INVESTMENTS,**
**LLC,** *et al.*,

      **Defendants.**

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Defendants' Haynes Investments, LLC ("Haynes Investments"), Sovereign Business Solutions, LLC ("SBS" or "Sovereign Business Solutions"), and L. Stephen Haynes's (collectively with Haynes Investments and SBS, the "Haynes Defendants") three motions: the Motion to Transfer or, in the Alternative, to Stay Proceedings (the "Motion to Transfer"), (ECF No. 36), the Motion to Compel Arbitration, (ECF No. 34), and the Motion to Dismiss, (ECF No. 32).[1] Plaintiffs Darlene Gibbs, Stephanie Edwards, Lula Williams, Patrick Inscho, and Lawrence Mwethuku's ("Plaintiffs") responded to the Motions, (ECF Nos. 41, 42, 43), and the Haynes Defendants replied, (ECF Nos. 44, 45, 46).[2]

---

[1] For ease of reference, the Court refers to the Motion to Transfer, the Motion to Compel Arbitration, and the Motion to Dismiss collectively as the "Motions."

[2] On March 6, 2019, Plaintiffs also filed a Motion for Leave to File Supplemental Authority, (ECF No. 49), asking the Court to file and consider a transcript from a case in the Northern District of California which they contend addresses identical motions as those before this Court. Plaintiffs assert that the California district judge's oral comments as to an upcoming written opinion should inform this Court's decision. On March 12, 2019, Plaintiffs filed the California district court's written opinion on the motions. (ECF No. 50.) The Haynes

Accordingly, the matters are ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. §§ 1331[3] and 1367.[4] For the reasons that follow, the Court will deny the Motions.

## I. Procedural and Factual Background

### A. Summary of Allegations in the Complaint[5]

This controversy arises out of the Haynes Defendants' involvement in an allegedly unlawful lending operation involving two Native American-owned lending companies[6] and multiple alleged co-conspirators. The lending operation allegedly offered loans to Plaintiffs in

---

Defendants did not oppose the Motion to File Supplemental Authority and the time to do so has expired.

    The Court will deny the Motion to File Supplemental Authority as moot. A ruling from a non-binding court provides meager persuasive value. Even more importantly, the Court need not rely on nor refer to any authority beyond those briefed by the parties in order to render its findings here.

[3] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Complaint alleges violations of 18 U.S.C. § 1962 of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). (*See* Compl., ECF No. 1.)

[4] The Court exercises supplemental jurisdiction over Plaintiffs' state usury claim and unjust enrichment claim pursuant to 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . .").

[5] For the purpose of the Motion to Dismiss, the Court will assume the well-pleaded factual allegations in the Complaint to be true and will view them in the light most favorable to Plaintiffs. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

[6] The Chippewa Cree Tribe of the Rocky Boy's Indian Reservation (the "Chippewa Cree Tribe"), a federally recognized tribe, owns Plain Green, LLC ("Plain Green"). The Otoe-Missouria Tribe of Indians (the "Otoe-Missouria Tribe"), a federally recognized tribe, owns Great Plains Lending, LLC ("Great Plains"). The Court refers to the Chippewa Cree Tribe and the Otoe-Missouria Tribe collectively as the "Tribes."

amounts ranging from $300 to $3,000, charging interest rates ranging from 227.92% to 448%. (Compl. ¶¶ 120–21, ECF No. 1.) Plaintiffs bring this suit on behalf of themselves and all individuals similarly situated, alleging that this lending operation violates state and federal lending laws.

Plaintiffs allege that the lending operation constitutes what they refer to as a "rent-a-tribe." Under this improper business model, actors establish entities to originate internet-based high interest loans so as to evade state and federal usury and lending laws. A non-tribal entity and a Tribe agree to establish a lending company in the Tribe's name. According to Plaintiffs, the Native American Tribe nominally establishes the lending company in order to extend its tribal sovereign immunity to the newly-formed business entity. The tribal company, however, receives capital from a different, non-tribal person or company who seeks to use the tribal lending companies in order to cloak the unlawfully high-interest internet loans with sovereign immunity. The non-tribal entity retains the vast majority of the profits and controls the lending tribal entity, from major business decisions to day-to-day operations. In exchange, the Tribe receives only a small percentage of the revenue.

Here Plaintiffs challenge the formation and operation of two lending entities: Plain Green[7] and Great Plains.[8] Plain Green seeks immunity as part of the Chippewa Cree Tribe. Great Plains would claim immunity as part of the Otoe-Missouria Tribe. Because only the

---

[7] The allegations against Plain Green pertain largely to L. Stephen Haynes, Haynes Investments, and Sovereign Business Solutions.

[8] The claims against Great Plains primarily run against Victory Park Capital Advisors, Victory Park Management, LLC, Scott Zemnick, Jeffrey Schneider, and Thomas Welch.

On April 19, 2018, the Court transferred all claims against those defendants to the United States District Court for the Northern District of Texas pursuant to 28 U.S.C. §1412, finding that "related chapter 11 bankruptcy proceedings" were pending in that court. (*See* Apr. 19, 2018 Order, ECF No. 26.)

Haynes Defendants—who principally ran the Plain Green lending operation—remain in this action, the Court, for clarity, focuses on the factual allegations as to them. Plaintiffs also allege, however, that Haynes played a critical role in finding a new bank to partner with *both* Plain Green *and* Great Plains after they had been targeted by state and federal regulators (and the Department of Justice), resulting in some banks ceasing the processing of their loans. As such, some claims regarding Great Plains are interspersed and all five Plaintiffs bring their claims against the Haynes Defendants.

As to Plain Green, Plaintiffs allege that the Haynes Defendants, in conjunction with other actors and through a web of entities, actually "funded and partially operated" the so-called "rent-a-tribe" scheme at the heart of this case. (Compl. ¶ 2.) Specifically, the Haynes Defendants and several non-tribal actors entered into a term sheet in support of the unlawful tribal lending operation.[9] (*See* Compl. Ex. 1 "March 2011 Term Sheet" 1, ECF No. 1-1.) Per the March 2011 Term Sheet, a designated non-tribal entity[10] provided "the infrastructure to run the lending operations." (Compl. ¶ 34 (citing March 2011 Term Sheet 1).) Haynes Investments "provide[d] funding to the Tribe to enable it to make each of the [l]oans." (*Id.* ¶ 35 (quoting March 2011 Term Sheet 1–2).) In accordance with the provisions in the 2011 Term Sheet, Haynes

---

[9] At all times, Haynes, as the owner and managing partner of Haynes Investments, signed all of the agreements related to the purported enterprise.

[10] Think Finance, LLC, a non-party, served in this role. Plaintiffs describe Think Finance, LLC as a "payday lender" that conspired with the Haynes Defendants and others to avoid state usury laws. (Compl. ¶ 4.) According to Plaintiffs, the Haynes Defendants, "together with Think Finance, Plain Green, [and] Great Plains, marketed, initiated, and collected usurious loans in Virginia." (*Id.* ¶ 118.)

Plaintiffs state that they "filed a related case against Think Finance, its chief executive officer (Kenneth Rees), and some of the other companies involved on May 19, 2017." (Compl. 2 n.1 (citing *Gibbs et al. v. Rees et al.*, 3:17-00386 (E.D. Va.).) Plaintiffs also state they "filed a related case against Plain Green and Great Plains." (*Id.* (citing *Gibbs et al. v. Plain Green et al., LLC*, 3:17-cv-495 (MHL) (E.D. Va.).)

Investments provided a principal amount of up to $2,000,000 through "a revolving line of credit" to fund the loans. (Compl. ¶ 36 (quoting Compl. Ex. 2 "Credit Agreement" 1, ECF No. 1-2).)

Once Plain Green originated the loans in its name, another designated third-party entity "purchased" the loans from Plain Green. (Compl. ¶ 37.) As part of this "purchase," the third party entity "refunded [back to Haynes Investments] 99% of the funds provided by Haynes Investments, wh[ich] also received: (1) 5% interest on the money loaned to the Tribe, and (2) 1% of the revenue collected on the loans as a 'referral' fee." (*Id.* ¶ 38.) Plaintiffs allege that Great Plains has a comparable structure, albeit with different entities.

In this way, although Plain Green[11] and Great Plains[12] executed the loan agreements, the Haynes Defendants[13] and other non-tribal entities actually funded and controlled the lending operation. The lending operation issued loans to Virginia residents with interest rates far in excess of Virginia's usury law, which caps interest rates at 12%, with some exceptions not applicable here. *See* Va. Code. Ann. § 6.2-303. The Haynes Defendants, together with other non-parties, "marketed, initiated, and collected usurious loans in Virginia." (Compl. ¶ 118, ECF No. 1.)

On several occasions, Haynes Investments increased its investment in the Tribal lending operation. Between December 2011 and June 2012, "Haynes Investments received a monthly profit between $131,555 and $166,714" from its participation in the Tribal lending venture. (*Id.*

---

[11] Plaintiffs Gibbs and Mwethuku borrowed funds through Plain Green.

[12] Plaintiffs Williams, Edwards, and Inscho took out loans through Great Plains.

[13] Plaintiffs quote Haynes Investments' website as saying that its "Native American investments have successfully monetized the tribal advantages of sovereignty to enhance yield while substantially reducing risk." (Compl. ¶ 13 (quoting Haynes Investment, *American Indian*, http://www.haynesinvestments.net/native-american/).)

¶ 53 (citing Compl. Ex. 7 "ILP Profit Share Breakout Trend" TF-VA0602566).)  As of July 12,

2012, Haynes Investments had increased the line of credit it extended to the lending operation to

$20,000,000, ten times the amount originally agreed upon in March 2011.

In August 2012, Haynes proposed an additional arrangement "to continue to grow" the

improper lending operation.  (*Id.* ¶ 55.)  As part of this new financing arrangement, Haynes

created Sovereign Business Solutions,[14] which provided Plain Green a principal amount of up to

$15,000,000 through a revolving line of credit to fund additional loans.  In exchange, "SBS

received 15% interest on the outstanding advances on the line of credit, as well as a security

interest in the loans in the event of default."  (*Id.* ¶ 61 (citing Compl. Ex. 9 "February 2013

Credit and Security Agreement" §§ 3.3, 3.7).)  Haynes signed the February 2013 Credit and

Security Agreement on behalf of SBS.

Plaintiffs allege that Haynes "did not merely invest" in this unlawful Tribal lending

scheme, (Compl. ¶ 64,) but rather, "played an integral role in helping . . . [to] obtain a bank

willing to process payments through the Automated Clearing House Network (the 'ACH

Network')," (*id.* ¶ 65.)  The ACH Network "allows financial institutions to send or take money

directly out of a bank account without the requirement of a direct relationship between the

---

[14] Plaintiffs allege that Haynes "formed SBS because Plain Green wanted its 'lender entity to be named something more generic' than Mr. Haynes's last name."  (Compl. ¶ 15) (quoting Compl. Ex. 3 "Oct. 31, 2012 E-mail Chain," ECF No. 1-3.)).  Although Haynes created this new entity, Haynes continued to act as owner and managing partner of Haynes Investments under the prior agreements.

