**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1434**

DARLENE GIBBS; STEPHANIE EDWARDS; LULA WILLIAMS; PATRICK
INSCHO; LAWRENCE MWETHUKU, on behalf of themselves and all individuals
similarly situated,

        Plaintiffs – Appellees,

   v.

HAYNES INVESTMENTS, LLC; L. STEPHEN HAYNES; SOVEREIGN
BUSINESS SOLUTIONS, LLC,

        Defendants – Appellants,

and

VICTORY PARK CAPITAL ADVISORS, LLC; VICTORY PARK
MANAGEMENT, LLC; SCOTT ZEMNICK; JEFFREY SCHNEIDER; THOMAS
WELCH,

        Defendants.

--------------------------------

NATIVE AMERICAN FINANCIAL SERVICES ASSOCIATION,

      Amicus Supporting Appellants,

AMERICAN ASSOCIATION FOR JUSTICE,

      Amicus Supporting Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  M. Hannah Lauck, District Judge.  (3:18-cv-00048-MHL)

————————————

Submitted:  May 29, 2020                                    Decided:  July 21, 2020

————————————

Before GREGORY, Chief Judge, MOTZ, and AGEE, Circuit Judges.

————————————

Affirmed by published opinion. Judge Agee wrote the opinion, in which Chief Judge Gregory and Judge Motz joined.

————————————

David N. Anthony, Timothy St. George, TROUTMAN SANDERS LLP, Richmond, Virginia; Richard L. Scheff, David F. Herman, ARMSTRONG TEASDALE, LLP, Philadelphia, Pennsylvania, for Appellants. Kristi C. Kelly, Andrew J. Guzzo, KELLY GUZZO, PLC, Fairfax, Virginia; Matthew W.H. Wessler, GUPTA WESSLER PLLC, Washington, D.C.; Leonard A. Bennett, Craig C. Marchiando, Elizabeth W. Hanes, CONSUMER LITIGATION ASSOCIATES, P.C., Newport News, Virginia; Anna C. Haac, TYCKO & ZAVAREEI LLP, Washington, D.C., for Appellees. Patrick O. Daugherty, Frances B. Morris, VAN NESS FELDMAN LLP, Washington, D.C., for Amicus Curiae. Bruce Stern, Jeffrey R. White, AMERICAN ASSOCIATION FOR JUSTICE, Washington, D.C., for Amicus Curiae.

————————————

2

AGEE, Circuit Judge:

This appeal considers the enforceability of arbitration agreements included within the terms of payday loans issued by two online lenders. After a group of borrowers filed suit against the entities and others (collectively, the "Haynes Defendants") that invested in these lenders, challenging the legality of the loans issued, the Haynes Defendants filed a motion to compel arbitration. The district court denied the motion on the basis that the arbitration agreements operated as prospective waivers. The Haynes Defendants now appeal. For the reasons set forth below, we affirm the judgment of the district court.

## I.

The plaintiffs are Virginia consumers who borrowed money between 2013 and 2016 from one of two online lenders owned by a sovereign Native American tribe.[1] The first lender, Plain Green, LLC, is owned and operated by the Chippewa Cree Tribe of the Rocky Boy's Reservation in Montana. The second, Great Plains Lending, LLC, is owned and operated by the Otoe-Missouria Tribe of Oklahoma.[2] Although Virginia usury law

---

[1] Plaintiffs Lawrence Mwethuku and Darlene Gibbs took out loans from Plain Green, LLC in 2013 and 2016, respectively. Meanwhile, plaintiffs Stephanie Edwards, Lula Williams, and Patrick Inscho received loans from Great Plains Lending, LLC in 2015, 2016, and 2016, respectively.

[2] The district court did not consider—nor does it appear that the borrowers alleged—any specific claims against the lending operations themselves. Rather, because both Plain Green and Great Plains sought immunity as arms of their respective tribes, the district court concluded that only the Haynes Defendants "remain in this action[.]" J.A. 435. The borrowers do not contest this point on appeal.

generally prohibits interest rates in excess of twelve percent, Va. Code Ann. § 6.2-303, the laws of both Tribes permit higher rates. As a result, the interest rates on the loans—which varied in principal amounts from $500 to $1,700—ranged from 219.38% to 373.97%. J.A. 439.