Through SBS, Haynes increased the amount of the revolving credit in the lending operation and, according to Plaintiffs, his interest in—and therefore, revenue from—the lending operation.  (*Id.* ¶ 61 (citing Compl. Ex. 9 "February 2013 Credit and Security Agreement" §§ 3.3, 3.7).)  SBS invested income into the lending operation, received income from unlawful loans, and reinvested in the lending venture.  Plaintiffs aver:  "Over the next several years, Mr. Haynes and his companies continued to receive proceeds from the enterprise and invest funds in the illegal business."  (Compl. ¶ 63.)

financial institution and the borrower." (Compl. ¶ 66.) Plaintiffs quote reports stating that the ACH plays a "vital role" in online lenders' ability to conduct business.[15] (*Id.* ¶ 68 (citation omitted).) These same financial reports indicate that due to the ACH's vital role, "state and federal regulators, as well as the Department of Justice have, seized on the ACH Network as a means to stop online lending by out-of-state lenders." (*Id.* (citation omitted).

When regulators targeted Plain Green and Great Plains, and banks consequently "ceased processing the debits and credits on their loans,"[16] (Compl. ¶ 72), Haynes "played a critical role in finding a new bank to partner with Plain Green and Great Plains," (*id.* ¶ 73). To this end, Haynes met with several banks beginning in 2013 and identified several possible partners over the course of a year.

Plaintiffs in this case all entered into loan agreements (the "Contracts" or the "Loan Contracts") with either Plain Green or Great Plains. (*See* Gibbs Agr., ECF No. 35-1; Williams Agr., ECF No. 35-1; Edwards Agr., ECF No. 35-1; Inscho Agr., ECF No. 35-1; Mwethuku Agr., ECF No. 35-1.) Although some variation in wording exists among the Contracts, they essentially include the same terms and the minor differences do not alter the outcome on the

---

[15] Those same reports add that "[w]ithout access to the ACH Network, a payday lender would not be able to electronically process payments in batches or without participation of the consumer—necessary functions of companies who specialize in providing small dollar loans over the Internet." (Compl. ¶ 67 (citing Elizabeth G. Balassone & Lauren L. Wroblewski, CHOKING-OFF ACCESS TO ONLINE SHORT-TERM LENDING?: AN OVERVIEW OF RECENT REGULATORY AND LITIGATION ACTIVITY AND THE ATTENDANT POLICY IMPLICATIONS, 17 No. 2 Fintech L. Rep. 1 (Mar. 2014)).)

[16] Plaintiffs contend that regulatory action caused the Haynes Defendants and others to turn from a previous so-called "rent-a-bank" operation between the First Bank of Delaware and Think Finance toward an unlawful lending venture with Native American tribes that mirrored "the rent-a-bank" model. (Compl. ¶¶ 27–30.)

Motions. Because the legal analysis requires a detailed evaluation of specific provisions within each Contract, an introductory summary follows.

Each Contract purports to constitute a loan agreement between the named plaintiff and either Plain Green (two contracts) or Great Plains (three contracts), including the underlying loan terms, choice of law provisions, and arbitration agreements. The principal amounts varied, from as low as $500 in a loan through Plain Green, (Mwethuku Agr. 2), to as high as $1,700 in a loan through Great Plains, (Inscho Agr. 2). Interest rates[17] also varied, ranging from 219.38%, (Inscho Agr. 3), to 373.97%, (Mwethuku Agr. 2).

All Contracts purport to be governed by Tribal Law.[18] All Contracts, through both Plain Green and Great Plains, expressly disavow the application of any state law. (Gibbs Agr. 8; Williams Agr. 10; Edwards Agr. 9; Inscho Agr. 10; Mwethuku Agr. 7.) As to federal law, Plaintiffs allege that the provisions make clear the parties' intention to disclaim the application of federal law. For example, the "Governing Law" provision in four[19] of the Contracts states that Tribal law governs each Contract, and that the lender "may choose to voluntarily use certain federal laws as guidelines for the provision of services. Such voluntary use does not represent acquiescence of the [Tribe] to any federal law." (Gibbs Agr. 6; Williams Agr. 7; Edwards Agr. 6–7; Inscho Agr. 7.) All Contracts include a "Truth in Lending Disclosure" but expressly

---

[17] For purposes of the instant Motions, the Court refers to the Annual Percentage Rates (APRs) in the Loan Contracts.

[18] The Gibbs and Mwethuku Contracts purport to be subject to the laws of the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, as the tribal owner of Plain Green.
The Williams Contract, Edwards Contract, and Inscho Contract purport to be subject to the laws of the Otoe-Missouria Tribe of Indians, as the tribal owner of Great Plains.

[19] Plain Green issued two of thes Contracts, and Great Plains issued the other three Contracts with this language. (Gibbs Agr. 6; Williams Agr. 7; Edwards Agr. 6–7; Inscho Agr. 7.)

disavow any conclusion that the inclusion of the disclosure constitutes "consent" to any "application of state or federal law." (Gibbs Agr. 3; Williams Agr. 3; Edwards Agr. 3; Inscho Agr. 3; Mwethuku Agr. 2.)

All Contracts also include an additional agreement to arbitrate disputes arising from the Contract (the "Arbitration Agreements"). According to the Contracts, the arbitration could take place through a nationally recognized arbitration entity,[20] on tribal land or within thirty (30) miles of the borrower's current address. The Arbitration Agreements all contain a proviso indicating that, should the chosen arbitration firm's policies and procedures conflict with the Loan Contract or Tribal law, the terms of the Loan Contract will prevail. (Gibbs. Agr. 8; Williams Agr. 7; Edwards Agr. 9; Inscho Agr. 9; Mwethuku Agr. 6.)

All Contracts include a severance clause stating that, should any provision within it— such as the Arbitration Agreement—be found unenforceable, the offensive provision would be severed, meaning that the remainder of the Contract would remain in full force and effect. (Gibbs Agr. 7, Williams Agr. 6; Edwards Agr. 6; Inscho Agr. 7; Mwethuku Agr. 6.) Borrowers can opt out of the Arbitration Agreements, but each Contract provides that borrowers who opt out of the Arbitration Agreements nevertheless agree to bring any disputes within the applicable Tribal court system and according to Tribal law. (Gibbs Agr. 7-8; Williams Agr. 7-8; Edwards Agr. 8; Inscho Agr. 7-8; Mwethuku Agr. 5.)

The Arbitration Agreements require the application of Tribal law, and limit the Arbitrator's authority to remedies and legal claims recognized by Tribal law. (Gibbs Agr. 6,

---

[20] The Arbitration Agreements provide the names and contact information of two arbitration organizations from which the borrower must choose. (*See* Gibbs Agr. 7 (American Arbitration Association and JAMS, the Resolution Experts); Williams Agr. 8 (International Institute for Conflict Prevention & Resolution, Inc. and JAMS); Edwards Agr. 7–8 (same); Inscho Agr. 8–9 (same); Mwethuku Agr. 6 (American Arbitration Association and JAMS).)

Williams Agr. 9; Edwards Agr. 9; Inscho Agr. 7; Mwethuku Agr. 6.) The Arbitration Agreements provide that either party may appeal the Arbitrator's decision in the Tribal court system. (Gibbs Agr. 8; Williams Agr. 9; Edwards Agr. 8; Inscho Agr. 9; Mwethuku Agr. 6.)

### B. Procedural Background

Plaintiffs filed a six-count putative class action Complaint against eight defendants[21] alleging various federal and state violations associated with the allegedly unlawful loan enterprise. Plaintiffs pursue this suit on behalf of Virginia residents who entered into loan agreements with Plain Green or Great Plains, bringing six class counts as follows:

| | |
|---|---|
| **Count I:** | **18 U.S.C. § 1962(a).**[22] Plaintiffs allege that the Haynes Defendants received "income derived, directly and indirectly, through collection of unlawful debt," and used and reinvested "parts of such income to acquire interests in and to further establish and assist the operations of the enterprise." (Compl. ¶ 149.) |
| **Count II:** | **18 U.S.C. § 1962(b).** Plaintiffs allege that the Haynes Defendants acquired and maintained "interests in and control of the enterprise involved in the unlawful collection of debt." (Compl. ¶ 161.) |
| **Count III:** | **18 U.S.C. § 1962(c).** Plaintiffs allege that the Haynes Defendants "associated with the enterprise and participated in the affairs of the enterprise, which existed for the purpose of collection of unlawful debt." (Compl. ¶ 175.) |
| **Count IV:** | **18 U.S.C. § 1962(d).** Plaintiffs allege the Haynes Defendants entered into several agreements to violate §§ 1962(a)-(c). (Compl. ¶ 187.) |

---

[21] Of the original named defendants, only the Haynes Defendants remain.

[22] Counts I, II, III, and IV (the "RICO Claims") all arise out of 18 U.S.C. § 1962. *See* 18 U.S.C. § 1962(a)-(d). The first three provisions in § 1962 proscribe certain actions related to an enterprise engaged in interstate commerce through the collection of unlawful debt. *See* 18 U.S.C. § 1962(a)-(c). The fourth provision makes it unlawful to conspire to violate subsections (a), (b), or (c) of the statute. 18 U.S.C. § 1962(d).

**Count V:** **Virginia Usury Laws.**[23]  Plaintiffs allege the loans violate Virginia's usury laws because the interest rates exceed 12%. Plaintiffs allege that the Haynes Defendants unlawfully "received revenues generated on the loans." (Compl. ¶ 197.)

**Count VI:** **Unjust Enrichment.**[24]  Plaintiffs allege they conferred a benefit on the Haynes Defendants when they repaid the allegedly unlawful loans; that the Haynes Defendants knew or should have known about the benefit; and that the Haynes Defendants "have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans." (Compl. ¶ 207.)

Plaintiffs seek: (1) class certification; (2) declaratory and injunctive relief and damages; and, (3) attorney's fees, litigation expenses, and costs of suit.

On April 18, 2018, Defendants Victory Park Capital Advisors, LLC; Victory Park Management, LLC; Scott Zemnick; Jeffrey Schneider; and Thomas Welch moved to transfer the case to the United States District Court for the Northern District of Texas. (ECF No. 24.) On April 19, 2018, the Court granted the Motion as to the claims against these defendants, but retained the claims against the Haynes Defendants.

On July 18, 2018, the Haynes Defendants filed the Motion to Transfer, the Motion to Compel Arbitration, and the Motion to Dismiss. Plaintiffs responded in opposition to the Motions, and the Haynes Defendants replied.

---

[23] Subject to certain exceptions, Virginia law proscribes charging more than 12% interest on loans. Va. Code Ann. § 6.2-303(A). Virginia law provides that a loan contract which violates Virginia's usury provisions "shall be void" and the lender to that void contract agreement cannot "collect, receive, or retain any principal, interest, or charges whatsoever with respect to the loan." Va. Code Ann. § 6.2-1541(A)–(B). A borrower who pays interest on a loan in excess of the applicable statutory maximum may bring an action against "the person taking or receiving such payments." Va. Code Ann. § 6.2-305(A).

[24] To state a claim for unjust enrichment, a plaintiff must allege: "(1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *Integrated Direct Mktg. v. May*, 129 F. Supp. 3d 336, 374 (E.D. Va. 2015), *aff'd*, 690 F. App'x 822 (4th Cir. 2017).

## II.  Analysis:  Motion to Transfer

In their Motion to Transfer, the Haynes Defendants invoke the "first-to-file" rule,

claiming the doctrine warrants transferring the action to the United States District Court for the

District of Vermont, where Haynes Investments is currently defending itself in a lawsuit, filed

previous to this one, involving its business associations with Plain Green.[25]  (*See* Mem. Supp.

Mot. Transfer 1–2, ECF No. 37.)  Having reviewed the matter, the Court concludes that the

first-to-file analysis counsels denying the Motion to Transfer.  Even without such a finding, the

interests of justice amply justify an exception to transfer to the earlier filed case here.