In order to obtain the loans, each borrower electronically signed a contract that contained (1) the terms governing the loan (the "loan agreement") as well as (2) an agreement to arbitrate any disputes (the "arbitration agreement"). Both agreements contained choice-of-law provisions requiring the application of tribal law. For example, a choice-of-law provision in Gibbs's 2016 Plain Green loan agreement stipulated that "[t]his Agreement and the Agreement to Arbitrate are governed by Tribal Law." J.A. 341. Further, the arbitration agreement included provisions stating the agreement "shall be governed by Tribal Law" and the "arbitrator shall apply Tribal Law." J.A. 343. Similarly, Mwethuku's older 2013 Plain Green loan provided that both the loan and arbitration agreements "are governed by . . . the laws of the Chippewa Cree Tribe," and that the arbitrator "will apply the laws of the Chippewa Cree Tribe[.]" J.A. 384.

Likewise, all three 2015 and 2016 Great Plains loan agreements indicated the lender could choose to voluntarily use federal laws as guidance, but that the agreements ultimately

---

In turn, according to the borrowers, the Haynes Defendants—Haynes Investments, LLC; Sovereign Business Solutions, LLC; and L. Stephen Haynes, the managing member of both businesses—"funded and partially operated" both tribal lending operations. J.A. 14. Further, "[w]hen regulators targeted [the operations]," Haynes allegedly played a "critical role" in finding a bank to partner with Plain Green and Great Plains to continue their operations. J.A. 438.

would be governed by tribal law: "This Agreement and the Agreement to Arbitrate are governed by Tribal law and such federal law as is applicable under the Indian Commerce Clause," but "[s]uch voluntary use [of federal laws as guidelines for the provision of services] does not represent acquiescence of the Otoe-Missouria Tribe to any federal law unless found expressly applicable to the operations of the Otoe-Missouria Tribe[.]" J.A. 352; *see also* J.A. 362–63, 373. Similarly, the Great Plains arbitration agreement specified that "[t]his agreement to arbitrate shall be governed by Tribal Law"; "[t]he arbitrator shall apply Tribal Law"; and the arbitration award "must be consistent with this Agreement and Tribal Law[.]" J.A. 354; *see also* J.A. 364, 375. Finally, a number of other provisions in both lenders' loan agreements—such as those requiring borrowers who chose to opt out of arbitration to resolve any disputes through tribal court systems in accordance with tribal law—also stipulated the application of tribal law.

After receiving the loans from the two online lenders, the borrowers brought a putative class action complaint alleging, among other claims, that the lenders' loans were unlawful under Virginia's usury laws and that the Haynes Defendants' receipt of "income derived . . . through collection of unlawful debt" and reinvestment of such income to further the lending scheme violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. J.A. 38. In response, the Haynes Defendants moved to compel arbitration under 9 U.S.C. § 4 or, alternatively, to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The district court denied both motions.

As relevant to the motion to compel arbitration, the district court relied upon two Fourth Circuit cases—*Hayes v. Delbert Services Corporation*, 811 F.3d 666, 671 (4th Cir. 2016), and *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 332 (4th Cir. 2017)—both of which considered similar tribal loan and arbitration agreements with choice-of-law clauses providing for the nearly exclusive application of tribal law, to the exclusion of state and federal law. As in those cases, the district court here found that because the choice-of-law provisions in the arbitration agreements "sought to prospectively exclude the application of federal law"—including the assertion of any federal statutory claims by the borrowers— the agreements "[ran] afoul of the prospective waiver doctrine[.]" J.A. 461. And because, the court concluded, "arbitration agreements that operate as a prospective waiver of a party's right to pursue statutory remedies are not enforceable because they are in violation of public policy," J.A. 454 (internal quotation marks omitted), the arbitration agreements at issue were likewise unenforceable.

The Haynes Defendants timely appealed, arguing that: (1) the district court ignored the arbitration agreements' delegation provisions requiring an arbitrator to resolve all threshold issues of arbitrability, including whether the choice-of-law clauses amounted to a prospective waiver; and (2) even if the court was correct to consider the effect of the provisions, they did not operate as a prospective waiver. We address each issue in turn, mindful of the "strong federal policy in favor of enforcing arbitration agreements[.]" *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985).

II.

We turn first to the delegation clauses. Each of the arbitration agreements contained a delegation clause stipulating that the parties would arbitrate "any issue concerning the validity, enforceability, or scope of this Agreement or this Agreement to Arbitrate." J.A. 342; *see also* J.A. 353, 363, 374, 383. As a result, the Haynes Defendants argue, any threshold questions as to the enforceability of the arbitration agreements should have first been sent to an arbitrator. We disagree. Because the borrowers sufficiently challenged the validity of the delegation clauses, the district court was correct to consider the enforceability of the arbitration agreements.