### A.  The First-to-File Rule Generally

"The first-to-file rule provides that 'when multiple suits are filed in different Federal

courts upon the same factual issue, the first or prior action is permitted to proceed to the

---

[25] The Haynes Defendants describe *Gingras et al. v. Victory Park Capital Advisors, LLC, et al.* ("*Gingras*"), No: 5:15cv233, (D. Vt. Nov. 21, 2017), as "nearly identical" to this suit, (Mem. Supp. Mot. Transfer 3).  (*See Gingras* Compl., ECF No. 37-1.)  In *Gingras*, two named Plaintiffs—neither named in the action before this Court—seek a nationwide class-action suit against seventeen defendants:  Victory Park Capital Advisors, LLC; Victory Park Management, LLC; GPL Servicing, LTD.; GPL Servicing Agent, LLC; GPL Servicing Trust; GPL Servicing Trust II; Haynes Investments; and John Does 1-10.  (*See* Gingras Compl. 1.)  The *Gingras* Complaint also identifies fourteen interested parties.  (*Id.* ¶¶ 20–33.)  The *Gingras* Complaint does not name Haynes or Sovereign Business Solutions.

The *Gingras* plaintiffs purport to bring the "class action against the financial and operational backers of an unlawful online payday lending scheme that has taken advantage of people who are struggling financially by charging extortionate interest rates and engaging in illegal lending practices." (*Gingras* Compl. ¶ 1.)  The *Gingras* Complaint goes on to describe "rent-a-tribe" schemes, contending that the defendants engaged in such a scheme through Great Plains, the same lending entity who issued loans to Williams, Edwards, and Inscho in this suit.

The plaintiffs in *Gingras* raise six claims.  Count One, against all of the defendants, states violations of the Electronic Funds Transfer Act.  In Count Two, the plaintiffs allege that all the defendants violated the Vermont Consumer Fraud Act.  Counts Three and Four include allegations of wire fraud in violation of RICO against the "Victory Park Defendants." (*Gingras* Compl. 51, 53.)  In Count Five, the plaintiffs allege that all of the defendants "knowingly entered into a series of agreements designed to further the affairs of the Plain Green enterprise and the business of illegal lending that violates RICO § 1962(c)." (*Id.* ¶ 261.)  Finally, Count Six brings an unjust enrichment claim against all of the *Gingras* defendants.

exclusion of another subsequently filed.'" *Victaulic Co. v. E. Indus. Supplies, Inc.*, No: 6:13-01939, 2013 WL 6388761, at *2 (D. S.C. Dec. 6, 2013) (quoting *Allied-Gen. Nuclear Servs. v. Commonwealth Edison Co.*, 675 F.2d 610, 611 n.* (4th Cir. 1982)). Courts within the United States Court of Appeals for the Fourth Circuit have observed that the Fourth Circuit "has no unyielding 'first-to-file' rule." *See, e.g., Victaulic*, 2013 WL 6388761 at *2 (quoting *CACI Int'l Inc. v. Pentagen Techs. Int'l Ltd.*, 70 F. 3d 111, 1995 WL 679952, at *6 (4th Cir. 1995) (citation omitted)). Generally, "the first suit should have priority, absent the showing of balance of convenience in favor of the second action." *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 594–95 (4th Cir. 1982). But the first-to-file rule "is not absolute and is not to be mechanically applied." *Victaulic*, 2013 WL 6388761 at *2, (quoting *Harris v. McDonnell*, No. 5:13-cv-000777, 2013 WL 5720355, at *3 (W.D. Va Oct. 18, 2013)).

In determining whether the two actions come within the scope of the first-to-file rule, courts consider "three factors: (1) the chronology of the filings, (2) the similarity of the parties involved, and (3) the similarity of the issues at stake." *Victaulic*, 2013 WL 6388761 at *3 (quoting *Harris* 2013 WL 5720355, at *3). The parties and issues need not be identical, as the first-to-file rule may apply if the parties and issues "are substantively the same or sufficiently similar." *Id.*

If two actions fall within the scope of the first-to-file rule, the decision to apply the rule "is an equitable determination that is made on a case-by-case, discretionary basis." *Elderberry of Weber City, LLC v. Living Centers-Southeast, Inc.*, No. 6:12cv52, 2013 WL 1164835, at *4 (W.D. Va. Mar. 20, 2013) (quoting *Nutrition & Fitness, Inc. v. Blue Stuff, Inc.*, 264 F. Supp. 2d 357, 360 (W.D.N.C. May 19, 2003)). Because the first-to-file rule, as a matter of policy, seeks to avoid duplicative litigation and to conserve judicial resources, "exceptions to the rule are

common 'when justice or expediency requires.'" *Id.* (quoting *Samsung Electronics Co., Ltd. v. Rambus, Inc.*, 386 F. Supp. 2d 708, 724 (E.D. Va. 2005)).

"[A]lthough the Fourth Circuit has not stated explicitly that special circumstances may warrant an exception to the first-to-file rule, it has implicitly recognized a special circumstance exception in cases involving procedural fencing or forum shopping." *Elderberry*, 2013 WL 1164835, at *4 (quoting *Federated Mut. Ins. Co. v. Pactiv Corp.*, No. 5:09cv00073, 2010 WL 503090, at *3 (W.D. Va. Feb. 9, 2010) (internal citations and quotation marks omitted). When determining whether "special circumstances" exist, courts within the Fourth Circuit have considered a variety of factors: the existence of forum shopping or a "race to the courthouse," how far each case has progressed, and the balance of convenience. *Id.* (collecting cases). In weighing the balance of convenience, "courts consider the same factors relevant to transfer of venue or forum non conveniens."[26] *Id.* (citation omitted). Ultimately, "[t]he moving party bears the burden of clearly establishing that these factors favor transfer." *Victaulic*, 2013 WL 6388761 at *3.

---

[26] Title 28, § 1404(a) governs transfer of venue, stating: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The decision to transfer a case rests in the district court's sound discretion. *Koh v. Microtek Intern., Inc.*, 250 F. Supp. 2d 627, 630 (E.D. Va. 2003). A court determining the propriety of a motion to transfer under § 1404(a) follows a two-step inquiry. *Bascom Research, LLC v. Facebook, Inc.*, No. 1:12cv1111, 2012 WL 12918407, at *1 (E.D. Va. Dec. 11, 2012). First, the court determines whether the claims could have been brought in the transferee forum. *Id.*

Second, the court considers the following four factors: "(1) plaintiff's choice of forum, (2) convenience of the parties, (3) witness convenience and access, and (4) the interest of justice." *Id.* A court's decision to transfer depends on the particular facts of the case because § 1404(a) "provides no guidance as to the weight" that courts should afford each factor. *Samsung Elecs. Co., LTD.*, 386 F. Supp. 2d at 716.

**B.     The Court Will Deny the Motion to Transfer Because the First-to-File Rule Does Not Support Transfer**

A review of the two actions shows that *Gingras* and the present action do not fall within the scope of the first-to-file rule.  Although *Gingras* predates the action in this Court, thereby satisfying the first and most obvious factor under the test, the present case fails to sufficiently overlap with *Gingras*.

As to the second prong of the first-to-file evaluation, the parties do not substantially overlap.  Of the eight parties to this case—five named plaintiffs and three defendants—*Gingras* names only Haynes Investments.  Plaintiffs bring this purported class action suit on behalf of Virginia residents.  The *Gingras* plaintiffs, both Vermont residents, seek to bring suit on behalf of a nationwide class.  Although the proposed *Gingras* class may ultimately include some of the named plaintiffs in this suit,[27] the *Gingras* plaintiffs have not yet moved to certify the class.[28] On this record, it would be premature to conclude that the plaintiffs in each suit would

---

[27] The *Gingras* action defines the proposed class as "[a]ll persons who took out payday loans issued in the name of Plain Green." (*Gingras* Compl. ¶ 191 (excluding certain Pennsylvania residents).) The proposed *Gingras* class, if certified, would exclude Plaintiffs Williams, Edwards, and Inscho, as they took out loans only with Great Plains.

[28] The Haynes Defendants argue that the Court should consider *Gingras's* proposed class members, which would include some of the named Plaintiffs.  (Mem. Supp. Mot. Transfer 2.) Plaintiffs counter that "it is improper to compare the classes until a class has actually been certified."  (Resp. Mot. Transfer 9, ECF No. 43 (citing *Lac Anh Le v. Pricewaterhousecoopers LLP*, No. C-0-5476, 2008 WL 618938, at *1 (N.D. Cal. Mar. 4, 2008)).)  Plaintiffs describe the Haynes Defendants' efforts as "premature." (*Id.* 8.)  The United States Court of Appeals for the Fourth Circuit has not considered this issue, but the Court need not conclusively resolve it here.
    The proposed *Gingras* nationwide class would exclude three of the five named Plaintiffs in this suit.  Combined with the lack of substantial similarities between the named defendants in this suit and the named defendants in *Gingras*, a consideration of the current-party identities weighs against the applicability of the first-to-file rule, even assuming the proposed *Gingras* class moves forward as currently defined.

sufficiently overlap.[29]  Although the difference in named plaintiffs, on its own, might not defeat

the first-to-file rule in a purported class action, the Court also considers the absence of both

Haynes and Sovereign Business Solutions highly problematic.  The *Gingras* Complaint names

seventeen defendants and fourteen interested parties.  It does not name Haynes or Sovereign

Business Solutions.[30]

More importantly, as to the third factor, the causes of action in the cases do not constitute

substantively identical or similar claims.  The Haynes Defendants allege that the theories of the

cases overlap, as both sets of plaintiffs allege that "the Haynes Defendants invested in what [the

plaintiffs in each case] describe as an illegal lending enterprise involving Native American tribes

and various loan servicers. . . and assisted the servicers in attempting to find a bank to work with

the servicers in collecting the loans via the [ACH Network]."  (Mem. Supp. Mot. Transfer 3.)

---

[29] According to the *Gingras* court, "the [p]arties have made substantial progress toward a final settlement in this action."  (Nov. 28, 2018 Order 3, *Gingras et al. v. Victory Park Capital Advisors, LLC et al.*, No. 5:17cv233, (D. Vt. Nov. 28, 2018), ECF No. 22.)  Several parties engaged in a mediation, and "[a]ll but one of the parties to the mediation reached an agreement on the essential terms of a settlement, and those parties are actively negotiating detailed settlement terms."  (*Id.* 2.)  As any potential settlement may affect the scope of the class, or possibly render moot a class certification, this information bolsters the Court's conclusion that it would be premature to proceed on the assumption that the *Gingras* class would include two of the five named Plaintiffs from this case.

[30] The *Gingras* Complaint describes John Doe 5–10 as "additional parties who participated in the unlawful scheme . . . but whose identities are unknown to Plaintiffs at this time."  (*Gingras* Compl. ¶ 19.)  To the extent the Haynes Defendants might argue that *Gingras* may ultimately implicate Haynes or Sovereign Business Solutions—a possibility the Haynes Defendants did not raise in their briefing—the Court would reject such arguments at this stage of litigation.  Nothing in the record of either case indicates that the *Gingras* plaintiffs did not know about Haynes or Sovereign Business Solution when they filed.  No party here argues that the *Gingras* plaintiffs—who named Haynes *Investments* as a defendant—did not know about Haynes himself, the owner and managing partner of Haynes Investments.  Haynes's absence in the *Gingras* Complaint, which so thoroughly identifies relevant actors, strikes the Court as meaningfully distinguishing the cases.

And though the *Gingras* Complaint names several defendants previously named in this case, there exists—at *this* time—very little overlap between parties.