A.

The question of who decides arbitrability—the court or the arbitrator—is one we review de novo. Of course, parties to an arbitration agreement can "agree to arbitrate gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010) (internal quotation marks omitted). Thus, when an agreement "clearly and unmistakably" delegates the threshold issue of arbitrability to the arbitrator, a court must enforce that delegation clause and send that question to arbitration. *Id.* at 67 (internal citation omitted). However, if the claimant specifically attacks the validity of the delegation clause itself, a court may consider that clause's enforceability. *Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 455 (4th Cir. 2017).

In *Rent-A-Center*, the Supreme Court held that when a litigant specifically challenges the enforceability of an arbitration agreement with a delegation clause, the challenge must be submitted to the arbitrator *unless* the plaintiff has lodged a specific objection to the delegation clause (which a court may consider). There, the plaintiff had signed as a condition of his employment an arbitration agreement that contained a broad delegation clause requiring arbitration of any issue "relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable." *Rent-A-Center*, 561 U.S. at 66 (internal quotation marks omitted). After the plaintiff filed an employment lawsuit, his employer sought to compel arbitration. The plaintiff opposed the motion on the grounds that the arbitration agreement was "clearly unenforceable" because certain aspects of the agreement, such as arbitration fee splitting, were "unconscionable" under state law. *Id.* (internal quotation marks omitted).

But the Supreme Court—observing that a delegation clause "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce," *id.* at 70—concluded that the plaintiff could not lodge such a challenge to the enforceability of the arbitration agreement as a whole because of the presence of the delegation clause. Rather, only if he had "challenge[d] the validity under [9 U.S.C] § 2 of the precise agreement to arbitrate at issue [could the] federal court . . . consider the challenge before ordering compliance with that agreement under § 4." *Id.* at 71. Put another way, unless the plaintiff has "challenged the delegation provision specifically, we must treat it as valid

under § 2 and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator." *Id.* at 72.

Importantly, however, the Court observed that challenges to the overall arbitration agreement could also be specifically directed at the delegation provision. As the Supreme Court explained, had the plaintiff "challenged the delegation provision by arguing that [the purportedly unconscionable arbitration procedures] *as applied* to that delegation provision rendered *that provision* unconscionable, the challenge should have been considered by the court." *Id.* at 74. But given that the plaintiff had not mentioned the delegation provision at all in his opposition to the motion to compel arbitration, he had failed to present a viable challenge. *Id.* Applying this view from *Rent-A-Center*, we concluded in *Minnieland* that the plaintiff's argument that the applicability of a certain Virginia statute "rendered void '*any*' arbitration provision" "necessarily include[d] the delegation provision, which is simply 'an additional, antecedent agreement' to arbitrate," 867 F.3d at 455, and that the plaintiff had sufficiently challenged the delegation provision to warrant judicial review. Other courts have adopted a similar reading of *Rent-A-Center*: for example, the Third Circuit has noted that "[i]n specifically challenging a delegation clause, a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions." *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226–27 (3d Cir. 2018). "To do so, the party must at least reference the provision in its opposition to a motion to compel arbitration." *Id.* at 226.

In sum, in assessing the enforceability of an arbitration agreement containing a delegation provision, "we first must decide whether [the plaintiff] lodged a challenge against the delegation provision . . . . Second, if we conclude that [he or she] specifically challenged the enforceability of the delegation provision, we then must decide whether the delegation provision is unenforceable 'upon such grounds as exist at law or in equity.'" *Minnieland*, 867 F.3d at 455 (quoting 9 U.S.C. § 2).

## B.

With this legal framework in mind, we now consider whether the borrowers have lodged a sufficient challenge to the delegation provisions and, if so, whether the district court properly considered the challenge. The Haynes Defendants argue that the delegation provisions are valid and enforceable, which, in turn, should have compelled the district court to let the arbitrator resolve all threshold issues of arbitrability. We disagree with this argument for the simple reason that the borrowers challenged those clauses with "sufficient force and specificity," *Hayes*, 811 F.3d at 671 n.1, to warrant the district court's threshold review as to whether they were enforceable. Specifically, in their opposition to the motion to compel arbitration, the borrowers argued that the "delegation clause[s] [are] unenforceable for the same reason as the underlying arbitration agreement—the . . . wholesale waiver of the application of federal and state law[.]" J.A. 404. And as *Rent-A-Center* observed, such a challenge is all that is required to dispute the viability of the delegation provisions. 561 U.S. at 72–73; *see also MacDonald*, 883 F.3d at 227.