Although *Gingras* raises many of the same factual allegations—a description of how allegedly improper Tribal lending operations work and allegations that Haynes Investments carried out such an operation through Plain Green—the legal claims presented to the United States District Court for the District of Vermont lack sufficient similarity to the current case to justify invoking the first-to-file rule and transferring this suit to Vermont.

Here, Plaintiffs' claims all stem from Virginia's usury laws. Count V of the Complaint states violations of Virginia usury laws, and these alleged violations undergird Plaintiffs' four RICO claims[31] and their unjust enrichment claim.[32] *Gingras* does not invoke Virginia law or rely on it to support any of the causes of actions. Even if the District Court for the District of Vermont were to certify the proposed *Gingras* nationwide class, the *Gingras* class still might not preclude Plaintiffs from pursuing their claims for relief here because of the different theories of legal liability in each suit.

For example, although the *Gingras* Complaint brings three RICO claims pursuant to the same provisions Plaintiffs invoke here, the facts underlying each claim differ. The *Gingras* plaintiffs allege that the "Victory Park Defendants" violated 18 U.S.C. § 1962(c) by engaging in wire fraud and mail fraud, but they do not allege that Haynes Investments violated this RICO

---

[31] Plaintiffs invoke 18 U.S.C. §§ 1962(a)-(d) to charge violations of RICO by the Haynes Defendants. Relevant here, § 1962 makes it unlawful to take certain actions in connection with the collection of unlawful debt. *See* 18 U.S.C. §§ 1962(a)-(d). Because the interest rates violate Virginia's usury laws, Plaintiffs argue, the loans at issue constitute unlawful debt. From this starting point, Plaintiffs allege that the Complaint sufficiently alleges the other necessary elements to maintain their RICO allegations against the Haynes Defendants.

[32] To prove unjust enrichment, a plaintiff must show "circumstances that render it inequitable for the defendant to retain the benefit" conferred onto it without paying for its value. *Integrated Direct*, 129 F. Supp. at 374. Plaintiffs allege it would be inequitable for the Haynes Defendants to benefit from the collection of the loans because the interest rates on the loans unlawfully exceeded Virginia's statutory limits.

provision.  (*Gingras* Compl. ¶ 246.)  Also, no allegations of wire or mail fraud stand before this Court.  Instead, Plaintiffs allege that the Haynes Defendants violated this RICO provision when they "associated with the enterprise and participated in the affairs of the enterprise, which existed for the purpose of collection of unlawful debt."  (Compl. ¶ 175.)

Both the *Gingras* Complaint and the Complaint filed in this Court raise a claim under § 1962(b).  But the *Gingras* plaintiffs allege that all the *Gingras* defendants, including Haynes Investments, violated § 1962(b) by engaging in the unlawful collection of debt.  The facts undergirding these allegations relate to Vermont consumers and Vermont law.  Plaintiffs here, instead, allege that the Haynes Defendants violated § 1962(b) when they acquired and maintained "interests in and control of the enterprise involved in the unlawful collection of debt."  (Compl. ¶ 161.)  Plaintiffs describe the debt as unlawful because it violates Virginia usury laws.  Although the *Gingras* Complaint refers to "usurious rates of more than twice the legal limit in several states," this general assertion does not suffice, on its own, to support a finding that the cases bring duplicate § 1962(b) claims.[33]

Other important differences among the causes of action also exist.  Two of the four claims against Haynes Investments in *Gingras* do not overlap with this case at all:  Count One states violations of the Electronic Funds Transfer Act, and Count II states violations of the Vermont Consumer Fraud Act.  Plaintiffs here, meanwhile, bring a claim, completely absent in *Gingras*, pursuant to § 1962(a) (the "RICO Receipt & Investment Count") against all of the Haynes Defendants.

---

[33] Relatedly, the plaintiffs to each action bring a claim against Haynes Investments pursuant to 18 U.S.C. § 1962(d) (the "Conspiracy Claim") for conspiring to violate § 1962(b). But the conspiracy claims fail to constitute substantively similar claims for the same reasons the § 1962(b) claims themselves fail to overlap:  if the facts undergirding the RICO claims differ, the facts supporting the related RICO conspiracy claims necessarily differ, as well.

Thus, the Court finds that the parties and the claims in *Gingras* and this action do not present as "substantively the same or sufficiently similar." *Victaulic*, 2013 WL 6388761 at *3. Because neither the parties nor the claims substantially overlap, the first-to-file rule does not commend transfer. Although similarities between the cases exist, the Haynes Defendants themselves recognize that "this case is one of many being litigated in courts across the country," all of which bring similar claims. (Mem. Supp. Mot. Transfer 1, ECF No. 37.)

In conclusion, assessing the circumstances at bar, the Court will deny the Motion to Transfer under the first-to-file rule. Because the *Gingras* case and the action here lack a similarity of parties or issues at stake, the final two prongs of the first-to-file rule remain unmet. For these reasons, the Court will deny the Motion to Transfer.

### C. Alternatively, Special Circumstances Would Justify Proceeding In This Court Rather than Ordering Transfer

As articulated earlier, even in circumstances where the first-to-file would suggest transfer, the decision to invoke the rule "is an equitable determination that is made on a case-by-case, discretionary basis." *Elderberry*, 2013 WL 1164835 at *4 (quoting *Nutrition & Fitness*, 264 F. Supp. 2d at 360). A court may use its broad discretion to determine whether special circumstances exist, such as the existence of forum shopping,[34] the progress of both actions, and the balance of convenience. *Id.* (collecting cases). Here, even were the Court to assume that substantial overlap existed between the parties and claims in *Gingras* and this action (meaning

---

[34] Under these facts, given the numerous related cases in this district, this factor does not weigh for or against transfer.

that the Haynes Defendants could properly invoke the first-to-file rule), special circumstances readily would persuade the Court that this action should remain, and proceed, in this Court.

First, the *Gingras* action has not progressed since its filing. The *Gingras* plaintiffs filed suit on November 21, 2017. (*See Gingras Compl.*) On February 20, 2018, before any party filed an answer or responsive pleading, the *Gingras* court stayed the case.[35] (Feb. 20, 2018 Order, *Gingras et al. v. Victory Park Capital Advisors, LLC et al.*, No. 5:17cv233 (D. Vt. Feb. 20, 2018).) The *Gingras* action remains stayed. (*See generally, Gingras et al. v. Victory Park Capital Advisors, LLC et al.*, No. 5:17cv233 (D. Vt. Filed Nov. 21, 2017).) In contrast, although Plaintiffs filed this action after the *Gingras* Plaintiffs brought their suit, this case remains active. The Haynes Defendants have filed substantive pretrial motions and the Court, in this Memorandum Opinion, makes substantive rulings on legal issues central to the dispute, including the enforceability of the arbitration agreement clauses.

Second, the "balance of convenience" strongly favors remaining in this Court. *See Volvo*, 386 F.3d at 594–95; *see also Elderberry*, 2013 WL 1164835 at *4; *Victaulic*, 2013 WL 6388761 at *3. When determining the balance of convenience, the Court considers the same factors that a court weighs when ruling on a motion to transfer venue pursuant to 28 U.S.C. § 1404(a).

In analyzing a motion to transfer under 28 U.S.C. § 1404(a), a court must first consider "whether the plaintiff could have brought the action in the transferee forum." *Wenzel v. Knight*, Case No. 3:14cv432, 2015 WL 222179, at *1 (E.D. Va. 2015). Plaintiffs, in their opposition to the Motion to Transfer, raise legitimate concerns about personal jurisdiction over the Haynes

---

[35] The *Gingras* court stayed the action pending resolution of an appeal currently before the United States Court of Appeals for the Second Circuit that may affect the *Gingras* proceedings. (*See* Oct. 10, 2018 Order, *Gingras et al. v. Victory Park Capital Advisors, LLC et al.*, No. 5:17cv233.)

Defendants in the District of Vermont as it pertains to Plaintiffs' claims, which stem from acts that took place in Virginia, not Vermont. Specifically, Plaintiffs state that "the allegations in Plaintiffs' Complaint would not have established Defendants' minimum contacts with Vermont to satisfy the strictures of due process as applied by the Second Circuit." (Resp. Mot. Transfer 13.) The Haynes Defendants do not adequately respond to these concerns. It seems unlikely that Plaintiffs could have brought this case in the District of Vermont.

Even putting aside the issue of personal jurisdiction, given the nature of class action suits, other § 1404 factors weigh in favor of remaining in this Court. A court considers: "(1) plaintiffs['] choice of forum, (2) convenience of the parties, (3) witness convenience and access, and (4) the interest of justice." *Wenzel*, 2015 WL 222179 at *2. "In some cases, the interest of justice trumps the other factors, even when they suggest a different outcome." *Id.* at *3. Under this analysis, the Haynes Defendants could not meet their burden to "clearly establish[] that these factors favor transfer." *Victaulic*, 2013 WL 6388761 at *3.

Remarkably, these four § 1404 factors also commend a denial of transfer. First, as to the plaintiff's choice of forum, no question exists that Plaintiffs prefer this forum to Vermont, given their opposition to the transfer and legitimate concerns about personal jurisdiction to proceed in Vermont. Second, as to party convenience, Plaintiffs each filed declarations detailing the inconvenience and expense that transfer to Vermont would produce. (*See* ECF Nos. 43-1, 43-2, 43-3, 43-4, 43-5.) Although the Haynes Defendants may *prefer* to litigate claims in one venue, party convenience plainly weighs in favor of this venue. Finally, as to the third factor, Plaintiffs' declarations indicate that witnesses familiar with Plaintiffs' claims live in Virginia and that Plaintiffs do not know of any person in Vermont who could act as a witness in this case. For this reason, this factor also weighs in favor of remaining in this Court.

Most importantly, the interest of justice—the fourth consideration under § 1404—justifies proceeding in this venue. As the Haynes Defendants recognize, several other actions pending here appear closely related to this case, perhaps more so than *Gingras*. (Mem. Supp. Mot. Dismiss 3 ("The instant Complaint alleges identical harms and practically identical theories of liability as those in [other cases before this Court], including as to the Haynes Defendants.").) Any potential gain in judicial efficiency from transferring this case to the District of Vermont seem overborne because this Court will have to consider the same underlying facts and claims to address other cases before it. *See, e.g.*, *Wenzel*, 2015 WL 222179 at *4 (discussing judicial efficiency when determining whether to grant a transfer).

In sum, even absent the Court's finding that the Haynes Defendants cannot invoke the first-to-file rule to justify transfer, the Court would find that ample "special circumstances" commend proceeding in this forum and denying the Haynes Defendants' Motion to Transfer. *Elderberry*, 2013 WL 1164835 at *4 (quotation omitted).

### III. Analysis: Motion to Compel Arbitration

#### A. Applicable Law

The Fourth Circuit reviews *de novo* "a district court's order compelling arbitration under the [Federal Arbitration Act]." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 671 (4th Cir. 2016). A "strong federal policy in favor of enforcing arbitration agreements" exists. *Id.* (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985)).

Principles of contract law govern the enforceability of arbitration agreements, *id.*, and arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Federal Arbitration Act (or "FAA") generally "preserves state law contract defenses unless such defenses

'rely on the uniqueness of an agreement to arbitrate' and are applied 'in a fashion that disfavors arbitration.'" *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 334 (4th Cir. 2017) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341–42 (2011)).

The Supreme Court of the United States "has recognized that arbitration agreements that operate 'as a prospective waiver of a party's right to pursue statutory remedies' are not enforceable because they are in violation of public policy." *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985)). "Under this 'prospective waiver doctrine,' courts will not enforce an arbitration agreement if doing so would prevent a litigant from vindicating federal substantive statutory rights." *Id.* (citations omitted).