In turn, because this challenge to the delegation provisions necessarily encompassed and included arguments that related to the validity of the arbitration agreements as a whole—specifically, whether the choice-of-law provisions amounted to a prospective waiver—the district court did not err by considering the challenge to the delegation clauses in the context of the challenge to the entirety of the agreements.[3] This is because "[i]n specifically challenging a delegation clause, a party may rely on the same arguments that it employs to contest the enforceability of other arbitration provisions." *MacDonald*, 883 F.3d at 226–27; *see also Gingras v. Think Finance, Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) (recognizing the presence of a delegation clause but concluding that the plaintiff's "specific attack on the delegation provision is sufficient to make the [broader] issue of arbitrability one for a federal court"); *Dillon*, 856 F.3d at 335 (declining to "defer consideration of the prospective waiver doctrine until after the arbitrator construe[d] the choice of law

---

[3] Although the district court considered the effect of the choice-of-law provisions on the entirety of the arbitration agreements (rather the delegation provisions specifically), its overall conclusions as to the agreements' enforceability provides—in combination with the borrowers' specific challenge to the delegation clauses—sufficient grounds for affirmance. *See Thigpen v. Roberts*, 468 U.S. 27, 30 (1984) ("[W]e may affirm on any ground that the law and the record permit and that will not expand the relief granted below."). Ultimately, the district court's decision to address the choice-of-law provisions in the context of the entirety of the agreements makes no difference to our analysis here because the borrowers' challenge to the validity of the delegation provisions specifically and the arbitration agreements as a whole stems from the same issue. *Cf. Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 515 (5th Cir. 2019) (observing that "attacks on [a valid] arbitration agreement's existence [were] step one matters for the courts, not arbitrators"); *see also Brice v. Plain Green, LLC*, 372 F. Supp. 3d 955, 969 (N.D. Cal. 2019) ("The issue of whether there are clear and unmistakable delegation provisions . . . is secondary to the determination of whether the agreements are unenforceable prospective waivers.").

provision" because "that provision effects an unambiguous and categorical waiver of federal statutory rights"); *Hayes*, 811 F.3d at 671 n.1 (concluding the borrowers in that case had "challenged the validity of that delegation with sufficient force and specificity to occasion [the Court's] review"); *Smith v. W. Sky Fin., LLC*, 168 F. Supp. 3d 778, 786 (E.D. Pa. 2016) (noting that "enforcing the delegation provision would place an arbitrator in the impossible position of deciding the enforceability of the agreement *without* authority to apply any applicable federal or state law").[4] In sum, given that the borrowers specifically challenged the delegation provisions, the question of their enforceability was one for the courts—rather than the arbitrator—to decide.

---

[4] The Haynes Defendants rely on *Henry Schein, Inc. v. Archer & White Sales, Inc.* as reinforcement for the proposition that if the contract "delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." 139 S. Ct. 524, 530 (2019). However, *Schein* is inapposite because that case "dealt with an exception to the threshold arbitrability question—the so-called 'wholly groundless' exception [which concerns the arbitrability or non-arbitrability of certain issues]—not a challenge to the validity of an arbitration clause itself." *Gingras*, 922 F.3d at 126 n.3. Further, as *Schein* itself noted, "before referring a dispute to an arbitrator, the court [must] determine[] [under 9 U.S.C. § 2] whether a valid arbitration agreement exists." 139 S. Ct. at 530.

Next, the Haynes Defendants argue that the borrowers cannot challenge the delegation provision because the borrowers have not met their burden of demonstrating the delegation clause will prevent them from vindicating their rights. But the cases that the Haynes Defendants cite in support are distinguishable from this case because they concerned situations in which the plaintiffs asserted that they would be unable to vindicate their rights because of certain *costs* associated with the arbitration. *See, e.g.*, *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000); *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 283 (4th Cir. 2007). And where the record failed to provide any evidence as to those costs, those courts concluded the prospective waiver argument was too speculative. But here, because the borrowers assert that the choice-of-law provisions amount to a prospective waiver, no further evidentiary development beyond the text of the arbitration agreements is required.

12

III.

A.

We turn to the question of whether the choice-of-law provisions amount to a prospective waiver, rendering the delegation clause unenforceable. Under the Federal Arbitration Act (the "FAA"), arbitration contracts are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Courts must therefore enforce arbitration agreements "on an equal footing with other contracts." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *see also Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (observing "arbitration is a matter of contract" such that courts must "rigorously enforce" arbitration agreements according to their terms). Thus, a court may invalidate an arbitration agreement based on "generally applicable contract defenses." *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017) (internal quotation marks omitted).