**B.     The Court Finds the Arbitration Agreements Unenforceable**

**1.     Fourth Circuit Precedent: *Hayes* and *Dillon***

Two recent Fourth Circuit cases control the Motion to Compel before the Court and warrant thorough summaries: *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666 (4th Cir. 2016); and, *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330 (4th Cir. 2017).

In 2016, the Fourth Circuit considered an arbitration agreement similar to the Arbitration Agreements at issue here. *See generally Hayes*, 811 F.3d 666. Plaintiff Hayes entered into a loan contract (the "Hayes Contract") with Western Sky Financial, LLC ("Western Sky"), "an online lender owned by Martin Webb," a member of the Cheyenne River Sioux Tribe. *Id.* at 668. The Hayes Contract, like the Plaintiffs' Contracts, included underlying loan provisions, choice of law provisions, and an arbitration agreement. Western Sky issued Hayes a $2,600 loan (minus a $75 origination fee) with an annual interest rate of 139.12%. *Id.* Over the four-year life cycle of the loan, "Hayes was set to pay $14,093.12 for his $2,525[]." *Id.* at 668–69. Hayes

brought suit to obtain relief from the allegedly unlawful debt collection, and the defendants sought to compel arbitration. *Id.* at 669.

The Hayes Contract purported to be "subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe." *Id.* (quoting the Hayes Contract (bold removed)). It expressly disavowed other law: "no other state or federal law or regulation shall apply to this Loan Agreement." *Id.* (quoting the Hayes Contract).

After discussing the rising trend of challenges to similarly-worded arbitration agreements in lower courts, and closely reviewing other provisions in the Hayes Contract related to applicable law, the *Hayes* court concluded that "[t]his arbitration agreements fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to the plaintiffs' federal claims." *Id.* at 673. The *Hayes* court explained:

> With one hand, the arbitration agreement offers an alternative dispute resolution procedure in which aggrieved persons may bring their claims, and with the other, it proceeds to take those very claims away. The just and efficient system of arbitration intended by Congress when it passed the FAA may not play host to this sort of farce.

*Id.* at 673–74. The Fourth Circuit concluded that "a party may not underhandedly convert a choice of law clause into a choice of no law clause—it may not flatly and categorically renounce the authority of the federal statutes to which it is and must remain subject." *Id.* at 675. The Fourth Circuit described the Hayes Contract's attempt to prospectively waive Hayes's federal rights as "plainly forbidden" and held it "invalid and unenforceable." *Id.*

The *Hayes* court also highlighted questionable provisions within the arbitration agreement, such as one allowing professional arbiters to "administer" the arbitration without specifying they would "conduct" it. *Id.* at 673. In *Hayes*, the Fourth Circuit also pointedly noted that the requirement that an arbiter could rely on traditional rules of arbitration "only to the

extent that those rules and procedures do not contradict either the law of the [Tribe or the arbitration agreement]," *id.,* presented a "conundrum," *id.* (citation and quotation omitted).

Finally, the Fourth Circuit declined to sever the arbitration agreement's "errant provisions." *Id.* at 675. "It is a basic principle of contract law that an unenforceable provision cannot be severed when it goes [to] the 'essence' of the contract." *Id.* at 675–76 (quoting 8 SAMUEL WILLISTON & RICHARD A. LORD, *A Treatise on the Law of Contracts* § 19:73 (4th ed. 1993)). The *Hayes* court considered the arbitration agreement in the context of the entire Hayes Contract, critiquing the "brazen nature" of provisions attempting to evade federal law. Declaring these attempts "the animating purposes" of the arbitration agreements, *id.* at 676, the Court concluded that "[g]ood authority counsels that severance should not be used when an agreement represents an 'integrated scheme to contravene public policy,'" *id.* at 676 (quoting E. Allan Farnsworth, *Farnsworth on Contracts* § 5.8, at 70 (1990)).[36]

Just over a year after deciding *Hayes*, the Fourth Circuit again considered the enforceability of an arbitration agreement in the context of an online lending contract. *See generally Dillon*, 856 F.3d 330. *Dillon* presents even closer similarities to the case at bar. Plaintiff Dillon entered into a loan agreement (the "Dillon Contract") with Great Plains through Great Plains's website. *Id.* at 332. The Dillon Contract included choice of law provisions and an arbitration agreement similar to the ones in Plaintiffs' Contracts. Although Dillon resided in North Carolina, which prohibits interest rates in excess of 16%, Great Plains charged an interest

---

[36] Because the issue before the *Hayes* court was limited to the motion to compel arbitration, the Fourth Circuit did not make any findings related to the Hayes Contract as a whole—that is, the Fourth Circuit found the choice of law provisions in the arbitration agreement unenforceable, rendering the entire arbitration agreement unenforceable, which resolved the motion to compel arbitration against ordering arbitration. *See generally Hayes*, 811 F.3d 666. The court stopped short of finding the Hayes Contract entirely unenforceable or void, instead remanding the case for further proceedings. *Id.*

rate of 440.18% for Dillon's loan.  *Id.*  Dillon brought suit, alleging RICO violations against defendants involved in the collection on the loan.[37]  *Id.* at 332–33.  Defendants sought to compel arbitration.

The Court found that the arbitration agreement within the Dillon Contract ran afoul of the prospective waiver doctrine.  *Id.* at 336.  Unlike the arbitration agreement at issue in *Hayes*, the arbitration agreement that Dillon entered into did not expressly disavow federal law.  *Compare Dillon*, 856 F.3d at 335 *with Hayes*, 811 F.3d at 671.  The *Dillon* arbitration agreement provided, in part, that it "shall be governed by the law of the Otoe-Missouria Tribe of Indians.  The arbitrator will apply the law of the Otoe-Missouria Tribe of Indians and the terms of this Agreement…."  *Dillon*, 856 F.3d at 335 (quoting the Dillon Contract (capitalization altered)).  Elsewhere, the Dillon Contract stated that "[n]either this Agreement nor the Lender is subject to the laws of any state of the United States."  *Id.* (quoting the Dillon Contract (brackets in original)).  Although these provisions did not expressly disavow federal law, the *Dillon* court "interpret[ed] these terms in the arbitration agreements as an unambiguous attempt to apply tribal law *to the exclusion of federal and state law*."  *Id.* at 336 (citing *Hayes*, 811 F.3d at 675 (emphasis in original)).  The Fourth Circuit went on to explain that other terms in the Dillon Contract "evince[d] an explicit attempt to disavow the application of federal or state law to any part of the contract or its parties."  *Id.*

After finding the choice of law provision unenforceable, the *Dillon* court declined to sever the unenforceable provisions from the rest of the arbitration agreement, stating that "such a result is untenable.  Unlawful portions of a contract may be severed *only* if: (1) the unlawful

---

[37] According to Dillon, the debt violated North Carolina's usury laws, and the defendants' involvement in the collection of the debt constituted the collection of unlawful debt in violation of several RICO provisions.  *Dillon*, 856 F.3d at 332–33.

provision is not central or essential to the parties' agreement; and (2) the party seeking to enforce the remainder negotiated the agreement in good faith." *Id.* (citing 9 WILLISTON ON CONTRACTS § 19:70 (4th ed. 1993 & Supp. 2010); Restatement (Second) or Contracts § 184 (1981)). The *Dillon* court concluded that the arbitration agreement failed to meet either prong of the test for severability. *Id.* at 336–37.

In sum, the *Dillon* court thus concluded that the Dillon Contract as a whole contained "unenforceable choice of law provisions, which are not severable from the broader arbitration agreement and render the entire arbitration agreement unenforceable."[38] *Id.* at 337.

### 2. The Court Will Deny the Motion to Compel Arbitration Because Plaintiffs' Arbitration Agreements Run Afoul of the Prospective Waiver Doctrine

The Arbitration Agreements found within Plaintiffs' Contracts with Plain Green and Great Plains run afoul of the prospective waiver doctrine because they "unambiguous[ly] attempt to apply tribal law to the exclusion of federal and state law." *Dillon*, 856 F.3d 336 (citing *Hayes*, 811 F.3d at 675 (emphasis omitted)). First, the Arbitration Agreements purport to apply Tribal law exclusively. Second, the context provided by the Loan Contracts as a whole reinforces this conclusion. Because the choice of law provisions in the Arbitration Agreements cannot be severed from the remainder of the Arbitration Agreements, the Court cannot enforce the Arbitration Agreements. Accordingly, the Court will deny the Haynes Defendants' Motion to Compel Arbitration.

---

[38] As in *Hayes*, 811 F.3d at 675, the *Dillon* court did not make any findings regarding the enforceability of the Dillon Contract as a whole, limiting its holding to the arbitration agreement for the purpose of the motion to compel arbitration, and remanding the case to the district court for further proceedings. *Dillon*, 856 F.3d at 337.

### a.  The Arbitration Agreements Evince an Attempt to Disavow State and Federal Law

Various provisions in the Arbitration Agreements demonstrate that the Arbitration Agreements sought to apply Tribal law to the exclusion of federal law.  The Arbitration Agreements share strong parallels with the arbitration agreements at issue in *Hayes* and *Dillon*, both of which the Fourth Circuit found unenforceable under the prospective waiver doctrine.[39] *See generally Hayes*, 811 F.3d 666; *Dillon*, 856 F.3d 330; *see also Williams et al. v. Big Picture Loans, LLC*, 329 F. Supp. 3d 248 (E.D. Va. 2018) (discussing similarly-worded provisions before finding the arbitration agreements unenforceable).

For example, the arbitration agreement in *Dillon* provided that it "shall be governed by the law of the Otoe-Missouria Tribe of Indians.  The arbitrator will apply the law of the Otoe-Missouria Tribe of Indians and the terms of this Agreement…."  856 F.3d at 335 (quoting the Dillon Contract (capitalization altered)); *Hayes*, 811 F.3d at 675 ("The arbitrator will apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement." (quoting the Hayes Agreement)).  The Fourth Circuit concluded that these provisions "unambiguous[ly] attempt[ed] to apply tribal law to the exclusion of federal and state law."  *Dillon*, 856 F.3d at 336 (citing *Hayes*, 811 F.3d at 675 (emphasis omitted)).

The Arbitration Agreements at bar fare no better.  Just like the arbitration agreements discussed in *Dillon* and *Hayes*, the Williams, Edwards, and Inscho Arbitration Agreements state that the arbitrator "shall apply Tribal Law and the terms of this Agreement."  (Williams Agr. 9;

---

[39] This comes as no surprise, as both Hayes and Dillon challenged tribal lending contracts.  Further, Dillon challenged a Great Plains contract, and three Great Plains Contracts now form part of the dispute here.  The two Plain Green Contracts appear materially similar to the Great Plains Contracts, so all the Arbitration Agreements within the Loan Contracts share strong similarities with the arbitration agreements in *Dillon* and *Hayes*.

Edwards Agr. 8; Inscho Agr. 9.)  Similarly, the Mwethuku Arbitration Agreement requires the arbitrator to "apply the laws of the Chippewa Cree Tribe and the terms of this Agreement." (Mwethuku Agr. 6.)