Consistent with contract principles, the Supreme Court has recognized that arbitration agreements that operate "as a prospective waiver of a party's right to pursue statutory remedies" are not enforceable because they are in violation of public policy. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985). Arbitration must permit a party to effectively vindicate statutory claims so that "the statute will continue to serve both its remedial and deterrent function." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991). Therefore, "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral

13

forum," courts should enforce the parties' contract under the FAA. *Mitsubishi*, 473 U.S. at 637. But where an arbitration agreement prevents a litigant from vindicating federal substantive statutory rights, courts will not enforce the agreement. *Id.*; *see also Am. Express*, 570 U.S. at 236 (observing courts will invalidate any contract—arbitration or otherwise—that attempts to foreclose "the assertion of certain statutory rights" because such a contract would jeopardize a party's "*right to pursue* statutory remedies").

Of course, a "foreign choice of law provision, of itself, will not trigger application of the prospective waiver doctrine." *Dillon*, 856 F.3d at 334. "Instead, a court first must examine whether, as a matter of law, the choice-of-forum and choice-of-law clauses operate in tandem as a prospective waiver of a party's right to pursue statutory remedies." *Id.* (internal quotation marks omitted). "When there is uncertainty whether the foreign choice of law would preclude otherwise applicable federal substantive statutory remedies, the arbitrator should determine in the first instance whether the choice of law provision would deprive a party of those remedies." *Id.* (citing *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 540–41 (1995); *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 371–73 (4th Cir. 2012)). In those instances, the prospective waiver issue would not become ripe for final determination until the federal court was asked to enforce the arbitrator's decision.

However, where there is no uncertainty about the effect of these choice-of-law provisions, the court may properly conclude the delegation provision—and thus the arbitration agreement—is unenforceable. And that is exactly the result we reached in both

*Hayes* and *Dillon*, where we concluded that the choice-of-law provisions providing for the application of tribal law to the exclusion of federal statutory law amounted to an "unambiguous and categorical waiver of federal statutory rights," thereby rendering the arbitration agreements unenforceable. *Dillon*, 856 F.3d at 335; *see also Hayes*, 811 F.3d at 675 (concluding that because the arbitration agreement "underhandedly convert[ed] a choice of law clause into a choice of no law clause . . . renounc[ing] the authority of the federal statutes to which it is and must remain subject," it was "unenforceable").

## B.

We see no material distinction between the case at hand and the precedent set forth in *Hayes* and *Dillon*: because the choice-of-law provisions contained in both the Plain Green and Great Plains arbitration agreements operate as prospective waivers, the delegation clauses (and therefore the arbitration agreements) are unenforceable.

In *Hayes*, the arbitration agreement required the arbitrator to "apply the laws of the [Tribe] and the terms of this Agreement" to any claims. 811 F.3d at 675 (internal quotation marks omitted). Another section of that arbitration agreement "confirm[ed] that, no matter where the arbitration occurs, the arbitrator will not apply 'any law other than the law of the [Tribe] to this Agreement.'" *Id.* Further, the arbitration agreement was paired with loan terms stating that the loans were "subject solely to the exclusive laws and jurisdiction of the [Tribe]" and that "no other state or federal law or regulation [would] apply to this Loan Agreement." *Id.* at 669 (emphasis omitted). Upon reviewing these provisions, the *Hayes* Court concluded that "[i]nstead of selecting the law of a certain jurisdiction to govern the

15

agreement, as is normally done with a choice of law clause, [the] arbitration agreement use[d] its 'choice of law' provision to waive all of a potential claimant's federal rights." *Id.* at 675. Of course, *Hayes* noted, although parties to an arbitration agreement are permitted to waive certain rights, any such waiver "may not flatly and categorically renounce the authority of the federal statutes to which it is and must remain subject." *Id.* But because the arbitration agreement at issue took "this plainly forbidden step, [the Court held] it invalid and unenforceable" as a violation of public policy. *Id.*