The Gibbs Arbitration Agreement, worded slightly differently, states that it "shall be governed by Tribal law.  The parties additionally agree to look to the Federal Arbitration Act and judicial interpretations thereof for guidance."  (Gibbs Agr. 9.)  In contrast to the Haynes Defendants' assertions otherwise, the fact that this agreement merely "look[s]" to the FAA for "guidance" supports the conclusion that the Gibbs Arbitration Agreement attempts to make the FAA optional, rather than mandatory.  (Gibbs Agr. 9.)  All Arbitration Agreements also allow borrowers some choice of venue to pursue any dispute, "provided that this accommodation . . . shall not be construed . . . to allow for the application of any law other than [Tribal law]." (Gibbs Agr. 7; Williams Agr. 9; Edwards Agr. 8; Inscho Agr. 9; Mwethuku Agr. 6.)  These provisions plainly disavow the application of federal law, running afoul of the prospective waiver doctrine.  *Hayes*, 811 F.3d at 675.[40]  Also, the Arbitration Agreements authorize the arbitrator to "award all remedies available under [Tribal law], whether at law or in equity." (Gibbs Agr. 8; Williams Agr. 9; Edwards Agr. 8; Inscho Agr. 9; Mwethuku Agr. 6.)  The absence of any reference to awarding remedies under state or federal law supports the inference that the Arbitration Agreements sought to exclude any state or federal remedy, unless separately authorized by Tribal law.  *See Dillon*, 856 F.3d at 335–36.

---

[40] In *Hayes*, the Fourth Circuit discussed a provision in the Hayes Contract providing that the "no matter where the arbitration occurs, the arbitrator will not apply 'any law other than the law of the Cheyenne River Sioux Tribe of Indians to this Agreement.'"  811 F.3d at 675 (quoting the Hayes Contract).  The *Hayes* court concluded this provision evinced the Hayes Contract's intent to disavow federal or state law.  *Id.*

These provisions within the Arbitration Agreements plainly support a finding that the Arbitration Agreements sought to prospectively exclude the application of federal law. Because any such attempt runs afoul of the prospective waiver doctrine,[41] the Court finds the choice of law provisions unenforceable.

### b. The Loan Contracts as a Whole Evince an Attempt to Disavow State and Federal Law

A review of the Loan Contracts as a whole fortifies the Court's conclusion. As in *Dillon* and *Hayes*, the Court considers the context of the Loan Contracts overall to consider the enforceability of the Arbitration Agreements within them.[42] The Court easily concludes that the Loan Contracts attempt to disavow the application of any state and federal law.

---

[41] Defendants suggest that applying the prospective waiver doctrine here "is indignant to the concept of Native American sovereignty. . . and seeks to place the laws of Native Americans on an unequal and subordinate footing to the laws of other states of foreign countries." (Reply Mot. Compel Arb. 4, ECF No. 45.) In support of this argument, the Haynes Defendants argue that the United States Supreme Court "has consistently required courts to enforce arbitration agreements that require arbitrators to faithfully apply the laws of foreign nations to the exclusion of the laws of the United States." (*Id.* 6 (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972)).) Their reliance on *Bremen* is misplaced.

In *Bremen*, an admiralty case about a choice-of-forum provision, the Supreme Court considered a contract between an American corporation and a German corporation to tow a drilling rig from the state of Louisiana to Italy. *Bremen*, 407 U.S. at 2. The contract provided that the "London Court of Justice" would hear any dispute arising under the contract and, accordingly, apply English law. *Id.*

In finding the choice-of-forum provision enforceable, the Supreme Court considered several factors inapplicable to the case at bar. For example, "experienced and sophisticated businessmen" entered into the agreements after negotiating terms. *Id.* at 12. Additionally, the Supreme Court reasoned that "in an era of expanding world trade and commerce," federal courts *sitting in admiralty*, specifically, should find choice-of-forum provisions presumptively valid. *Id.* at 9–10. The *Bremen* court also found relevant that an English court "[p]lainly. . . meet[s] the standards of neutrality and long experience in admiralty litigation." *Id.* at 12.

Because this case does not involve the facts the Supreme Court found persuasive, *Bremen* simply does not compel the Court to enforce the Arbitration Agreements here.

[42] Also as in *Dillon* and *Hayes*, the Court—for now—limits its findings to the relevant contract provisions, evaluating only the enforceability of the Arbitration Agreements within Plaintiffs' Loan Contracts, and not the Loan Contracts as a whole.

As in *Dillon*, the Contracts expressly disavow and sometimes contain purported waivers of the application of any state law. (Gibbs Agr. 1–2; Williams Agr. 1-2, 10; Edwards Agr. 1, 9; Inscho Agr. 1-2, 10; Mwethuku Agr. 1, 7.) As to federal law, several provisions appear to disavow its application. As did the Dillon Contract, all Contracts include a "Truth in Lending Disclosure" but expressly provides that the inclusion of the disclosure does not constitute "consent" to any "application of state or federal law." (Gibbs Agr. 2; Williams Agr. 2; Edwards Agr. 2; Inscho Agr. 2; Mwethuku Agr. 1.)

The Mwethuku Contract expressly requires Mwethuku to "agree that no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation." (Mwethuku Agr. 1.) Similarly, the four other Agreements warn the borrower that the loan "is subject to and governed by Tribal law and not the law of [the borrower's] resident state." (Gibbs Agr. 1 (capitalization altered); Williams Agr. 1 (capitalization altered); Edwards Agr. 1 (capitalization altered); Inscho Agr. 1 (capitalization altered).)

The "Governing Law" provisions in four Contracts state that Tribal law governs each Contract, and that the lender "may choose to voluntarily use certain federal laws as guidelines for the provision of services. Such voluntary use does not represent acquiescence of the [Tribe] to any federal law." (Gibbs Agr. 7; Williams Agr. 8; Edwards Agr. 7–8; Inscho Agr. 8.) The Governing Law provision in the Mwethuku Agreement states that the Loan Contract is "governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Chippewa Cree Tribe," implicitly disavowing any other aspects of the Constitution or federal or state law. (Mwethuku Agr. 6.)

Other aspects of the Loan Agreements evince an attempt to disavow the application of federal law. While all of the Arbitration Agreements within the Contracts provide an

opportunity to opt out of the Arbitration Agreement, a borrower that opts out may only bring claims within the Tribal court system and under Tribal law. (Gibbs Agr. 6–7; Williams Agr. 7–8; Edwards Agr. 7; Inscho Agr. 7–8; Mwethuku Agr. 5.) And though arbitrators would apply the standard policies and procedures of the selected arbitration firm, the Arbitration Agreements state that, should any conflict arise between federal rules and Tribal law, Tribal law controls. (Gibbs Agr. 7; Williams Agr. 8; Edwards Agr. 8; Inscho Agr. 9; Mwethuku Agr. 6.) This language constitutes the kind of "conundrum" the Fourth Circuit found troubling in *Hayes*. 811 F.3d at 673. Finally, four Contracts provide that any challenge to the arbitration decision must be brought within the Tribal court system, and would be evaluated pursuant to Tribal law, not federal or state law, or even standard arbiter rules. (Gibbs Agr. 8; Williams Agr. 9; Edwards Agr. 8; Inscho Agr. 9–10.) The Mwethuku Arbitration Agreement does not outline any procedure for judicial review of the arbitrator's decision. (*See* Mwethuku Agr.)

Considering the Arbitration Agreements, the full context of the Loan Contracts, and highly relevant, controlling Fourth Circuit precedent, the Court finds the Arbitration Agreements unenforceable[43] and nonseverable.[44]

---

[43] Plaintiffs offer alternative arguments against enforcing the Arbitration Agreements, including that the Arbitration Agreements overreach and that the Court should decline to enforce them as a matter of Virginia public policy. The Court recognizes that in a factually and procedurally similar tribal lending case in the United States District Court for the Eastern District of Virginia, the *Big Picture* court found that plaintiffs plausibly alleged facts in support of these arguments, among others. *See Big Picture*, 329 F. Supp. 2d 248.) Because the Court concludes that the prospective waiver doctrine precludes enforcement of the Arbitration Agreements, the Court need not address Plaintiffs' other arguments.

[44] As identified earlier, the Contracts each proclaim that the other provisions of the Contracts would remain in full force and effect even if some aspect, such as the arbitration agreement, were found to be unenforceable. (Gibbs Agr. 7, Williams Agr. 6; Edwards Agr. 6; Inscho Agr. 7; Mwethuku Agr. 6.) Despite the fact that each Contract self-proclaims the severability of any provision found to be unenforceable, the Haynes Defendants do not ask the Court to consider severing the Arbitration Agreements.

# IV. Analysis: Rule 12(b)(6) Motion to Dismiss[45]

The Haynes Defendants challenge each of the six class claims that Plaintiffs assert

against them as failing to state a claim under Federal Rule of Civil Procedure 12(b)(6).[46]  First,

---

Were the Court to consider severability, *Dillon* strongly suggests that arbitration agreements like the ones presently before the Court—even with this purported workaround— would not be severable.  *See Dillon*, 856 F.3d at 336–37.  "Unlawful portions of a contract may be severed *only* if: (1) the unlawful provision is not central or essential to the parties' agreement; and (2) the party seeking to enforce the remainder negotiated the agreement in good faith."  *Id.* at 336 (citing 9 WILLISTON ON CONTRACTS § 19:70 (4th ed. 1993 & Supp. 2010); Restatement (Second) of Contracts § 184 (1981)).

The Arbitration Agreements would likely fail to meet either prong of the test for severability.  For example, four of the Arbitration Agreements include the following provision: "As an *integral* component of accepting this [Contract], you irrevocably consent to the exclusive jurisdiction of the Tribal courts for purposes of this [Contract]."  (Gibbs Agr. 9 (emphasis added); Williams Agr. 10 (emphasis added); Edwards Agr. 9 (emphasis added); Inscho Agr. 10 (emphasis added).)  As in *Dillon*, the Court would likely find the unlawful choice-of-law provisions integral to the Arbitration Agreements.

Furthermore, the *Dillon* court identified that Great Plains "obtained the terms in the arbitration agreement through its 'dominant bargaining power' in a calculated attempt to avoid the application of state and federal law."  *Dillon*, 856 F.3d at 337 (quoting Restatement (Second) of Contracts § 184 cmt.b).  Based on this, the Fourth Circuit concluded that Great Plains did not negotiate the Dillon Contract in good faith, failing the second prong of the severability analysis.  *Id.*  Here, the same factors counsel against finding that either Plain Green or Great Plains negotiated in good faith.

[45] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

[46] The Haynes Defendants also challenge personal jurisdiction, suggesting that the Court decline to follow binding Fourth Circuit precedent.  (Mem. Supp. Mot. Dismiss 8, ECF No. 33.)  Plaintiffs served the Haynes Defendants in accordance with the Fourth Circuit's interpretation of 18 U.S.C. § 1965(d).  *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626–27 (4th Cir. 1997).  In *ESAB*, the Fourth Circuit ruled that § 1965(d) allows a plaintiff to establish personal jurisdiction over a defendant by effectuating service over the defendant in any district in which the defendant resides.  *Id.*

As another court in the Eastern District of Virginia recently noted, "[t]his conclusion puts the Fourth Circuit in the clear minority."  *George Hengle, et al. v. Mark Curry, et al.,* No: 3:18cv100, 2018 WL 3016289, Jun. 6, 2018 Order, ECF No. 114 (discussing cases).  The Haynes Defendants ask the Court to "apply the well-reasoned interpretations of [§] 1965 used by other circuits and decline to apply the Fourth Circuit's decision in ESAB."  (Mem. Supp. Mot. Dismiss 8.)  The Fourth Circuit has not overruled *ESAB* and the Court declines to stray from binding precedent here.

the Haynes Defendants allege that all the claims must fail because no unlawful debt exists. Second, the Haynes Defendants argue that Plaintiffs fail to allege all of the elements of their claims, primarily based on a lack of connection between the Haynes Defendants' alleged acts and Plaintiffs' alleged injuries. For the reasons stated below, the Court finds that Plaintiffs meet their burden. Accordingly, the Court will deny the Motion to Dismiss.