Similarly, the agreements at issue in *Dillon*—which were also made pursuant to a Great Plains loan—contained choice-of-law provisions "requir[ing] the application of Otoe-Missouria tribal law and disclaim[ing] the application of state or federal law." 856 F.3d at 332. For example, the loan agreement there provided it was "subject solely to the exclusive laws and jurisdiction of the Otoe-Missouria Tribe of Indians" and that "no other state or federal law or regulation shall apply[.]" *Id.* (internal quotation marks omitted). Likewise, the *Dillon* arbitration agreement provided that it was to be governed by tribal law, that "any dispute will be resolved by arbitration in accordance with the law of the Otoe-Missouria Tribe of Indians," and that any arbitrator was to "apply the laws of the Otoe-Missouria Tribe of Indians." *Id.* at 332 (internal quotation marks omitted). *Dillon* thus concluded that the agreements were "not distinguishable in substance from the related provisions . . . that [were] held unenforceable in *Hayes*" and that "[j]ust as we did in *Hayes*,

we interpret these terms in the arbitration agreement as an unambiguous attempt to apply tribal law *to the exclusion of federal and state law*." *Id.* at 335–36.[5]

Unlike in *Hayes* and *Dillon*, the Plain Green and Great Plains arbitration agreements do not explicitly preclude the application of federal law.[6] Nonetheless, the terms of both sets of arbitration agreements—as reinforced by the overall loan agreements—violate the prospective waiver doctrine by providing that tribal law preempts the application of contrary law, including any contrary federal statutory law, such that a plaintiff would be unable to effectively vindicate certain federal statutory claims. Specifically, all of the Plain

---

[5] The weight of circuit authority supports this conclusion. In *Gingras*, the Second Circuit concluded that similarly-worded tribal arbitration agreements—for example, providing that any dispute "will be resolved by arbitration in accordance with Chippewa Cree tribal law," 922 F.3d at 118 (internal quotation marks omitted)—were unenforceable "because they [were] designed to avoid federal and state consumer protection laws" and thereby "foreclose[d the borrowers] from vindicating rights granted by federal and state law." *Id.* at 127. Put another way, although the arbitration agreements "purport[ed] to offer neutral dispute resolution," they actually "disallow[ed] claims brought under federal and state law[.]" *Id.*

In an analogous context, other circuits have concluded that loan agreements requiring arbitration within a tribal forum are unenforceable because such forums are illusory. *MacDonald*, 883 F.3d at 227 (concluding arbitration clause was unenforceable because stipulated tribal arbitral forum did "not exist" and choice-of-arbitrator provision did not offer valid alternative forum); *Parm v. Nat'l Bank of Cal.*, 835 F.3d 1331, 1334–35 (11th Cir. 2016) (same); *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 779–81 (7th Cir. 2014) (same); *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1354 (11th Cir. 2014) (same).

[6] Indeed, the arbitration agreements are careful to state that they do not explicitly disclaim federal law, and in some instances provide that federal law may serve as guidance. For example, Gibbs's arbitration agreement with Plain Green states that it "shall be governed by Tribal law" but that the "parties additionally agree to look to the [FAA] and judicial interpretation thereof for guidance." J.A. 460 (internal quotation marks omitted). *Cf. Dillon*, 856 F.3d at 332 (stating agreement was "subject solely to the exclusive laws and jurisdiction of the" relevant tribe); *Hayes*, 811 F.3d at 670 (stating that "no . . . federal law applie[d] to" the agreement (internal quotation marks omitted)).

Green and Great Plains arbitration agreements contain choice-of-law provisions (1) providing that they "shall be governed by tribal law"; (2) requiring that any arbitrator "apply Tribal law and the terms of this Agreement" (or similar language); and (3) mandating that the arbitrator's decision "be consistent with . . . Tribal Law" ("and if it is not, [that] it may be set aside by a Tribal court upon judicial review"). J.A. 343 (Gibbs's Plain Green arbitration agreement); *see also* J.A. 354 (Williams's Great Plains arbitration agreement), 364 (Edwards's Great Plains arbitration agreement), 375 (Inscho's Great Plains arbitration agreement), 384 (Mwethuku's Plain Green arbitration agreement).[7] In turn, the terms in all of the arbitration agreements before us limit the arbitrator's authority to provide awards to those "remedies available under Tribal Law." J.A. 343; *see also* J.A. 354, 364, 375, 384.[8] Although these provisions do not explicitly disclaim the application of federal law, the practical effect is the same because they *do* provide that tribal law preempts the application of any contrary law—including contrary federal law. *Cf. Dillon*, 856 F.3d at 336; *see also Hayes*, 811 F.3d at 675.