### A.    Legal Standard:  Rule 12(b)(6) Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs.*, 7 F.3d at 1134; *see also Martin*, 980 F.2d at 952. This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (omission in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Plaintiffs cannot satisfy this standard with complaints containing only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted). Instead, a plaintiff must assert facts that rise above speculation and conceivability to those that "show" a

claim that is "plausible on its face." *Iqbal*, 556 U.S. at 678–79 (citing *Twombly*, 550 U.S. at 570; Fed. R. Civ. P. 8(a)(2)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678 (citing *Twombly*, 550 U.S. at 556). Therefore, in order for a claim or complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citations omitted).

### B.    Plaintiffs' Claims Survive the Motion to Dismiss

Plaintiffs allege that the Haynes Defendants violated RICO by engaging in a series of acts to establish and expand on an unlawful lending operation. Specifically, the Haynes Defendants played an instrumental role in designing the improper Tribal lending business structure, provided necessary funding, and reaped profits from the collection of repayments on the Loan Contracts. The Loan Contracts, according to Plaintiffs, violate Virginia usury laws because all Contracts charge an interest rate that exceed Virginia's statutory limit of 12%. For the reasons below, the Court concludes that each claim survives the Rule 12(b)(6) challenge.

### 1.    Count V:  Virginia Usury Claim

The Court first addresses Count V (the Virginia Usury Claim) because it undergirds all the RICO counts. The RICO claims all implicate the "collection of unlawful debt." 18 U.S.C. § 1964. RICO defines "unlawful debt," in relevant part, as:

> a debt . . . which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and . . . which was incurred in connection with . . . the business of lending money . . . at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

18 U.S.C. § 1961(6). Plaintiffs allege that the Loan Contracts charge rates unlawful under

35

Virginia law, and this debt constitutes the relevant "unlawful debt" in Counts I – IV, the RICO claims.

Virginia law provides that, in general, "no contract shall be made for the payment of interest on a loan at a rate that exceeds 12 percent per year." Va. Code. Ann. § 6.2-303(A). A lender may not charge interest in excess of this 12% limit unless she or he obtains a consumer finance license. *See* Va. Code Ann. § 6.2-1501. A loan contract that violates these Virginia provisions "shall be void" and the lender to that void contract agreement cannot "collect, receive, or retain any principal, interest, or charges whatsoever with respect to the loan." Va. Code Ann. § 6.2-1541(A)–(B). A borrower who pays interest on a loan in excess of the applicable statutory maximum may bring an action against "the person taking or receiving such payments."[47] Va. Code Ann. § 6.2-305(A).

Plaintiffs' detailed allegations, sometimes including documentary attachments, amply support their Virginia usury claim. First, Plaintiffs plainly allege that they paid interest on loans in excess of 12%, citing interest rates as high as 448%. Plaintiffs allege that the Haynes Defendants, Plain Green, and Great Plains did not have a "consumer finance license when they made the loans to Plaintiffs; nor did they attempt to obtain such a license." (Compl. ¶ 123.)

---

[47] Section 6.2-305(A) of the Virginia Code states, in relevant part:

If interest in excess of that permitted by an applicable statute is paid upon any loan, the person paying may bring an action within two years from [certain preconditions]:

1. The total amount of the interest paid to such person in excess of that permitted by the applicable statute;
2. Twice the total amount of interest paid to such person during the two years immediately preceding the date of the filing of the action; and
3. Court costs and reasonable attorney fees.

Va. Code. Ann. § 6.2-305(A).

36

The Complaint includes sufficient facts in support of Plaintiffs' contention that the Haynes Defendants collected or received payments on the loans, including interest payments. According to Plaintiffs, Haynes Investments received 1% of the revenue collected on the loans. Sovereign Business Solutions received 15% interest "on the outstanding advances on the line of credit, as well as a security interest in the loans in the event of default." (Compl. ¶ 61.) The Court draws the reasonable inference in Plaintiffs' favor, as it must, that the loan repayments provided the funding to repay the 15% interest due to Sovereign Business Solutions. For purposes of the Motion to Dismiss, the Court readily infers that Haynes, as the owner and managing partner of Haynes Investments and the creator of Sovereign Business Solutions, ultimately received proceeds from these loan repayments through both partnerships. And though these allegations pertain largely to the Haynes Defendants' credit agreements with Plain Green, and not Great Plains, the Court concludes—for purposes of the present Motion to Dismiss—that Plaintiffs adequately plead facts in support of construing the lending operation as a single entity under RICO, meaning the claims may proceed as to both Plain Green and Great Plains.[48]

---

[48] At this procedural stage, the Haynes Defendants do not seem to challenge the "enterprise" element of any of the RICO claims. (*See, e.g.*, Mem. Supp. Mot. Dismiss 18 (referring to the entire alleged lending operation scheme as "the enterprise as a whole").) Under RICO, an "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

Although the Haynes Defendants do not explicitly contest that an enterprise may exist, they nevertheless argue that no allegation states that they collected on unlawful debt through Great Plains, because Plaintiffs do not allege that the Haynes Defendants invested any money into funding the Great Plains Loans. The Haynes Defendants conclude that Williams, Edwards, and Inscho cannot bring claims against them.

But the alleged enterprise at the heart of the scheme encompasses both Great Plains and Plain Green. For instance, Plaintiffs allege that Haynes worked to find a bank for both Great Plains and Plain Green when those entities were targeted by federal and state regulators, as well as the Department of Justice. Especially reading the allegations favorably toward Plaintiffs, as the Court must, the Complaint plausibly alleges that Plain Green and Great Plains *together*

Next, for the reasons articulated above, *supra* Section III.B.2, the Haynes Defendants'
choice of law arguments cannot prevail. According to the Haynes Defendants, the Loan
Agreements' express adoption of Tribal law constitutes a valid choice of law provision that
precludes the application of Virginia law.[49] The Court considers *Hayes* and *Dillon* instructive on
this point. *See generally Hayes*, 811 F.3d 666; *Dillon*, 856 F.3d 330. Just as the Arbitration
Agreements cannot prospectively waive federal law in these circumstances, the Loan Contracts
as a whole cannot prospectively waive federal law. Because the choice of law provisions
throughout the Loan Contracts are unenforceable, the Haynes Defendants cannot rely on them
for their state-law related arguments, either.

Plaintiffs plausibly allege that the Haynes Defendants collected or received payments on
loans that violated Virginia's statutory limits as part of their involvement with the alleged RICO

_____

constituted the enterprise, rather than separate enterprises. Plaintiffs' allegations make this plain,
and, on the whole, the Haynes Defendants do not contest this characterization.

[49] The Haynes Defendants' reliance on *Settlement Funding v. Von Neumann-Lillie*, 274
Va. 76 (2007), is misplaced. In *Settlement Funding*, the Supreme Court of Virginia considered
whether the trial court erred in *assuming* that no distinction existed between Utah usury laws and
Virginia usury laws, despite evidence to the contrary on the record. 274 Va. at 78–80. The
Supreme Court of Virginia reversed the trial court and remanded the case for further
proceedings. *Id.* at 81.
  The Haynes Defendants argue that to decline applying Tribal law here would "degrade
the sovereignty of Native American tribes," (Reply Mot. Dismiss 8, ECF No. 44), because "the
laws of Native American tribes [are not] entitled to any less deference than the laws of the
[states]," (*id.* 4).
  But the Supreme Court of Virginia held only that the trial court erred in concluding that
parties failed to present Utah law for the trial court's consideration. *Settlement Funding*, 274 Va.
at 78 –80. The *Settlement Funding* court did not substantively address the enforceability of the
loan contract at issue or the merits of any possible contract defenses. *See generally id.*
  Existing Fourth Circuit precedent, and ample federal case law more on point, obliges this
Court to give *Settlement Funding* far less weight than the Haynes Defendants urge. The Court
cannot find that Settlement Funding requires application of Tribal choice-of law provisions.

enterprise, which implicates both Plain Green and Great Plains. Accordingly, Count V,

Plaintiffs' Virginia usury claim, survives this Rule 12(b)(6) challenge.

### 2. Count I: RICO § 1962(a) – Prohibiting Investment of Income Derived from a Pattern of Racketeering Activity[50]

To state a claim under 18 U.S.C. § 1962(a),[51] Plaintiffs must allege that: "(1) the

Defendants derived income [through the collection of an unlawful debt]; [and] (2) the income

was used or invested, directly or indirectly, in the establishment or operation; (3) of an

enterprise; (4) which is engaged in or the activities of which affect interstate or foreign

commerce." *Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union, et. al.*,

---

[50] Courts have held that the collection of an unlawful debt, as an act native to the RICO statute, is itself a RICO violation even without a "pattern of racketeering activity." *See Goldstein v. Repossessors, Inc.*, 815 F.3d 142, 148 n.5 (3d. Cir. 2016) (citations and quotations omitted); *see also United States v. Eufrasio*, 935 F.2d 553, 576 (3d Cir. 1991). Although "the Fourth Circuit has not expressly adopted this interpretation, [] district courts within the circuit have embraced that view." *Day v. DB Capital Group, LLC*, No. 10-1658, 2011 WL 887554, at *12 and n.10 (D. Md. Mar. 11, 2011) (citations and quotations omitted); *see also, Proctor v. Metro. Money Store Co.,* 645 F. Supp. 2d 464, 481 (D. Md. 2009).

[51] Section 1962(a) provides:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

18 U.S.C. § 1962(a).

633 F. Supp. 2d 214, 222 (E.D. Va. 2008) (citing *United States v. Vogt*, 910 F.2d 1184, 1193 (4th Cir. 1990)).

At this procedural stage, Plaintiffs easily meet their burden under Rule 12(b)(6).  As alleged, Great Plains and Plain Green constitute a so-called enterprise engaged in interstate commerce.[52]  Plaintiffs allege that Haynes Investments derived income through the collection of revenue on the allegedly unlawful debt.  And the Complaint plainly states that Sovereign Business Solutions—wholly controlled by Haynes—derived income from the alleged enterprise, in the form of interest payments on the principal it advanced to Plain Green.  (Compl. ¶ 61 (citing February 2013 Credit and Security Agreement §§ 3.3, 3.7).)  The Court draws the reasonable inference that the collection of unlawful debt funded the interest payments, so that the Complaint plausibly alleges facts adequate to support Plaintiffs' allegation that the Haynes Defendants derived income through the collection of unlawful debt.  Plaintiffs also plausibly allege a similar scheme as to Great Plains as part of the unlawful Tribal lending scheme.

As such, Plaintiffs meet their Rule 12(b)(6) burden to allege plausible facts supporting their contention that the Haynes Defendants derived income through the collection of unlawful debt.[53]

---

[52] The Haynes Defendants do not challenge the "interstate commerce" element of the RICO provisions at this stage of proceedings.  Indeed, four of the five Contracts expressly avow that "the transaction represented by this [Loan Conract] involves interstate commerce for all purposes."  (Gibbs Agr. 6; Williams 7; Edwards 7; Inscho 7.)

[53] The Haynes Defendants argue that Plaintiffs fail to meet this element because the Complaint contains no allegation that the Haynes Defendants *collected* the allegedly unlawful debt.  According to the Haynes Defendants, they "are only alleged to have extended credit to Plain Green and . . . in identifying potential ACH provides.  But those actions to not constitute . . . the collection of an unlawful debt."  (Mem. Supp. Mot. Dismiss 21, ECF No. 33.)  Existing case law suggests otherwise.