Other clauses within both the Plain Green and Great Plains arbitration agreements reinforce this point. For example, both sets of arbitration agreements provide that

---

[7] In this vein, all the arbitration agreements also provide that the "[t]he policies and procedures of the selected arbitration firm [such as the American Arbitration Association] . . . will apply" only to the extent they "do not contradict [the arbitration agreement] or Tribal Law." J.A. 342; *see also* J.A. 353, 364, 375, 384.

[8] As the district court recognized, "the absence of any reference to awarding remedies under state or federal law supports the inference that the Arbitration Agreements sought to exclude any state or federal remedy, unless separately authorized by Tribal law." J.A. 460.

arbitration may be held within thirty miles of the claimant's residence, but only to the extent that such accommodation will not be construed "to allow for the application of any law other than Tribal Law." J.A. 342; *see also* J.A. 354, 364, 375, 384. *Cf. Hayes*, 811 F.3d at 675 (concluding that a provision stipulating that "no matter where the arbitration occurs, the arbitrator will not apply 'any law other than the law of the [Tribe] to this Agreement'" provided further evidence of a general disavowal of federal law). Likewise, both arbitration agreements provide that any appeal: (1) is limited to a review of, among one of two grounds, "whether the conclusions of law are erroneous under Tribal Law" and (2) may only occur through the tribal courts (as is also the case for any confirmation of the arbitral award). J.A. 343; *see also* J.A. 354, 364, 375–76, 384.  Such review "effectively insulates the tribe from any adverse award and leaves prospective litigants without a fair chance of prevailing in arbitration." *Gingras*, 922 F.3d at 128. Finally, even if a party wished to opt out of arbitration, both the Great Plains and Plain Green loan agreements stipulate that the only path for pursuing a claim would be through their respective tribal systems. J.A. 342 ("In the event you opt out of the agreement to arbitrate, any disputes shall be governed under tribal law and must be brought in the Chippewa Cree Tribal Court."); *see also* J.A. 352–53, 363, 374, 383. At bottom, the terms of both the loan and arbitration agreements establish the primacy and effective control of tribal law in governing any disputes arising out of the agreements.

However, given that the language of the agreements does not *explicitly* forbid the application of federal law, the Haynes Defendants argue that the borrowers have failed to

show that they cannot vindicate their federal statutory rights through arbitration applying tribal law because tribal law will "often expressly incorporate or require compliance with federal law." Opening Br. at 29. But we find this argument unavailing. As the borrowers correctly point out, the relevant tribal codes would not permit them to effectively vindicate the federal protections and remedies they seek—that is, the borrowers could not assert a RICO claim seeking treble damages against the entities and individuals who comprise the Haynes Defendants.

First, although § 5.1 of the Otoe-Missouria Tribal Consumer Financial Services Ordinance provides that lenders "shall . . . comply with . . . all other Tribal and federal laws as applicable," the federal law that governs the claims at issue in this case—namely, RICO, 18 U.S.C. § 1962 (including a request for treble damages based on alleged RICO violations)—is noticeably absent from the list of federal consumer protection statutes with which a lender must comply. Otoe-Missouria Tribal Consumer Fin. Servs. Ord. §§ 5.1, 5.2(a) (2018). And even for the laws listed, the Ordinance makes clear that a lender's compliance does not constitute "consent . . . related to the applicability of federal laws," *id.* § 5.2(b), or a waiver of the lender's "sovereign immunity from unconsented judicial or administrative process." *Id.* § 7.5(a).

Second, a borrower's ability to assert a federal statutory claim under tribal law against an individual or entity (such as the Haynes Defendants) related to a lender remains even more elusive: although the Ordinance governs "licensed lenders" and mandates their compliance with tribal and applicable federal law, it says nothing about other non-tribal

entities or individuals associated with the lenders who may have violated RICO. In fact, it explicitly exempts a range of entities and persons from its licensing requirements—and therefore its purview—including "[a] Person who is a bank . . . organized under the laws of the United States, or any other lender to the Tribe or to a Financial Services Licensee or Debt Collection Licensee," as well as "[a] Person who provides financial services to a Licensee." *Id.* § 4.1(a).

Third, even if the borrowers could assert a RICO claim against the Haynes Defendants under tribal law, the rest of the Ordinance fails to clarify how any consumer could meaningfully pursue any claims under it. Although the Ordinance contains a consumer complaint procedure, it does not provide for or establish any private right of action for violations of any provisions, let alone any federal laws. *Id.* §§ 8.1–8.4. And to the extent a borrower could pursue a claim, a tribal commission overseeing such a claim is permitted to "grant or deny any relief as the Commission deems appropriate." *Id.* § 9.2(c). Thus, it is clear that a claimant would be unable to assert a RICO claim against entities associated with a tribal lender and that, even if he or she were able to assert such a claim, the relief he or she would seek—namely, treble damages as permitted by RICO—would remain unavailable.