A plaintiff suing under RICO need not argue that each defendant individually collected the debt.  For example, in *Proctor v. Metro. Money Store Corp.*, a plaintiff brought RICO claims

Plaintiffs also allege facts that the Haynes Defendants used the unlawfully obtained income to further invest in and support the operation. Specifically, Plaintiffs allege that Haynes Investments increased its line of credit from $2,000,000 to $20,000,000, "[d]ue to the success of the operation and the returns it earned." (Compl. ¶ 51.) The Court makes the reasonable inference, as it must at this procedural stage, that Haynes Investments increased its line of credit using income derived through the collection of the unlawful debt. Haynes later created Sovereign Business Solutions to increase his investment in the enterprise, creating a $15,000,000 line of credit. The Court reasonably infers that Haynes funded Sovereign Business Solutions's line of credit using funds that Haynes obtained from Haynes Investments. And although these allegations pertain to Plain Green specifically, Plaintiffs who entered into Loan Contracts with Great Plains (Williams, Edwards, and Inscho) may proceed with this claim because the Court, as it must at this procedural stage, favorably construes both Plain Green and Great Plain as members of the unlawful Tribal lending operation for purposes of RICO.

Plaintiffs' allegations satisfy all prongs of the § 1962(a) analysis. They plausibly contend that the Haynes Defendants derived income from an unlawful Tribal lending operation engaged

against multiple defendants involved in an alleged "mortgage foreclosure rescue scam." 645 F. Supp. 2d at 471. Some of the named defendants argued the Complaint did not allege any acts by them related to the collection of unlawful debts. *Id.* at 482. Instead, the plaintiffs alleged that these defendants acted for a common purpose and with knowledge of each other, receiving "a large number of referrals" and commissions in exchange for their activities related to the enterprise: the collection of an unlawful debt. *Id.* at 483 (quoting the Second Am. Compl.) When denying the motion to dismiss before it, the United States District Court for the District of Maryland concluded these allegations sufficed to show that these defendants derived income from the enterprise for the purpose of § 1962 liability. *Id.*

Additionally, co-conspirators remain liable for the actions of fellow co-conspirators. *See, e.g., Day*, WL 887554 *9 (D. Md. 2011) ("[W]here a conspiracy has been adequately pleaded, individual members of the conspiracy can be held liable for actions taken by coconspirators.") As discussed below, *infra* Section IV.B.5, the Court finds that Plaintiffs plausibly pleaded that the Haynes Defendants engaged in a conspiracy to violate RICO provisions.

in interstate commerce through the collection of unlawful debt. They also plausibly contend that the Haynes Defendants reinvested these proceeds into the so-called enterprise. Because Plaintiffs meet their burden, Count I, Plaintiffs' § 1962(a) claim, survives the Motion to Dismiss.

### 3. Count II: RICO § 1962(b) – Prohibiting the Use of a Pattern of Racketeering to Acquire or Maintain Control Over an Enterprise

To establish a violation of § 1962(b),[54] Plaintiffs must allege that: "(1) the Defendants engaged in [collection of an unlawful debt];[55] (2) in order to acquire or maintain, directly or indirectly; (3) any interest or control over an enterprise; (4) which is engaged in, or the activities of which affect interstate or foreign commerce."[56] *Smithfield Foods*, 633 F. Supp. 2d at 222 (citing 18 U.S.C. § 1962(b); *Davis v. Hudgins*, 896 F. Supp 561, 567 (E.D. Va. 1995)).

Plaintiffs amply state factual allegations in support of their § 1962(b) claim. First, Plaintiffs' plausible, non-speculative, factual allegations related to the collection of unlawful debt plainly support a their claim that the Haynes Defendants exerted substantial control over the alleged enterprise described above. *See supra n. 48.* When alleging with great specificity, and attaching documents suggesting, that Haynes Investment increased its investment in Plain Green on numerous occasions (starting with $2,000,000 and going up to at least $20,000,000), Plaintiffs

---

[54] Section 1962(b) provides:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(b).

[55] As discussed above, Plaintiffs plausibly state facts to satisfy this element, *supra* Section IV.B.3.

[56] As discussed above, the parties do not dispute the "interstate commerce" element of any RICO claim at this procedural juncture, *supra* note 52.

plausibly aver a high level of control because, without funding, the enterprise could not continue to grow its business or issue loans. Additionally, Plaintiffs contend that Haynes did not "merely invest," (Compl. ¶ 64), but also that the Haynes Defendants played an integral role in establishing how Plain Green operated, thereby supporting an inference that the Haynes Defendants exerted considerable control over how Plain Green operated within the unlawful Tribal lending operation as a whole. These allegations support a finding, for the purpose of the Motion to Dismiss, of substantial control over the enterprise by the Haynes Defendants.

And certainly, the Complaint plausibly alleges non-speculative facts that the Haynes Defendants continued to collect revenue, and increase its investment, *in order to* maintain its interest and control over the enterprise. *See* 18 U.S.C. § 1962(b); *see also Constellation Bank, N.A. v. C.L.A. Mgmt. Co.*, No. 94 Civ. 0989, 1995 WL 42285, *4 (S.D.N.Y. Feb. 1, 1995) ("Allegations that the acquisition or maintenance of an interest in an enterprise was obtained by arranging financing satisfied the requirements of section 1962(b).") For example, Plaintiffs allege that the Haynes Defendants collected 1% of revenue from the Plain Green loans. The Haynes Defendants reinvested these funds, showing an interest by the Haynes Defendants in increasing their control and interest in the enterprise. Again, Plaintiffs plausibly allege facts that support the same finding as to Great Plains as part of the unlawful Tribal lending operation.

At this procedural stage, the Court readily concludes that these allegations suffice to show that the Haynes Defendants engaged in the collection of the unlawful debt "in order to . . . maintain" its interest in and control over the a purportedly unlawful lending operation in violation of RICO. 18 U.S.C. § 1962(b).

### 4. Count III: RICO § 1962(c) – Prohibiting Conducting the Affairs of an Enterprise through the Collection of Unlawful Debt

To establish a violation of § 1962(c),[57] Plaintiffs must allege that the Haynes Defendants (1) conducted the affairs of an enterprise[58] (2) through the collection of unlawful debt[59] (3) while employed by or associated with (4) the "enterprise engaged in, or the activities of which affect, interstate or foreign commerce."[60] 18 U.S.C. § 1962(c); *cf. Smithfield Foods*, 633 F. Supp. 2d at 222 (providing the elements for satisfying § 1962(c) claims founded on allegations of racketeering activity).

The Court readily concludes that Plaintiffs make substantial allegations demonstrating that the Haynes Defendants conducted the affairs of the unlawful Tribal lending operation which engages in interstate commerce. 18 U.S.C. § 1962(c). As discussed at length above, Plaintiffs contend that Haynes helped design and implement the Tribal lending business. And by virtue of funding Plain Green, and increasing its investment in the enterprise, the Haynes Defendants essentially conducted the affairs of the alleged enterprise. Put plainly, the enterprise could not exist or grow without funding. Haynes controlled the amount of funding Plain Green had, thus

---

[57] Section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

[58] As discussed above, Plaintiffs plausibly allege facts in support of this element, *supra* note 48.

[59] As discussed above, Plaintiffs plausibly state facts to satisfy this element, *supra* Section IV.B.3.

[60] As discussed above, Plaintiffs plausibly allege facts in support of this element, *supra* note 52.

controlling the size of the business.  Finally, Haynes "played an integral role in helping" both Plain Green and Great Plains secure a method, via the ACH network, to collect on the loans. (Compl. ¶ 65.)  Haynes acted on behalf of both Plain Green and Great Plains when he met with multiple banks and identifying various potential partners over the course of a year beginning in 2013.  This plausibly evinces the Haynes Defendants' involvement in conducting the affairs of the lending operation.  18 U.S.C. § 1962(c).

Further, no question exists that Plaintiffs sufficiently allege that the Haynes Defendants "associated with" the lending operation as a whole when it committed the above acts.  18 U.S.C. § 1962(c).  Haynes engaged in the above acts as part of its association with the alleged unlawful lending operation, which includes both Plain Green and Great Plains.  Combined, these allegations amply support Plaintiffs' claim that the Haynes Defendants conducted the affairs of the unlawful Tribal lending business.  Count III survives the Motion to Dismiss.

### 5. Count IV:  RICO§ 1962(d) – Conspiracy to Violate RICO Sections 1962(a), (b) or (c)

Section 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).  Plaintiffs amply allege facts in support of this claim.  The Complaint contains detailed and thorough allegations related to the Haynes Defendants' role in the unlawful Tribal lending operation at the heart of the RICO claims.  The Complaint describes the formation of the so-called enterprise, detailed negotiations between co-conspirators, and the development and growth of the Tribal lending businesses over time, including subsequent related agreements.  The Complaint references attached documents in support of the factual allegations it contains.  Because Counts I, II, and III, alleging violations of §§ 1962(a)–(c), survive the Motion to Dismiss, this claim plainly survives the Motion to Dismiss as well.

### 6.     Count VI:  Unjust Enrichment

To state a claim for unjust enrichment, a plaintiff must allege:  "(1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *Integrated Direct*, 129 F. Supp. 3d at 374.  Plaintiffs plausibly plead facts to satisfy each element.

First, the Haynes Defendants benefitted from Plaintiffs' payments on their loans because, as discussed above, the Haynes Defendants derived income from the enterprise based on borrowers entering into loan Contracts with Plain Green and Great Plains.  Second, no dispute exists that the Haynes Defendants knew of the benefit.  Indeed, Plaintiffs attach documents purporting to support these allegations.  Haynes engaged in sophisticated negotiations to determine the benefit—the 1% revenue due to Haynes Investments from borrowers, and the 15% interest that Sovereign Business Solutions collected on principal amounts provided to borrowers.

Finally, Plaintiffs' plausible factual allegations, also delineated above, regarding the illegality of the loans under Virginia law support a finding, at this procedural stage, that "circumstances . . . render it inequitable for the defendant to retain the benefit without paying for its value."  *Integrated Direct*, 129 F. Supp. 3d at 374.  Virginia law limits lenders' ability to charge more than 12% interest on loans to Virginia consumers.  *See* Va Code. § 6.2-303.  The interest rates at issue range from between 227.92% to 448%.  It appears, certainly at this early stage, that Plaintiffs meet their burden of proof in demonstrating that these circumstances render it inequitable for the Haynes Defendants to retain the benefit they have received from the collection on loans from Virginia consumers.  The Court will deny the motion to Dismiss Count VI, the Unjust Enrichment claim.

### V.  Conclusion

The Court considers three Motions before it.  The Court will deny the Motion to Transfer because the first-to-file doctrine does not commend transfer and, in the alternative, because special circumstances would justify proceeding in this Court even if all three elements of the first-to-file rule were satisfied.  The Court will deny the Motion to Compel Arbitration because the prospective waiver doctrine renders the Arbitration Agreements wholly unenforceable.  The Court will deny the Motion to Dismiss for two reasons.  First, Plaintiffs properly served the Haynes Defendants in accordance with binding Fourth Circuit precedent.  Second, Plaintiffs plausibly plead facts in support of each element of each claim they bring against the Haynes Defendants.

Accordingly, the Court will deny the Motions.

An appropriate Order shall issue.

_____ /s/
M. Hannah Lauck
United States District Judge

Date: 3/22/19
Richmond, Virginia