Similarly, the Chippewa Code contains a single "civil remedies" provision limiting a defendant's liability to "actual damages" for "intentional[]" violations. Chippewa Cree Tribal Lending and Regulatory Code § 10-6-201 (2017). This does not permit a borrower

21

to effectively vindicate a federal statutory claim for treble damages, as would be permitted under RICO.

In sum, because the language of both sets of arbitration agreements provides that tribal law shall preempt the application of any contrary law, and the effect of such provisions is to thereby make unavailable to the borrowers the effective vindication of federal statutory protections and remedies, the arbitration agreements at issue amount to a prospective waiver.[9] Consequently, the "entire arbitration agreement is unenforceable." *Dillon*, 856 F.3d at 335–37; *see also Hayes*, 811 F.3d at 669–71, 675 (concluding that a tribal arbitration contract is unenforceable under the FAA where it "names a tribal forum and then purports to disavow the authority of all state or federal law").[10]

---

[9] Provisions within both the Plain Green and Great Plains loan agreements provide further support for this point. For example, both loan agreements contain choice-of-law clauses stipulating that all of the loans are made pursuant to the laws of the lenders' respective tribes and that such laws will govern the agreement. And although some of the loan terms make general reference to federal law, most of these provisions also either disclaim the applicability of federal law or simultaneously provide that tribal law will be controlling. For instance, the "Governing Law" provision in Williams's Great Plains loan agreement provides that any voluntary use of federal law for guidance "does not represent acquiescence of the . . . Tribe to any federal law unless found expressly applicable to the operations of the . . . Tribe." J.A. 352. In short, the loan agreements also evince an attempt to disclaim the applicability of federal law.

[10] The Haynes Defendants' central argument to the contrary is that the prospective waiver doctrine does not apply merely because an arbitration agreement selects the laws of a foreign jurisdiction to the exclusion of state and federal law. Rather, they contend, a claimant must demonstrate that the choice-of-law clause will "unambiguously prevent them from effectively vindicating their rights." Opening Br. at 34, 37. And because, the Haynes Defendants posit, the district court's analysis "focused on nothing else" but the fact that the choice-of-law clause selected tribal law—and did not assess whether the borrowers could vindicate their rights under tribal law—its assessment was in error. Opening Br. at 44. We observe that the Haynes Defendants are correct in that a foreign choice-of-law

For these reasons, we agree that the choice-of-law clauses amount to a prospective waiver such that the arbitration agreements, including the delegation clauses, are unenforceable. Therefore, the district court had the authority to decide whether the arbitration agreements were valid, correctly decided they were not, and did not err in denying the motion to compel arbitration.

## IV.

For the reasons set out above, we affirm the judgment of the district court. We dispense with oral argument because the facts and legal contentions are adequately

---

clause does not by itself give rise to a prospective waiver. However, this argument is unavailing because, for the reasons discussed above, the choice-of-law clauses at issue *do* operate to prevent claimants from effectively vindicating their statutory remedies.

Further, the arbitration agreements cited by the Haynes Defendants in support are distinguishable because of the distinctly international nature of those agreements. For example, in *Aggarao*, the plaintiff argued that the arbitration clause in his contract was invalid under the prospective waiver doctrine because, by requiring "arbitration of his Jones Act and Seaman's Wage Act claims in the Philippines," such arbitration would "contravene the public policy of the United States." 675 F.3d at 371. But we rejected that argument on the basis that evaluation of the prospective waiver doctrine should occur— with respect to *international* arbitration agreements—at the award-enforcement stage (rather than the arbitration-enforcement stage), given that "the problem with applying the public policy defense at . . . the arbitration-enforcement stage [in those cases] is that [the] defense cannot be applied neutrally on an international scale, as each nation operates under different statutory laws and pursues different public policy concerns." *Id.* at 373 (internal quotation marks omitted); *see also Mitsubishi*, 473 U.S. at 629 (concluding that "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes [required enforcement of] the parties' agreement, even assuming that a contrary result would be forthcoming in the domestic context"). But such considerations are not at play here.

presented in the materials before this Court and argument would not aid the decisional process.

*AFFIRMED*[*]

---

[*] This opinion is published without oral argument pursuant to this Court's Standing Order 20-01.